United States District Court
Southern District of Texas
FILED

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

NOV 2 9 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES | * | CASE NO.: B-04-107 |
| OF AMERICA | * | |
| | * | MEMORANDUM AND |
| v. | * | CASES OF AUTHORITY |
| | * | FOR DEFENDANT'S |
| CARLOS JORGE | * | DEMAND TO |
| HINOJOSA | * | DISMISS FOR LACK OF |
| | * | SUBJECT MATTER |
| | * | JURISDICTION |

## I. INTRODUCTION

1.     Plaintiff is the UNITED STATES OF AMERICA, a name foreign to the English Language.

2.     Defendant is CARLOS JORGE HINOJOSA, a name foreign to the English Language.

3.     Plaintiff and Defendant are both foreign to Texas and to the English Language.

4.     The man being restrained of his liberty is called Carlos Jorge of the Hinojosa Family, a sovereign man recognized by the Common Law Court (See 7th Amendment to the Constitution for the United States of America) and the Secretary of The State of Nevada and is the Petitioner, herein.

5.    Carlos Jorge of the Hinojosa Family does business as CARLOS JORGE HINOJOSA.

6.    Defendant has cancelled, forfeited, waived, and declined all benefits and privileges from the United States and its instrumentalities.

7.    Defendant has objected to the 14th amendment and is not a citizen of the United States.

8.    Defendant has reserved his rights under the Uniform Commercial Code at Article I, § 207 and has exercised the remedy provided to Defendant whereby Defendant might reserve Defendant's Common Law Right not to be compelled to perform under any contracts, commercial agreements or bankruptcy in which Defendant did not enter knowingly, intentionally, and voluntarily, with full disclosure of all relevant facts, meeting of the minds, specified obligations, and mutual exchange of **fair consideration.**

9.    Further, by such "Reservation of Right at U.C.C. 1-207, Defendant has notified all administrative agencies and agents of Local, State, and Federal governments and their instrumentalities, that, Defendant **does not and will not accept any and all liability** associated with any and all **compelled benefits** of any and all such unrevealed contracts, commercial agreements or bankruptcy, be they Admiralty or otherwise. **Such benefits include but are not limited to the Use of Federal Reserve Notes to discharge debts in equity with limited liability, and any such Use is by compelled Necessity as a matter of survival only**.

10.    Carlos Jorge of the Hinojosa Family is an *Idem Sonans* of the Defendant.

11.    This Court is not an Article III Court established under the Constitution of the United States and has no jurisdiction in this matter.

2

12.    The Government has not demonstrated that this Court has the Subject Matter Jurisdiction to hear this case.

13.    "Once jurisdiction is challenged, the court cannot proceed when it clearly appears that the court lacks jurisdiction, the court has no authority to reach merits, but, rather, should dismiss the action." *Melo* v. *US*, 505 F2d 1026.

14.    "There is no discretion to ignore that lack of jurisdiction." *Joyce* v. *US*, 474 F2d 215.

15.    "The burden shifts to the court to prove jurisdiction." *Rosemond* v. *Lambert*, 469 F2d 416.

16.    "Court must prove on the record, all jurisdiction facts related to the jurisdiction asserted." *Lantana* v. *Hopper*, 102 F2d 188; *Chicago* v. *New York*, 37 F Supp 150.

17.    "A universal principle as old as the law is that a proceedings of a court without jurisdiction are a nullity and its judgment therein without effect either on person or property." *Norwood* v. *Renfield*, 34 C 329; *Ex parte Giambonini*, 49 P. 732.

18.    "Jurisdiction is fundamental and a judgment rendered by a court that does not have jurisdiction to hear is void *ab initio*." *In Re Application of Wyatt*, 300 P. 132; *Re Cavitt*, 118 P2d 846.

19.    "Thus, where a judicial tribunal has no jurisdiction of the subject matter on which it assumes to act, its proceedings are absolutely void in the fullest sense of the term." *Dillon* v. *Dillon*, 187 P 27.

20.    "A court has no jurisdiction to determine its own jurisdiction, for a basic issue in any case before a tribunal is its power to act, and a court must have the

3

authority to decide that question in the first instance." *Rescue Army* v. *Municipal Court of Los Angeles*, 171 P2d 8; 331 US 549, 91 L. ed. 1666, 67 S.Ct. 1409.

21. This Court is <u>NOT</u> an Article III Court, this Honorable Court lacks Subject Matter Jurisdiction over Plaintiff's suit and therefore, the suit must be dismissed.

