131.   There should be no confusion as to the difference between Article III courts and those courts that are not Article III courts.  Article III district courts are not territorially different from the tribunals that Congress may constitute pursuant to Article I inferior to the supreme court.  Federal courts do not extend their judicial districts beyond federal territory.  Article III courts are "territorial courts" that may exercise the judicial power of the United States—Article I and IV courts have no such power.

132.   Congress has established Article III district courts in Hawaii and the District of Columbia.  The 2 district courts of the United States that were ultimately pronounced ordained and established by Congress pursuant to Article III of the Constitution are the only ones that can exercise the judicial power of the national government.

133.   Because Congress can make law locally or nationally, it must be presumed that law enacted by Congress is territorial in scope rather than national, *Foley Bros. Inc. v. Filardo* 336 U.S. 281(1949), unless a contrary intent is shown in the legislation itself.  The legislation creating the district court for Hawaii is a clear example of the presumption and an example of a national legislative intent to create an Article III court.

134.   Combining the district court for Puerto Rico with the other United States District Courts identifies them all as territorial.  The federal district courts are found in Title 28 U.S.C. Judiciary and Judicial Procedure, in the sections numbered from 81 to 131.  Title 28 U.S.C. was enacted into positive law in 1948.  The district courts were found in Chapter 5 just as they are today.  The districts themselves had not changed from 1911 when they were described as the territory that existed on July 1, 1910.  The territory was, for example, the "State of California" which then and now consists of the federal territory within California.

135.   Puerto Rico is not a state of the Union.   Its inclusion in Chapter 5 and appearance in §119 identifies the "states" in the sections of Chapter 5 as mere

labels for the areas of federal territory. The Commonwealth of Puerto Rico includes the federal territory under the jurisdiction of the United States. Included, for example, in the "State of California" is the territory of the United States located in the California Republic. Use of the "State of California" facilitates the use of federal law to create a California personal income tax. State of California denotes those special federal places where the United States has jurisdiction.

136.    Congress established the only Article III court for a state of the Union in Hawaii. Hawaii appears in §91 as the only Article III court but that court is qualified as to the way judges are to be appointed to that court. That qualification precludes the exercise of Article III judicial power by any judge appointed to that court. Under the heading for § 91 Hawaii, "Court of the United States; District Judges," will found, Section 9 (a) of Pub. L. 86-3 which provides that:

137.    "The United States District Court for the District of Hawaii established by and existing under Title 28 of the United States Code shall thence forth be a court of the United States with judicial power derived from article III, of the Constitution of the United States: Provided, however, that the terms of office of the district judges for the district of Hawaii then in office shall terminate upon the effective date of this section and the President, pursuant to sections 133 and 134 of Title 28, United States Code, as amended by this Act, shall appoint, by and with the advice and consent of the Senate, two district judges for the said district who shall hold office during good behavior."

138.    All of Title 28 U.S.C. provides for the territorial government of the United States and nothing of Article III can be put back into it without destroying the entire Title 28 U.S.C. as positive law. In other words, there may be a present belief by all of the state and federal judiciary, all the legal academic community and all the local, state and federal government officials that the United States district courts for the 50 states of the Union are Article III courts, but they are wrong.

139.   Congress prevented the ordination of the Article III it established for Hawaii by denying the court full Article III judges.  Congress took a territorial court established by and existing under Title 28 and created an Article III district court for Hawaii.  It must be noted that the territorial jurisdiction did not change—only the description of the court.

140.   Congress has provided that territorial Title 28 U.S.C. judges be appointed to the United States district court for the district of Hawaii are to be appointed to an Article III court.  The district judges for the district of Hawaii are specifically to be appointed by the President pursuant to sections 133 and 134 of title 28, United States Code, as officers of the United States but not as judges of an Article III court.   These two sections are also to be used in appointing any of 7 judges of the Puerto Rico district should a vacancy occur there.  It can be deduced that appointment pursuant to § § 133 and 134 of Title 28, will always produce territorial judges.