## II. HISTORICAL SUMMARY OF FACTS AND ARGUMENTS

22. In the United States, there are two separate and distinct jurisdictions, such being the jurisdiction of the States within their own territorial boundaries and the other being federal jurisdiction. Broadly speaking, state jurisdiction encompasses the legislative power to regulate, control and govern real and personal property, individuals and enterprises within the territorial boundaries of any given State. In contrast, federal jurisdiction is extremely limited, with the same being exercised only in areas external to state legislative power and territory.

23. Notwithstanding the clarity of this simple principle, the line of demarcation between these two jurisdictions and the extent and reach of each has become somewhat blurred, due to popular misconceptions and the efforts expended by the federal government to conceal one of its major weaknesses. Only by resorting to history and case law can this obfuscation be clarified and the two distinct jurisdictions be readily seen.

24. The original thirteen colonies of America were each separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and the English Parliament governed each separately and independently.

25.     The political connections of the separate colonies to the English Crown and Parliament descended to an unhappy state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, representatives of the several colonies convened the First Continental Congress in October, 1774, the purpose of which was to submit a petition of grievances to the British Parliament and Crown.

26.     By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights," and the purpose of which were designs, schemes and plans "which demonstrate a system formed to enslave America." Revolution was assuredly in the formative stages absent conciliation between the mother country and colonies.

27.     Between October, 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July, 1776, the exercise of British authority in any and all colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal Declaration of Independence.

28.     The legal effect of the Declaration of Independence was to make each new State a separate and independent sovereign over which there was no other government of superior power or jurisdiction. This was clearly shown in M'Ilvaine v. Coxe's Lessee, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

29.     "This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign

states, and that they did not derive them from concessions made by the British king. The treaty of peace contains a recognition of their independence, not a grant of it. From hence it results, that the laws of the several state governments were the laws of sovereign states, and as such were obligatory upon the people of such state, from the time they were enacted."

30.    And a further expression of similar import is found in Harcourt v. Gaillard, 25 U.S. (12 Wheat.) 523, 526, 527 (1827), where the Court stated:

31.    "There was no territory within the United States that was claimed in any other right than that of some one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the states.

32.    "Each declared itself sovereign and independent, according to the limits of its territory.

33.    "[T]he soil and sovereignty within their acknowledged limits were as much theirs at the declaration of independence as at this hour."

34.    Thus, unequivocally, in July, 1776, the new States possessed all sovereignty, power, and jurisdiction over all the soil and persons in their respective territorial limits.

35.    This condition of supreme sovereignty of each State over all property and persons within the borders thereof continued notwithstanding the adoption of the Articles of Confederation. In Article II of that document, it was expressly stated:

36.    "Article II. Each state retains its sovereignty, freedom, and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled."

37.    As the history of the confederation government demonstrated, each State was indeed sovereign and independent to the degree that it made the central

6

government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States and the remedy became the calling of a constitutional convention.

38.     The representatives who assembled in Philadelphia in May, 1787, to attend the Constitutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention produced more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by the States at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, Sec. 8, Cl. 17 of the U.S. Constitution, which read as follows:

39.     "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

40.     The reason for the inclusion of this clause in the Constitution was and is obvious. Under the Articles of Confederation, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the Articles was merely a body which represented and acted as agents of the separate States for external affairs, and had no jurisdiction within the States.

41.     This defect in the Articles made the Confederation Congress totally dependent upon any given State for protection, and this dependency did in fact cause embarrassment for that Congress. During the Revolutionary War, while the Congress met in Philadelphia, a body of mutineers from the Continental Army

surrounded the Congress and chastised and insulted the members thereof. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy the situation, and the Congress was forced to flee first to Princeton, New Jersey, and finally to Annapolis, Maryland.

42.    Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places as Congress might purchase for forts, magazines, arsenals, and other needful buildings wherein the State ceded jurisdiction of such lands to the federal government. Other than in these areas, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, and jurisdiction over unceded areas remained within the States.

43.    While there had been no real provisions in the Articles which permitted the Confederation Congress to acquire property and possess exclusive jurisdiction over such property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States.

44.    Such possessions were deemed essential to enable the United States to perform the powers conveyed by the Constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of such lands to Congress. Perhaps the most cogent reasons and explanations for this clause in the Constitution were set forth in Essay No. 43 of The Federalist:

45.    "The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an

imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy.

46.    This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

47.    "The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment."

48.    Since the time of the ratification and implementation of the present U.S. Constitution, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply the above provision of the Constitution. And

9

the essence of all these decisions is that the States of this nation have exclusive jurisdiction of property and persons located within their borders, excluding such lands and persons residing thereon which have been ceded to the United States.