141.   The Hawaii judicial district established in § 91 of the Judicial Code of 1948 was a territorial court.  Section 9 (a) above clearly indicates that prior to the admission to statehood, the United States District Court of Hawaii was not a true United States court established under Article III of the Constitution, to administer the judicial power of the United States, *Balzac v. Porto Rico,* 258 U.S. 298, 312 (1922).  In *Balzac,* Chief Justice William Howard Taft stated that United States District Court for Arecibo, Porto Rico, as Puerto Rico was known then, "created by virtue of the sovereign congressional faculty, granted under Article IV, § 3, of that instrument, of making all needful rules and regulations respecting the territory belonging to the United States."

142.   Puerto Rico is the Commonwealth of Puerto Rico and it has not been incorporated into the United States though its inhabitants are United States citizens.  The inclusion of Puerto Rico in Chapter 5 as § 119 does not make the

district court for Puerto Rico an Article III court because Puerto Rico has not been incorporated into the Union. Puerto Rico fits comfortably among the names of the 50 states because the geographical areas are mini federal territories or federal enclaves.

143.    United States Government people are required to obey the United States Code; it is their duty to obey that law. The government's law requires the total obedience of government's officers and employees.

144.    Citizens are not part of government and they are not its subjects. Citizens can impose upon only themselves certain legal duties, if they want. There is only one duty that citizens have that indirectly protects the government. In the words of the Declaration of Independence, "Governments are instituted among men" to secure God given rights.

145.    Only Hawaii has an Article III district court and that court cannot function as one. No other state has an Article III court. The federal district courts of California fall squarely within the mold of the federal courts of the 49 states that have no Article III district courts. Examination of copies of all the Statute Laws described in the annotations to all the Chapter 5 sections of Title 28 that establish district courts in the states and Hawaii reveals that Hawaii has the only Article III district court.

146.    The use of the term, "district courts of the United States" refers to Article III courts. There are no more than two "district courts of the United States." There is no doubt that the district court for Hawaii is an Article III court—that's one. The § 88 court for the District of Columbia is another. The Historical and Revision Notes to that section makes it clear that the District of Columbia district court is a constitutional court established and ordained under Article III. The existence of at least two "district courts of the United States" permits the general usage of language that refers to the "district courts of the United States" as Article III courts.

147.   State courts that were already established when the Constitution was ratified were duty bound to obey the Constitution and the laws enacted pursuant to it.  Reference to the Judiciary Act of 1789 clarified and substantiated that no Article III district courts had been created in the several states pursuant to that law.

148.   The federal trial courts during the period of the Judiciary Act of 1789 were manned by two United States Supreme Court justices riding circuit and the district judge for the district.  Districts were created for territories that by the date of enactment, September 24, 1789 had not yet ratified the Constitution because, of course, they were not states.   North Carolina did not ratify the Constitution until after enactment of the Judiciary Act of 1789.  District courts created under that act could not have been created under Article III.

149.   Non-judicial, legislative, administrative and territorial courts are incapable of exercising the judicial power of the United States, which can only be found in an Article III court.  Article III of the Constitution has expressly granted to Congress the power to vest courts inferior to the Supreme Court with the judicial power of the United States.  The Constitution does not prohibit the creation of federal courts outside of Article III.  It follows, therefore, that at the very least Congress must invoke the authority of Article III in creating Article III courts just so one court can be distinguished from another.

150.   The evidence that exists to show that the federal district courts are ordained and established pursuant to Article III is anecdotal or circumstantial.  The Constitution provides that Congress shall vest the judicial power of the United States in "such inferior Courts as the Congress may from time to time ordain and establish."  That same language was used in the Preamble to the Constitution to "ordain and establish this Constitution for the United States of

America." There can be no question that the Congress has established but not ordained an Article III in Hawaii and in no other states.

151.    Legal scholars assume without justification that the federal district courts are Article III courts. In all the legal literature examined, status of the United States district courts as Article III was assumed despite all the contrary authoritative evidence. The United States Supreme Court in two cases: *Balzac v. Porto Rico,* 258 U.S. 298 (1921) and *Mookini v. United States,* 303 U.S. 201 (1938) made it clear that a "district court of the United States" described a court created under Article III and a "United States district court" described a territorial court. The former identified a constitutional court of the United States exercising the judicial power of the United States and the latter merely identified a court for a district of the government of the United States.