49.    Perhaps one of the earliest decisions on this point was United States v. Bevans, 16 U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts. The defense complained that only the state had jurisdiction to prosecute and argued that the federal Circuit Courts had no jurisdiction of this crime supposedly committed within the federal government's admiralty jurisdiction. In argument before the Supreme Court, counsel for the United States admitted as follows:

50.    "The exclusive jurisdiction which the United States have in forts and dock-yards ceded to them, is derived from the express assent of the states by whom the cessions are made. It could be derived in no other manner; because without it, the authority of the state would be supreme and exclusive therein," 3 Wheat., at 350, 351.

51.    In holding that the State of Massachusetts had jurisdiction over the crime, the Court held:

52.    "What, then, is the extent of jurisdiction which a state possesses? "We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power," 3 Wheat., at 386, 387.

53.    "The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction. ... Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.

10

54.     "It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction," 3 Wheat., at 388.

55.     Thus in Bevans, the Court established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

56.     The decision in Bevans was closely followed by decisions made in two state courts and one federal court within the next two years. In Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the state law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

57.     "The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts. The legislative power and exclusive jurisdiction remained in the several states, of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states."

58.     A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at

Fort Niagara, a federal fort. In People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819), that court held that the fort was subject to the jurisdiction of the State since the lands therefore had not been ceded to the United States. The rationale of its opinion stated:

59.    "To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offence committed, but the place in which it is committed, which must be out of the jurisdiction of the state."

60.    The case relied upon by this court was U.S. v. Bevans, supra.

61.    At about the same time that the New York Supreme Court rendered its opinion in Godfrey, a similar fact situation was before a federal court, the only difference being that the murder committed in the case occurred on land, which had been ceded to the United States. In United States v. Cornell, 25 Fed.Cas. 646, 648 No. 14,867 (C.C.D.R.I. 1819), the court held that the case fell within federal jurisdiction, describing such jurisdiction as follows:

62.    "But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

63.    "When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto

12

falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted."

64.     Almost 18 years later, the U.S. Supreme Court was again presented with a case involving the distinction between State and federal jurisdiction. In New Orleans v. United States, 35 U.S. (10 Pet.) 662, 737 (1836), the United States claimed title to property in New Orleans likewise claimed by the city. After holding that title to the subject lands was owned by the city, the Court addressed the question of federal jurisdiction and stated:

65.     "Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the federal government shall establish forts or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction."

66.     In New York v. Miln, 36 U.S. (11 Pet.) 102 (1837), the question before the Court involved the attempt by the City of New York to assess penalties against the master of a ship for his failure to make a report as to the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the Court held:

67.     "If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction," 36 U.S., at 133.

68.     "They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every

13

act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive," 36 U.S., at 139.

69.    Some eight years later, in Pollard v. Hagan, 44 U.S. (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a contest of the title to real property, with one of the parties claiming a right to the disputed property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay. In discussing the subject of federal jurisdiction, the Court held:

70.    "We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," 44 U.S., at 221.

71     "[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," 44 U.S., at 223.

72.    "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," 44 U.S., at 228, 229.

73.    The single most important case regarding the subject of federal jurisdiction appears to be Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. There, the railroad company property, which passed through the Fort Leavenworth federal enclave, was being subjected to taxation by Kansas, and the company claimed an exemption from

14

state taxation. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

74.     "The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals."

75.     Thus, the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to such jurisdiction; this jurisdiction is superior. Federal jurisdiction results only from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. And there is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and possessions of the United States.

76.     The above principles of jurisdiction established continue their vitality today with only one minor exception. In the last century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing into the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which had been totally surrendered by the States. With the advent in this century of large federal works projects and

15

national parks, the problems regarding management of these areas by the federal government were magnified.

77.    During the last century or so, it was thought that if a State ceded jurisdiction to the federal government, the cession granted full and complete jurisdiction. But, with the ever increasing number of separate tracts of land falling within the jurisdiction of the federal government, it was obviously determined by both federal and state public officers that the States should retain greater control over these ceded lands, and the courts have acknowledged the constitutionality of varying degrees of state jurisdiction and control over lands so ceded.

78.    Perhaps one of the first cases to acknowledge the proposition that a State could retain a degree of jurisdiction over property ceded to the federal government was Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455 (1930). In this case, a state attempt to assess an ad valorem tax on Army blankets located within a federal army camp was found invalid and beyond the state's jurisdiction. But, in regards to the proposition that a State could make a qualified cession of jurisdiction to the federal government, the Court held:

79.    "[T]he state undoubtedly may cede her jurisdiction to the United States and may make the cession either absolute or qualified as to her may appear desirable, provided the qualification is consistent with the purposes for which the reservation is maintained and is accepted by the United States. And, where such a cession is made and accepted, it will be determinative of the jurisdiction of both the United States and the state within the reservation," 281 U.S., at 651, 652.