### V. Grand Jury Used

152.    Grand and petit jurors determine if they are citizens of the United States and whether they have resided in judicial district for a year. In 1968 Congress enacted the Jury Selection and Service Act that uses the nation's voter registration system as the basis for jury selection in the federal courts.

153.    Examination of available jury selection plans the district courts have created and that have been approved by the federal courts of appeal reveal no knowledge of the true territorial composition of the United States district courts. The jury questionnaire in common use merely asks an applicant a half dozen questions beginning with, if he or she is a citizen of the United States and a resident of the judicial district for at least a year.

154.    Very few Americans can prove that they are, indeed, citizens of the United States and practically no one understands that the Sixth Amendment requires that territorial composition be established prior to trial. For all of the states, district court vicinage is the federal territory within the counties that comprise the district. This is the only vicinage that satisfies the 6th Amendment command that

the "district shall have been previously ascertained by law." An individual juror's impression of what constitutes the judicial district does not satisfy the Constitution.

155.    All trial courts must have districts which shall have been previously ascertained by law. Venue and vicinage are being confused because an erroneous assumption is being universally made that the federal district courts are Article III courts and federal judges are Article III judges. Vicinage corresponds to territorial composition and describes where jurors come from.

156.    The areas from where Article III court jurors are to be drawn is the same as the territorial composition of the federal court from the federal territory within a district comprised of named counties but they are being drawn from outside the federal territory. Any grand and petit juror that resides outside a federal territory does not reside within the district and can successfully be challenged as unqualified.

157.    A federal territorial court without Article III power cannot be conferred such power by the litigants. One United States district court cannot legitimately serve both local federal and national interests. The interests of the two courts are almost completely mutually exclusive. Territorial courts without judicial power tenaciously serve the need of Congress to administer government law. These courts only have the jurisdiction conferred on them by Congress and they guard that jurisdiction to the exclusion of all other judicial concepts.

158.    All the United States district courts in 49 of the several states are other than Article III courts. There is no evidence that the United States district courts for any state other than Hawaii is ordained and established pursuant to Article III, Section 1; therefore, they are not vested with the judicial power of the United States. Article III has not been invoked by Congress in creating any other state's federal district courts and the 1911 Judiciary Act specifically creates those federal courts from the territory of the United States.

## VI. CITIZENSHIP – HISTORY AND ARGUMENTS

159.    As Americans, we are socialized to believe that we are all Citizens of this great nation we call the United States of America. Quite frankly, most Americans are pretty emotional about the issue.  The problem is that the people who write laws don't write them in the same manner that you and I speak.  Laws are written to achieve certain goals and the words used within laws are selected to achieve those goals. Sometimes the goals are legitimate and the language that is used, while confusing at times, is necessary to achieve the goal. Other times confusing language is used for no other reason than to obscure the truth from the casual reader.

160.    The issue of citizenship is no less clouded by such use of language than is any other area of law. The definitions of words or "legal terms" must be sought out diligently and the context in which they are used always carefully considered.

161.    In the Constitution of the United States, the phrase "Citizen of the United States" appears. Because this phrase appears within a Constitution, not a statute, the meaning of the phrase is determined by the meaning intended by those who wrote and signed the Constitution. If the intended meaning is manifest, there is no power on earth, including that of a criminal in a black robe, which can alter the meaning of the phrase.

162.    The meaning of the phrase "Citizen of the United States" is well understood. That phrase is shorthand for the sentence, "All the Citizens of the 13 independent nations [called "states"] that are a party to this Constitution". The important element that you should understand is that the "Citizen of the United States" spoken of in the Constitution of the United States is more properly and accurately a Citizen of the state in which he lives. The phrase "Citizen of the

39

United States" is actually a euphemism used for convenience and brevity, and not a legal title.

163.   After the Constitution was signed by all the states, the federal government began acquiring "territories". At the time, these territories were limited to the lands west of the established boundaries of the states, and lands not claimed by the states. People born in those federally held territories, by parents who were not Citizens of a state, became de facto "citizens of the United States".