80.    Two cases decided in 1937 by the U.S. Supreme Court further clarify the constitutionality of a reservation of any degree of state jurisdiction over lands ceded to the jurisdiction of the United States. In James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208 (1937), the State of West Virginia sought to impose a tax upon the gross receipts of the company arising from a contract which it had made with the United States to build some dams on rivers. One of

the issues involved in this case was the validity of the state tax imposed on the receipts derived by the company from work performed on lands to which the State had ceded "concurrent" jurisdiction to the United States. In the Court's opinion, it held that a State could reserve and qualify any cession of jurisdiction for lands owned by the United States; since the State had done so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of jurisdiction to the U.S.

81.    A similar result occurred in Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233 (1937). Here, the United States was undertaking the construction of several dams on the Columbia River in Washington, and had purchased the lands necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee Dam, but filed suit challenging the Washington income tax when that State sought to impose such tax on the contract proceeds. Either the Supreme Court of Washington or the U.S. Supreme Court did not uphold Mason's argument that the federal government had exclusive jurisdiction over both the lands and such contract. The latter Court held that none of the lands owned by the U.S. were within its jurisdiction and thus Washington clearly had jurisdiction to impose the challenged tax; see also Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663 (1946).

82.    Some few years later in 1943, the Supreme Court was again presented with similar taxation and jurisdiction issues; the facts in these two cases were identical with the exception that one clearly involved lands ceded to the jurisdiction of the United States. This single difference caused directly opposite results in both cases. In Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628 (1943), the question involved the applicability of state law to a contract entered into and performed on a federal enclave to which jurisdiction had been ceded to the United States.

83.    During World War II, California passed a law setting a minimum price for the sale of milk, which law imposed penalties for sales made below the regulated

price. Here, Pacific Coast Dairy consummated a contract on Moffett Field, a federal enclave within the exclusive jurisdiction of the United States, to sell milk to such federal facility at below the regulated price. When this occurred, California sought to impose a penalty for what it perceived as a violation of state law. But, the U.S. Supreme Court refused to permit the enforcement of the California law, holding that the contract was made and performed in a territory outside the jurisdiction of California and within the jurisdiction of the United States, a place where this law didn't apply.

84.     Thus, in this case, the existence of federal jurisdiction was the foundation for the ruling. However, in Penn Dairies v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617 (1943), an opposite result was reached on almost identical facts. Here, Pennsylvania likewise had a law, which regulated the price of milk and penalized sales of milk below the regulated price. During World War II, the United States leased some land from Pennsylvania for the construction of a military camp; since the land was leased, Pennsylvania did not cede jurisdiction to the United States. When Penn Dairies sold milk to the military facility for a price below the regulated price, the Commission sought to impose the penalty. In this case, since there was no federal jurisdiction, the Supreme Court found that the state law applied and permitted the imposition of the penalty. Thus, these two cases clearly show the different results, which can occur with the presence or absence of federal jurisdiction.

85.     A final point, which must be made regarding federal jurisdiction, involves the point as to when such jurisdiction ends or ceases. This point was considered in S.R.A. v. Minnesota, 327 U.S. 558, 66 S.Ct. 749 (1946), which involved the power of a State to tax the real property interest of a purchaser of land sold by the United States. Here, a federal post office building was sold to S.R.A. pursuant to a real estates sale contract, which provided that title would pass only after the purchase price had been paid. In refuting the argument of S.R.A. that the ad valorem tax on its equitable interest in the property was really an unlawful tax on U.S. property, the Court held:

86.     "In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article I, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states.

87.     As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power," 327 U.S., at 563, 564.

88.     Thus, it appears clearly that once that government no longer utilizes any property within the exclusive jurisdiction of the United States for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts to the State.

89.     The above principles regarding the distinction between State and federal jurisdiction continue through today; see Paul v. United States, 371 U.S. 245, 83 S.Ct. 426 (1963), and United States v. State Tax Commission of Mississippi, 412 U.S. 363, 93 S.Ct. 2183 (1973). And what was definitely decided in the beginning days of this Republic regarding the extent, scope, and reach of each of these two distinct jurisdictions remains unchanged and forms the foundation and basis for the smooth workings of state governmental systems in conjunction with the federal government. Without such jurisdictional principles, which form a clear boundary between the jurisdiction of the States and the United States, our federal governmental system would have surely met its demise long before now.

90.    In summary, jurisdiction of the States is essentially the same as that possessed by the States, which were leagued together under the Articles of Confederation. The confederated States possessed absolute, complete and full jurisdiction over property and persons located within their borders. It is hypocritical to assume or argue that these States, which had absolved and banished the centralized power and jurisdiction of the English Parliament and Crown over them by the Declaration of Independence, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress. They did not and they closely and jealously guarded their own rights, powers and jurisdiction. When the Articles were replaced by the Constitution, the intent and purpose of the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States for lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

91.    By the adoption of the Constitution, the States jointly surrendered some 17 specific and well-defined powers to the federal Congress, which related strictly to external affairs of the States. Any single power, or even several powers combined, do not operate in a fashion as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent.