164.   Although at that time there was no statutory authority for such a thing, international law had (and still has) a long established doctrine that, absent any extenuating circumstances, a person is a citizen of the national jurisdiction (or sovereignty) in which he's born. The federal territories were outside of the sovereignty of the individual state governments, and within the sovereignty of the United States government; hence the de facto status as a "citizen of the United States".

165.   This principle also applies to persons in Washington DC, which is under the exclusive sovereignty of the United States. [For the sake of clarity, we use a lower case "c" for a citizen of the federal government and an upper case "C" to denote a Citizen of a state of the Union.] It should be noted that "citizens of the United States" are not *The People* who created the states, then by state action, created the federal government. These "federal citizens" are not "parties to the Constitution" and therefore did not have legal claim to the same rights, privileges, and immunities that state Citizens did.

166.   One should take careful note that the Citizens of the states of the Union are the *only* Citizens who possess all the rights, privileges, and immunities spoken of in the US Constitution, plus whatever additional rights are secured to them by their own state Constitutions. Federal and state court cases that clearly show that the rights of one class of Citizen are thoroughly different from the "rights" (actually Congressionally granted privileges) of the other class of citizen.

40

This distinction in the "class of citizenship" continued without significant comment or concern until the end of the Civil War.

167.    Although the Civil War was not fought over slavery (despite what you were taught in the public schools), the end of the Civil War nevertheless brought about the end of involuntary servitude and slavery in America. [See Article XIII of the Constitution of the United States.]

168.    Prior to the Civil War, the southern states did not recognize blacks as persons who could become Citizens of their states. In fact it was well understood by the Citizens of these southern states that when their state Constitutions protected the right to own "property" or "chattel", that right included holding slaves. That was exactly what the framers of these southern Constitutions had intended and so that understanding was accurate and factual.

169.    After the South lost the rebellion, the United States took the opportunity to free the slaves. This was easier said than done because the Constitutions of the Southern states hadn't changed a bit just because the South had lost the War. Their Constitutions still did not recognize blacks as persons who could attain citizenship.

170.    *"Prior to the adoption of the federal Constitution, states possessed unlimited and unrestricted sovereignty and retained the same even afterward...except as such was surrendered to the federal government or they were expressly prohibited from exercising by the United States Constitution."* Blair v Ridgely, 97 D. 218, 249, S.P. People v. Coleman, 60 D. 581

171.    Congress was faced with a difficult dilemma; it wanted the freed blacks to become Citizens, but there was nothing in the US Constitution that gave Congress the power to alter the Constitutions of the Southern states. The best Congress could do in an immediate sense was to consider the South under "military occupation" of the United States (which it was) and recognize that as

such, the Southern states came within the authority of Article I, Section 8, Clause 17 of the US Constitution.

172.   What this meant was that as long as the Southern states were held as a "defeated foe" Congress could pass legislation that would operate within the area known as "the Southern states". However, in the future, when Congress would restore the Southern states to their former status as regular states of the Union, all such federal legislation would cease to operate in the Southern states. This meant that Congress needed a two-phase solution.

173.   The first phase being the enactment of federal laws to operate within the "occupied territories" and the second phase being a Constitutional amendment to secure the principles of those laws even after the laws themselves lost authority in the Southern states.

174.   It should be noted at this point that although the slaves were now free, and had been born in a state of the Union, they still were not Citizens of that state. In short, they had no citizenship at all. Under long established doctrines of law, a person who is not a citizen of a place in which he resides is an alien. The legal position of the freed slaves was tenuous - yes, they were free, but they were aliens in the land of their birth and were thus not entitled to the same rights, privileges, and immunities as Citizens.

175.   Although defeated in battle, the people of the South were not yet ready to capitulate on the slavery issue and they moved quickly to use the "alien" status of the blacks against them. Almost immediately after the surrender of the Confederacy, many Southern states started enacting "Black Codes". These laws were intended to operate only upon "persons not citizens" (a phrase right out of Dred Scott v. Sanford, 19 How. 393), and thus effectively limit the new found freedom enjoyed by the former slaves by requiring them to apply for licenses to do anything from holding a job, to hunting for food.