92.    The only provision in the Constitution, which permits jurisdiction to be vested in the United States, is found in Art. I, Sec. 8, Cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, possessing jurisdiction only in the lands encompassed in the Northwest Territories.

93.     Shortly thereafter, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. As time progressed thereafter, the States at various times ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions, which may be now owned by the United States.

94.     The above conclusion is not the mere opinion of the author of this brief, but it is likewise that of the federal government itself. In June 1957, the government of the United States published a work entitled Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part II, which report is the definitive study on this issue. Therein, the Committee stated:

95.     "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction – by State consent under Article I, section 8, clause 17 .... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place," Id., at 41.

96.     "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the State, the Federal Government possesses no legislative jurisdiction over any area within a State, such jurisdiction being for exercise by the State, subject to non-interference by the State with Federal functions," Id., at 45.

97.     "The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State," Id., at 46.

98.    "On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts or omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crime occurs on areas as to which legislative jurisdiction has been vested in the Federal Government," Id., at 107.

99.    Thus, from an abundance of case law, buttressed by this lengthy and definitive government treatise on this issue, the "jurisdiction of the United States" is carefully circumscribed and defined as a very precise portion of America. The United States is one of the 51 jurisdictions existing on this continent, excluding Canada and its provinces.

### III.  FEDERAL CRIMINAL JURISDICTION

100.    It is a well established principle of law that all federal "legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears;" see Caha v. United States, 152 U.S. 211, 215, 14 S.Ct. 513 (1894); American Banana Company v. United Fruit Company, 213 U.S. 347, 357, 29 S.Ct. 511 (1909); United States v. Bowman, 260 U.S. 94, 97, 98, 43 S.Ct. 39 (1922); Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932); Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575 (1949); United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949); and United States v. First National City Bank, 321 F.2d 14, 23 (2nd Cir. 1963).

101.    And this principle of law is expressed in a number of cases from the federal appellate courts; see McKeel v. Islamic Republic of Iran, 722 F.2d 582, 589 (9th Cir. 1983) (holding the Foreign Sovereign Immunities Act as territorial); Meredith v. United States, 330 F.2d 9, 11 (9th Cir. 1964) (holding the Federal Torts Claims Act as territorial); United States v. Cotroni, 527 F.2d 708, 711 (2nd Cir. 1975) (holding federal wiretap laws as territorial); Stowe v. Devoy, 588 F.2d

336, 341 (2nd Cir. 1978); Cleary v. United States Lines, Inc., 728 F.2d 607, 609 (3rd Cir. 1984) (holding federal age discrimination laws as territorial); Thomas v. Brown & Root, Inc., 745 F.2d 279, 281 (4th Cir. 1984) (holding same as Cleary, supra); United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir. 1977) (holding marine mammals protection act as territorial); Pfeiffer v. William Wrigley, Jr., Co., 755 F.2d 554, 557 (7th Cir. 1985) (holding age discrimination laws as territorial); Airline Stewards & Stewardesses Assn. v. Northwest Airlines, Inc., 267 F.2d 170, 175 (8th Cir. 1959) (holding Railway Labor Act as territorial); Zahourek v. Arthur Young and Co., 750 F.2d 827, 829 (10th Cir. 1984) (holding age discrimination laws as territorial); Commodities Futures Trading Comm. v. Nahas, 738 F.2d 487, 493 (D.C.Cir. 1984) (holding commission's subpoena power under federal law as territorial); Reyes v. Secretary of H.E.W., 476 F.2d 910, 915 (D.C.Cir. 1973) (holding administration of Social Security Act as territorial); and Schoenbaum v. Firstbrook, 268 F.Supp. 385, 392 (S.D.N.Y. 1967) (holding securities act as territorial). This was perhaps stated best in Caha v. United States, 152 U.S., at 215, where the Supreme Court stated as follows:

102.    "The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government."

103.    But, because of statutory language, certain federal drug laws operate extra-territorially; see United States v. King, 552 F.2d 833, 851 (9th Cir. 1976). The United States has territorial jurisdiction only in Washington, D.C., the federal enclaves within the States, and in the territories and insular possessions of the United States. However, it has no territorial jurisdiction over non-federally owned areas inside the territorial jurisdiction of the States within the American Union. And this proposition of law is supported by literally hundreds of cases.