176.   Because the Southern states were under the "exclusive legislative jurisdiction" of Congress at this time, any state or local laws that conflicted with federal law would immediately become void and unenforceable. Congress moved quickly to quash the Black Codes. In rapid succession Congress passed the Enforcement Act, the Freedman's Bureau Act, and the Civil Rights Act of 1866. Collectively, these acts prevented the enforcement of the Black Codes and simultaneously imbued the freed black slaves with federally granted privileges that are euphemistically called "rights". It is in the Enforcement Act that we first see the phrase "citizen of the United States" used as a "legal term" embracing *only* the recently freed black slaves.

177.   This term is then used again in both the Freedman's Bureau Act, and the Civil Rights Act of 1866 in the same limited manner. It should be noted at this point that the phrase "citizen of the United States" had been used for nearly 8 decades before the Civil War, but always to speak of persons within federal territories. This was the first time that Congress had used the phrase to denote a person who had been born within a state of the Union. Congress could only apply the term in this way, within federal law, at that specific point in history because the South (where the freed blacks lived) was "federal territory" as long as it was being held by the United States military as a "defeated foe".

178.   Phase two of Congress' plan was put into action with the drafting of the 14th Amendment.  Here are its pertinent parts to this discussion:

179.   **Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

180.  **Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

181.  In drafting the Amendment, Congress was looking to make its federal laws (the Enforcement Act, the Freedman's Bureau Act, and the Civil Rights Act of 1866) a part of the US Constitution. In doing so they intended to ensure that the freed blacks would have certain privileges and protections remain in place after the United States pulled its army out of the South and restored the Southern states to their previous status as states of the Union. The Amendment would also insure that Congress had the national authority to enforce the provisions of the Amendment upon any state that attempted to violate them.

182.  Because the Congressional Acts were merely intended to "hold the line" until the 14th Amendment was ratified, their intent is significant in determining the intent of the 14th Amendment.

**The Civil Rights Act of 1866:**

183.  "All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States, and such citizen of every race and color shall have the same right in every state and territory of the United States to the full and equal benefit of all

44

laws and proceedings for the security of persons and property as is enjoyed by white citizens."

184.    Please note that when the drafters of this bill meant to indicate a Citizen, they clearly used the word "citizen", however when defining "who" the Act applies to, the drafters used the word "person". As they used both words within the same paragraph, it is obvious that the drafters were keenly aware of the distinction.

185.    Clearly Congressional intent was to provide non-citizens with the same fundamental rights as de jure state Citizens (who in that day, were exclusively white). This intent was further clarified in President Johnson's speech when he vetoed that bill. President Johnson made this statement as part of his speech:

186.    "It [the Civil Rights Bill of 1866] comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, persons of color, Negroes, mulattoes and persons of African blood. Every individual of those races born in the United States is made a citizen thereof."

187.    Once again, it can clearly be seen that the intent of the this Act was to embrace "persons" (as defined in Dred Scott case), but in no way was intended to address or alter the relationship of the de jure white Citizen to his state of birth or domicile.

188.    In the case of *United States v. Otherson*, the US Supreme Court found it necessary to review the historical foundations of the Enforcement Act. The Court found that Senator Stewart, who had sponsored the Enforcement Act legislation, had made the following remarks regarding the Act's intent. Stewart noted that the bill,

189.    "...simply extends to foreigners, not citizens, the protections of our laws".

He also added that,

190.   "This bill extends [the equal protection of laws] to aliens, so that all persons who are in the United States shall have the equal protection of our laws."

191.   These realities were not lost upon the various courts that were later called upon to make determinations as to the intent of the various civil rights acts or the 14th Amendment. In *Van Valkenburg v. Brown*, 43 Cal Sup Ct. 43, the Court made the following statement:

192.   "No white person born within the limits of the United States and subject to their jurisdiction...owes his status of Citizenship to the recent amendments to the Federal Constitution."

193.   As we are now repeatedly drawing a distinction between blacks and whites, this is probably a good point to stop and address the topic of racism as it relates to this point. This is a historical examination of the law as it existed in the various states and the United States prior to, and after, the Civil War, and how the foundations laid down in those laws and court decisions that are important to this court.