104.    As a general rule, the power of the United States to criminally prosecute is, for the most part, confined to offenses committed within "its jurisdiction". This is born out simply by examination of Title 18, U.S.C. Section 5 thereof defines the

term "United States" in clear jurisdictional terms. Section 7 contains the fullest statutory definition of the "jurisdiction of the United States." The U.S. District Courts have jurisdiction of offenses occurring within the "United States" pursuant to Title 18, U.S.C., Sec. 3231.

105.    Examples of this proposition are numerous. In Pothier v. Rodman, 291 F. 311 (1st Cir. 1923), the question involved whether a murder committed at Camp Lewis Military Reservation in the State of Washington was a federal crime. Here, the murder was committed more than a year before the U.S. acquired a deed for the property in question. Pothier was arrested and incarcerated in Rhode Island and filed a habeas corpus petition seeking his release on the grounds that the federal courts had no jurisdiction over an offense not committed in U.S. jurisdiction. The First Circuit agreed that there was no federal jurisdiction and ordered his release. But, on appeal to the U.S. Supreme Court, in Rodman v. Pothier, 264 U.S. 399, 44 S.Ct. 360 (1924), that Court reversed; although agreeing with the jurisdictional principles enunciated by the First Circuit, it held that only the federal court in Washington State could hear that issue. In United States v. Unzeuta, 35 F.2d 750 (8th Cir. 1929), the Eighth Circuit held that the U.S. had no jurisdiction over a murder committed in a railroad car at Fort Robinson, the state cession statute being construed as not including railroad rights-of-way.

106.    This decision was reversed in United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284 (1930), the court holding that the U.S. did have jurisdiction over the railroad rights-of-way in Fort Robinson. In Bowen v. Johnson, 97 F.2d 860 (9th Cir. 1938), the question presented was whether jurisdiction over an offense prosecuted in federal court could be raised in a petition for habeas corpus. The denial of Bowen's petition was reversed in Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442 (1939), the Court concluding that such a jurisdictional challenge could be raised in a habeas corpus petition. But, the Court then addressed the issue, found that the U.S. both owned the property in question and had a state legislative grant ceding jurisdiction to the United States, thus there was

jurisdiction in the United States to prosecute Bowen. But, if jurisdiction is not vested in the United States pursuant to statute, there is no jurisdiction; see Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122 (1943).

107.   And the lower federal courts also require the presence of federal jurisdiction in criminal prosecutions. In Kelly v. United States, 27 F. 616 (D.Me. 1885), federal jurisdiction of a manslaughter committed at Fort Popham was upheld when it was shown that the U.S. owned the property where the offense occurred and the state had ceded jurisdiction. In United States v. Andem, 158 F. 996 (D.N.J. 1908), federal jurisdiction for a forgery offense was upheld on a showing that the United States owned the property where the offense was committed and the state had ceded jurisdiction of the property to the U.S. In United States v. Penn, 48 F. 669 (E.D.Va. 1880), since the U.S. did not have jurisdiction over Arlington National Cemetery, a federal larceny prosecution was dismissed. In United States v. Lovely, 319 F.2d 673 (4th Cir. 1963), federal jurisdiction was found to exist by U.S. ownership of the property and a state cession of jurisdiction. In United States v. Watson, 80 F.Supp. 649, 651 (E.D.Va. 1948), federal criminal charges were dismissed, the court stating as follows:

108.   "Without proof of the requisite ownership or possession of the United States, the crime has not been made out."

In Brown v. United States, 257 F. 46 (5th Cir. 1919), federal jurisdiction was upheld on the basis that the U.S. owned the post-office site where a murder was committed and the state had ceded jurisdiction; see also England v. United States, 174 F.2d 466 (5th Cir. 1949); Krull v. United States, 240 F.2d 122 (5th Cir. 1957); Hudspeth v. United States, 223 F.2d 848 (5th Cir. 1955); and Gainey v. United States, 324 F.2d 731 (5th Cir. 1963).

109.   In United States v. Townsend, 474 F.2d 209 (5th Cir. 1973), a conviction for receiving stolen property was reversed when the court reviewed the record and learned that there was absolutely no evidence disclosing that the defendant

had committed this offense within the jurisdiction of the United States. And in United States v. Benson, 495 F.2d 475, 481 (5th Cir. 1974), in finding federal jurisdiction for a robbery committed at Fort Rucker, the court stated:

110.    "It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor."

111.    In two Sixth Circuit cases, United States v. Tucker, 122 F. 518 (W.D.Ky. 1903), a case involving an assault committed at a federal dam, and United States v. Blunt, 558 F.2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, jurisdiction was sustained by finding that the U.S. owned the property in question and the state involved had ceded jurisdiction. In In re Kelly, 71 F. 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the United States. In United States v. Johnson, 426 F.2d 1112 (7th Cir. 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and cession.