194.   These arguments are not intended to critique or pass judgment upon the moral correctness (or lack thereof) of the laws which existed at that time, or upon the decisions of the US Supreme Court in reference to slavery, the Civil War, the various Civil Rights Acts, or the 14th Amendment. It is merely a historical observation with certain inevitable conclusions drawn at the end.

195.   As examined, courts in the latter part of the 19th century were quite clear on the intended purpose of the Freedman's Bureau Act, the Enforcement Act, the Civil Rights Act of 1866, and the 14th Amendment.

196.   In *Hurd v. Hodge* (1948), the court explained that in order to understand the Civil Rights Act of 1866,  "...reference must be made to the scope and purpose of the 14th Amendment; for that statute and the Amendment were

46

closely related both in inception and in objectives which Congress sought to achieve".

197.    The Court further stated that the purpose of the 14th Amendment, "was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land".

198.    The "original intent" link can also be found in several other cases as well. Justice Harlan noted that privileges and immunities protected by the 14 Amendment included [used in its restrictive sense] those set forth in the first section of the Civil Rights Act. Justice Thurgood Marshall noted that;

199.    "the Congress that passed the 14th Amendment is the same Congress that passed the 1866 Freedman's Bureau Act", and he concluded that the rights set forth in the Freedman's Bureau Act were dispositive of Congress' intent in the 14th Amendment.

200.    In 1987, Justice William Brennan traced the "rights" [actually congressionally granted "privileges"] that are secured by the 14th Amendment to the Freedman's Bureau bill. He then went on to state that, "The main target of the Civil Rights Act of 1866 were the 'black codes' enacted in the Southern States..."

201.    As can be readily seen, even relatively recent Courts have acknowledged the fact that the 14th Amendment was simply intended to integrate elements of the Civil Rights Act of 1866 and the Freedman's Bureau Act into the Constitutional structure of the nation. Accordingly, the 14th Amendment only applies to non-citizens (aliens) who were the exclusive focus of the Civil Rights Act of 1866 and the Freedman's Bureau Act.

202.    Now that the intent, meaning, and proper application of the 14th Amendment have been illustrated, it is clear that the Amendment made "federal citizens" out of specific aliens who otherwise would have had no form of

47

citizenship at all. By converting these "aliens" into "federal citizens", they fell under the protection of the federal government with regard to those "rights" that had been conferred upon them by the 14th Amendment.

203. In consideration of these facts, Black's Law Dictionary (6th Ed.) defines the 14th Amendment this way:

204. The Fourteenth Amendment of the Constitution of the United States, ratified in 1868, creates or at least recognizes for the first time a citizenship of the United States, as distinct from that of the states;...

205. Note the vagueness in the definition - "...creates or at least recognizes for the first time...". This vagueness is because Congressional intent purported to embrace only the recently freed slaves, but at the same time, the bare language of the Amendment, (without consideration of Congressional intent) seems to merely recognize the long standing principle that the federal government has its own citizens, who are not state Citizens; a legal reality that existed long before the 14th Amendment.

206. It is important to note that with all of the evidence that is available, it has never once been asserted by any member of Congress, or by the courts, that the 14th Amendment, or the phrase "citizen of the United States" as used before the ratification of the 14th Amendment, applies to native born Citizens of a state of the Union. It should also be noted that the original use and application of the phrase "citizen of the United States" still continues today, unaffected by the 14th Amendment, which embraced only a very narrow and specific group of persons.

207. To summarize the points that touched upon thus far:

1. There is an original Citizen of a state of the Union.
2. There is a "citizen of the United States" as that phrase has always been used.

48

3. There is a "citizen of the United States" as that term is used in the 14th Amendment.

208.   At this juncture one might rightly ask what the practical distinctions are in the three forms of citizenship. Before we move forward with that, we should observe that the 14th Amendment merely constitutionalized the concepts by which the United States had been operating for decades under the doctrine of international law, defining the derivation of citizenship. What made the 14th Amendment necessary was that for the first time the federal government intended to grant federal citizenship to persons born within a state of a Union.