112.    Cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see United States v. Heard, 270 F.Supp. 198 (W.D.Mo. 1967); United States v. Redstone, 488 F.2d 300 (8th Cir. 1973); United States v. Goings, 504 F.2d 809 (8th Cir. 1974) (demonstrating loss of jurisdiction); Hayes v. United States, 367 F.2d 216 (10th Cir. 1966); United States v. Carter, 430 F.2d 1278 (10th Cir. 1970); Hall v. United States, 404 F.2d 1367 (10th Cir. 1969); and United States v. Cassidy, 571 F.2d 534 (10th Cir. 1978).

114.    Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more than any of the rest. In United States v. Bateman, 34 F. 86 (N.D.Cal. 1888), it was determined that the United States did not have jurisdiction to prosecute for a murder committed at the Presidio because California had never ceded

jurisdiction; see also United States v. Tully, 140 F. 899 (D.Mon. 1905). But later, California ceded jurisdiction for the Presidio to the United States, and it was held in United States v. Watkins, 22 F.2d 437 (N.D.Cal. 1927), that this enabled the U.S. to maintain a murder prosecution; see also United States v. Holt, 168 F. 141 (W.D.Wash. 1909), United States v. Lewis, 253 F. 469 (S.D.Cal. 1918), and United States v. Wurtzbarger, 276 F. 753 (D.Or. 1921). Because the U.S. owned and had a state cession of jurisdiction for Fort Douglas in Utah, it was held that the U.S. had jurisdiction for a rape prosecution in Rogers v. Squier, 157 F.2d 948 (9th Cir. 1946). But, without a cession, the U.S. has no jurisdiction; see Arizona v. Manypenny, 445 F.Supp. 1123 (D.Ariz. 1977).

115.    The above cases from the U.S. Supreme Court and federal appellate courts set forth the rule that in criminal prosecutions, the government, as the party seeking to establish the existence of federal jurisdiction, must prove U.S. ownership of the property in question and a state cession of jurisdiction. This same rule manifests itself in state cases.

116.    State courts are courts of general jurisdiction and in a state criminal prosecution, the state must only prove that the offense was committed within the state and a county thereof. If a defendant contends that only the federal government has jurisdiction over the offense, he, as proponent for the existence of federal jurisdiction, must likewise prove U.S. ownership of the property where the crime was committed and state cession of jurisdiction.

117.    Examples of the operation of this principle are numerous. In Arizona, the State has jurisdiction over federal lands in the public domain, the state not having ceded jurisdiction of that property to the U.S.; see State v. Dykes, 114 Ariz. 592, 562 P.2d 1090 (1977). In California, if it is not proved by a defendant in a state prosecution that the state has ceded jurisdiction, it is presumed the state does have jurisdiction over a criminal offense; see People v. Brown, 69 Cal. App.2d 602, 159 P.2d 686 (1945). If the cession exists, the state has no jurisdiction; see People v. Mouse, 203 Cal. 782, 265 P. 944 (1928). In Montana, the state has

27

jurisdiction over property if it is not proved there is a state cession of jurisdiction
to the U.S.; see State ex rel Parker v. District Court, 147 Mon. 151, 410 P.2d 459
(1966); the existence of a state cession of jurisdiction to the U.S. ousts the state
of jurisdiction; see State v. Tully, 31 Mont. 365, 78 P. 760 (1904). The same
applies in Nevada; see State v. Mack, 23 Nev. 359, 47 P. 763 (1897), and
Pendleton v. State, 734 P.2d 693 (Nev., 1987); it applies in Oregon (see State v.
Chin Ping, 91 Or. 593, 176 P. 188 (1918) and State v. Aguilar, 85 Or.App. 410,
736 P.2d 620 (1987)); and in Washington (see State v. Williams, 23 Wash.App.
694, 598 P.2d 731 (1979)).

118.    In People v. Hammond, 1 Ill.2d 65, 115 N.E.2d 331 (1953), a burglary of
an I.R.S. office was held to be within state jurisdiction, the court holding that the
defendant was required to prove existence of federal jurisdiction by U.S.
ownership of the property and state cession of jurisdiction. In two cases from
Michigan, larcenies committed at U.S. post-offices which were rented were held
to be within state jurisdiction; see People v. Burke, 161 Mich. 397, 126 N.W. 446
(1910) and People v. Van Dyke, 276 Mich. 32, 267 N.W. 778 (1936); see also In
re Kelly, 311 Mich. 596, 19 N.W.2d 218 (1945). In Kansas City v. Garner, 430
S.W.2d 630 (Mo.App. 1968), state jurisdiction over a theft offense occurring in a
federal building was upheld, and the court stated that a defendant had to show
federal jurisdiction by proving U.S. ownership of the building and a cession of
jurisdiction from the state to the United States. A similar holding was made for a
theft at a U.S. missile site in State v. Rindall, 146 Mon. 64, 404 P.2d 327 (1965).
In Pendleton v. State, 734 P.2d 693 (Nev. 1987), the state court was held to have
jurisdiction over a D.U.I. committed on federal lands, the defendant having failed
to show U.S. ownership and state cession of jurisdiction.