**Rights of Citizens of the states of the Union**

209.   The Declaration of Independence states that, "all men are created equal, that they are endowed by their Creator with certain unalienable Rights..." This clearly lays out the foundation of our rights - we are all equal before God, and the law; we possess rights which are "unalienable"; those rights are given to us by God (our Creator).

300.   Although the men who wrote the Declaration of Independence said that "all men" are created equal, when it came time to create the legal framework of a government, they understood that they could not include "all men" in a Constitution, but could only speak of those people who had formed the states, which then resulted in the states creating a national government of limited power. It is the state Citizens to whom the phrase "all men" would have to be limited for governmental purposes.

301.   Accordingly, as the form of our governments began to take shape, the people who would be able to claim these, "unalienable rights", which the "Creator" granted, would only be the Citizens of the states. While this may seem like a narrow restriction, one must remember that a government can only make laws (including its Constitution) for its own "body politic", and no one else.

49

302.   So what are these mysterious "unalienable rights"? The Declaration of Independence says that, "among these [rights] are Life, Liberty and the pursuit of Happiness". While "Life, Liberty and the pursuit of Happiness" is pretty all encompassing, the words of the Framers tell us that there are more rights involved, and that "among them" are found the rights of "Life, Liberty and the pursuit of Happiness". In other words, the language of the Framers tells us that "Life, Liberty and the pursuit of Happiness" is a designated group of rights within a larger body of rights referred to as our "unalienable rights".

303.   This larger body of "unalienable rights" is vast. In fact, it is so vast that no one, not even the judicial branch, has ever attempted to list the rights contained therein. This is best illustrated by the old adage that, "My right to swing my fist ends somewhere before it hits your nose". In short, a Citizen can do virtually anything he or she wants, so long as it does not infringe on the rights of another Citizen, or endanger the community. Also inclusive in these rights are your protections against mistreatment by government; the primary protections being expressly stated in the Bill of Rights in the US Constitution.

304.   "You have rights antecedent to all earthly governments; rights that cannot be repealed or restrained by human laws; rights derived from the Great Legislator of the Universe." – John Adams, Second President of the United States. (1792-1801)

305.   The US Supreme Court has stated that because these rights existed antecedent [prior to] the formation of either the states or the national government they are outside the government's power to alter, modify, or abolish. How's that for some strong protection!

306.   With these powerful rights in our hands, one might wonder what sort of "rights" are possessed by "citizens of the United States".

**The Stepchild "citizen"**

307.    If the Citizens of the states of the Union have their "unalienable rights",
what then do "citizens of the United States" have? Frankly, not much of value.
For the balance of this section, we will use the term "federal citizen" to denote a
"citizen of the United States".

308.    A federal citizen has only those rights that have been granted to him by
Congress by way of the numerous and various civil rights acts, and such rights
as may have been invested in him by an activist US Supreme Court that felt it
could legislate from the bench.

309.    To be clear - the "rights" of federal citizens are not given to them by God,
as are our unalienable rights. Their rights are given to them by Congress alone,
and the most significant point to understand and keep in mind is that, "What
Congress giveth, Congress may taketh away".  Most Americans have no idea
that there are two "classes of citizenship", nor do they understand the vast
distinction between the two, and what it means in their lives.

310.    The Courts have addressed such issues about federal citizenship:

214.    "A 'civil right' is considered a right given and protected by law, and a
person's enjoyment thereof is regulated entirely by the law that creates it."
82 CA 369. 373, 255, P 760.

311.    "The persons declared to be citizens are, "All persons born or naturalized
in the United States and subject to the jurisdiction thereof." The evident meaning
of these last words is not merely subject in some respect or degree to the
jurisdiction of the United States, but completely subject..."
*Elk v. Wilkins*, 112 US 94, 101, 102 (1884)

312.    While *Elk v. Wilkins* is a 14th Amendment case, the concept is still true
concerning all federal citizens. In other words, all federal citizens must be, by

their very definition, a person who is "completely subject" to the jurisdiction of the federal government (such as a citizen of Washington DC). Virtually any legal concept stated by the courts concerning a 14th Amendment citizen is operative upon all federal citizens.

313.    "The privileges and immunities clause of the 14th Amendment protects very few rights because it neither incorporates the Bill of Rights nor protects all rights of individual citizens. (See Slaughter House cases, 83 US (16 Wall.) 36, 21 L. Ed. 394 (1873)).