119.    In People v. Gerald, 40 Misc.2d 819, 243 N.Y.S.2d 1001 (1963), the state
was held to have jurisdiction of an assault at a U.S. post-office since the
defendant did not meet his burden of showing presence of federal jurisdiction;
and because a defendant failed to prove title and jurisdiction in the United States

for an offense committed at a customs station, state jurisdiction was upheld in People v. Fisher, 97 A.D.2d 651, 469 N.Y.S.2d 187 (A.D. 3 Dept. 1983).

120.   The proper method of showing federal jurisdiction in state court is demonstrated by the decision in People v. Williams, 136 Misc.2d 294, 518 N.Y.S.2d 751 (1987). This rule was likewise enunciated in State v. Burger, 33 Ohio App.3d 231, 515 N.E.2d 640 (1986), in a case involving a D.U.I. offense committed on a road near a federal arsenal.

121.   In Kuerschner v. State, 493 P.2d 1402 (Okl.Cr.App. 1972), the state was held to have jurisdiction of a drug sales offense occurring at an Air Force Base, the defendant not having attempted to prove federal jurisdiction by showing title and jurisdiction of the property in question in the United States; see also Towry v. State, 540 P.2d 597 (Okl.Cr.App. 1975). Similar holdings for murders committed at U.S. post-offices were made in State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918), and in United States v. Pate, 393 F.2d 44 (7th Cir., 1968). Another Oregon case, State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987), demonstrates this rule. And finally, in Curry v. State, 111 Tex. Cr. 264, 12 S.W.2d 796 (1928), it was held that, in the absence of proof that the state had ceded jurisdiction of a place to the United States, the state courts had jurisdiction over an offense.

## IV.   ARTICLE III  COURT JURISDICTION

122.   Of the United States district courts established in the States, only the United States district court in Hawaii has been established as an Article III court and all other United States district courts in the remaining States have no Article III judicial power.

123.   No United States district court in any state may lawfully exercise Article III court power.  The lawful jurisdiction of the federal district court or courts is limited to those places where Congress has exclusive jurisdiction.   It is also clear that

federal judges and federal courts have been used in the past by the federal government to control those persons opposed to the usurpation of power by the national government.  The federal courts known as United States District Courts are federal and territorial in that these courts implement administrative law on territory exclusively under the jurisdiction of the United States.

124.    United States district courts are being used by Congress primarily to prevent the rendition of law and equity in national courts by masquerading as Article III courts.  These courts are incapable of achieving justice because they are not Article III courts.  Generally speaking, we have a federal government that consists of a Congress of the United States, a President of the United States and district courts of the United States because there is one in Hawaii, only one in the states, and one in Washington D. C.

125.    The purpose of the Constitution was to establish and limit government to the purposes for which it was established.  Unfortunately, the Congress has used very effectively the mechanisms in the Constitution to limit the third branch of the national government to the people's detriment.  Congress has intentionally failed or refused to provide Article III courts in the several states.

126.    Individuals appointed to United States district courts are permitted to believe that they are Article III judges because they are appointed for life.  These individuals are actually urged by the other two branches of federal government to act like Article III judges.

127.    Article III judicial power imposes self-restraint on judges.  Only judges appointed to Article III courts may exercise the judicial power of the United States found in Article III, Section 2.  Judicial power imposes restraints on the judges that have it and that serves as some protection from judicial abuse.  All justices appointed to the Supreme Court of the United States are genuine Article III judges.

30

128.    The judges of other than judicial courts, of course, have no constitutional judicial power so they tend to be extremely rigid in the way they administer their "judicial business." These judges are or can be called territorial, legislative or administrative. The rigidity of the non-judicial court is the result of the tight rein that the Congress maintains over the personnel and business of non-Article III courts to solely achieve congressional purposes.

129.    The Constitution is a limitation on Congress. The Constitution grants to Congress power to create courts by exercising three different powers. At various times in the history of this country Congress has created courts using these various powers under Article I, Article III and Article IV of the Constitution:

1.              The Congress shall have power...To constitute Tribunals inferior to the supreme Court;

2.              The judicial power of the United States, shall be vested in one supreme court, and such inferior Courts as the Congress may from time to time ordain and establish.

3.              The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States;

130.    Article III courts would also be limited to a territorial jurisdiction. Based on examination of the statute law that created the various territorial United States district courts throughout the several states, Article III courts would also be of limited federal territorial jurisdiction.

31