314.    Instead this provision protects only those rights peculiar to being a citizen of the federal government; it does not protect those rights which relate to state citizenship." *Jones v. Temmer*, 839 F. Supp. 1226

315.    "...the first eight amendments have uniformly been held not to be protected from state action by the privilege and immunities clause [of the 14th Amendment]."
*Hague v. CIO*, 307 US 496, 520

316.    "The right to trial by jury in civil cases, guaranteed by the 7th Amendment...and the right to bear arms guaranteed by the 2nd Amendment...have been distinctly held not to be privileges and immunities of citizens of the United States guaranteed by the 14th Amendment...and in effect the same decision was made in respect of the guarantee against prosecution, except by indictment of a grand jury, contained in the 5th Amendment...and in respect of the right to be confronted with witnesses, contained in the 6th Amendment...it was held that the indictment, made indispensable by the 5th Amendment, and trial by jury guaranteed by the 6th Amendment, were not privileges and immunities of citizens of the United States, as those words were used in the 14th Amendment. We conclude, therefore, that the exemption from compulsory self-incrimination is not a privilege or immunity of National citizenship

guaranteed by this clause of the 14th Amendment." *Twining v. New Jersey*, 211 US 78, 98-99

317.    "There are, then, under our republican form of government, two classes of citizens, one of the United States and one of the state". *Gardina v. Board of Registrars of Jefferson County*, 160 Ala. 155; 48 So. 788 (1909)

318.    "The governments of the United States and of each state of the several states are distinct from one another. The rights of a citizen under one may be quite different from those which he has under the other". *Colgate v. Harvey*, 296 U.S. 404; 56 S.Ct. 252 (1935)

319.    "...rights of national citizenship as distinct from the fundamental or natural rights inherent in state citizenship". *Madden v. Kentucky*, 309 U.S. 83: 84 L.Ed. 590 (1940)

320.    "There is a difference between privileges and immunities belonging to the citizens of the United States as such, and those belonging to the citizens of each state as such". *Ruhstrat v. People*, 57 N.E. 41 (1900)

321.    "We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of it's own..." *United States v. Cruikshank*, 92 U.S. 542 (1875)

322.    "It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a state, which are distinct from each other and which depend upon different characteristics or circumstances in the individual". *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36; 21 L.Ed. 394 (1873)

323.    It should be noted that many of the rights not attributed to federal citizens in the cases above have since been granted to them either by Congress or by

the courts. These early decisions simply clarify and solidify the reality that federal citizens are not the same "class of citizen" as state Citizens.

## VII.  CITIZENSHIP OF THE DEFENDANT

324.    Defendant is a "Sovereign Man" as proved by the Common Law Court, signed by (12) twelve Justices.  It has been verified, accepted, signed, and filed as an Apostille by the Secretary of The State of Nevada. (attached)

325.    Defendant has not accepted jurisdiction in this court.

326.    Defendant has not accepted any contract with this court. (United States District Court, Brownsville, Texas)

326.    Defendant does not voluntarily accept privileges from the United States.

327.    Defendant objects to the 14th amendment and its citizenship, (citizen of the United States.

328.    Defendant reserved his Right under the Uniform Commercial Code at Article I § 207.

329.    Defendant objects to the use of Federal  Reserve Notes to discharge debts in equity with limited liability.

## VIII.  DEMAND FOR RELEASE

330.    Based on the aforementioned, Defendant hereby demands his release immediately, as no jurisdiction to hold him exists.

54

331.   Defendant is being held illegally and against his will by the East Hidalgo Detention Center, by Alberto Bravo, Warden, at West 107, La Villa, Texas.


## IX. INCORPORATION

332.   The Defendant hereby incorporates all other motions, acts, demands, challenges, notices, etc… previously filed with this court.


## II. CONCLUSION

333.   For the aforementioned reasons stated, this Honorable Court lacks Subject Matter jurisdiction and should dismiss the case.


DATED: *November 24TH 2004*

Without Prejudice UCC 1-207, 1-103


*Carlos Hinojosa*

Per Se