# U.S. Supreme Court

## MOOKINI v. UNITED STATES, 303 U.S. 201 (1938)

303 U.S. 201

MOOKINI et al.
v.
UNITED STATES. *

No. 319.
Argued and Submitted Feb. 2, 1938.
Decided Feb. 28, 1938.

[303 U.S. 201, 202]   Mr. O. P. Soares, of Honolulu, Hawaii, for petitioners.

Mr. Bates Booth, of Washington, D.C., for the United States.

Mr. Chief Justice HUGHES delivered the opinion of the Court.

Petitioners were convicted in the District Court of the Territory of Hawaii of violating section 35 of the Criminal Code, as amended, relating to fraudulent claims. 18 U.S.C. 80, 18 U.S.C.A. 80. The verdict was rendered on May 28, 1935; motions for a new trial were overruled on June 19, 1935; and petitioners were sentenced on June 29, 1935. Appeal was allowed by the District Court on September 27, 1935

The Circuit Court of Appeals, Ninth Circuit, finding that the appeal was not taken in the manner or within the time permitted by the Criminal Appeals Rules promulgated by this Court on May 7, 1934, Rule 3, 28 U.S.C.A. following section 723a, 292 U.S. 662 , 663, dis- [303 U.S. 201, 203] missed the appeal. 92 F.2d 126. In view of the importance of the question as to the application of the Criminal Appeals Rules to the District Court of the Territory of Hawaii, we granted certiorari. 302 U.S. 674 , 58 S.Ct. 53, 82 L.Ed. --.

It is not questioned that the appeal to the Circuit Court of Appeals was allowed within the three months' period specified in section 8(c) of the Act of February 13, 1925, c. 229, 43 Stat. 936, 940, 28 U.S.C. 225, 230, 28 U.S.C.A. 225, 230; 48 U.S.C. 645, 48 U.S.C.A. 645.
The Criminal Appeals Rules were promulgated pursuant to the Act of March 8, 1934, 48 Stat. 399, amending the Act of February 24, 1933. 28 U. S. C. 723a, 28 U.S.C.A. 723a. The act authorized this Court "to prescribe, from time to time, rules of practice and procedure with respect to any or all proceedings after verdict, or finding of guilt by the court if a jury has been waived, or plea of guilty, in criminal cases in district courts of the United States, including the District Courts of Alaska, Hawaii, Puerto Rico, Canal Zone, and Virgin Islands, in the Supreme Courts of the District of Columbia, Hawaii, and Puerto Rico, in the United States Court for

1

the territorial courts and other courts mentioned in the authorizing act clearly shows the limitation that was intended.

As the Criminal Appeals Rules were not made applicable to the District Court of the Territory of Hawaii, they did not supersede or alter the provisions of the Act of February 13, 1925, as to appeals from that court to the Circuit Court of Appeals. 28 U.S.C. 225, 230, 28 U.S.C.A. 225, 230. The provision of the Organic Act of Hawaii, 48 U.S.C. 645, 48 U.S.C.A. 645, to which the court below refers, that appeals from the District Court of the Territory to the Circuit Court of Appeals should be taken in the same manner as appeals from District Courts, was always subject to modification in the discretion of the Congress which in its future legislation could make or authorize such distinctions in ap- [303 U.S. 201, 206] pellate procedure as appeared to be wise. The act authorizing this Court to promulgate rules for criminal appeals, which should have the effect of legislation, necessarily modified the former statutory provisions so as to give the Court full authority to prescribe the time and manner of taking appeals and to leave the Court free to determine to what courts, within the range of the authorization, its rules should apply. Pursuant to this authority, the Court has limited its rules so that they do not govern appeals from the District Court of the Territory of Hawaii, and there is nothing in the earlier legislation which compels the extension of the rules beyond their intended and expressed application.
The judgment of the Circuit Court of Appeals is reversed, and the cause is remanded to that court for further proceedings in conformity with this opinion. It is so ordered.
REVERSED.

Mr. Justice CARDOZO took no part in the consideration and decision of this case.

Footnotes
[Footnote * ] For opinion of Circuit Court of Appeals after remandment, see 95 F. 2d 960.

# U.S. Supreme Court

## BALZAC v. PEOPLE OF PORTO RICO, 258 U.S. 298 (1922)

258 U.S. 298

**BALZAC**
v.
**PEOPLE OF PORTO RICO (two cases).**

Nos. 178, 179.
Argued March 20, 1922.
Decided April 10, 1922.

[258 U.S. 298, 299] Mr. Jackson H. Ralston, of Washington, D. C. for plaintiff in error.

Mr. Grant T. Trent, of Washington, D. C., for the People of Porto Rico.

[258 U.S. 298, 300]

Mr. Chief Justice TAFT delivered the opinion of the Court.

These are two prosecutions for criminal libel, brought against the same defendant, Jesus M. Balzac, on informations filed in the district court for Arecibo, Porto Rico, by the district attorney for that district. Balzac was the editor of a daily paper published in Arecibo, known as 'El Baluarte,' and the articles upon which the charges of libel were based were published on April 16 and April 23, 1918, respectively. In each case the defendant demanded a jury. The Code of Criminal Procedure of Porto Rico grants a jury trial in cases of felony, but not in misdemeanors. The defendant, nevertheless, contended that he was entitled to a jury in such a case, under the Sixth Amendment to the Constitution, and that the language of the alleged libels was only fair comment, and their publication was protected by the First Amendment. His contentions were overruled; he was tried by the court, and was convicted in both cases and sentenced to five months' imprisonment in the district jail in the first, and to four months in the second, and to the payment of the costs in each. The defendant appealed to the Supreme Court of Porto Rico. That court affirmed both judgments. People v. Balzac, 28 P. R. R. 139; second case, 28 P. R. R. 141.

The first question in these cases is one of jurisdiction of this court. By section 244 of the Judicial Code, approved March 3, 1911 (36 Stat. 1157), it was provided that writs of error and appeals from the final judgments and decrees of the Supreme Court of Porto Rico might be prosecuted to this court in any case in which was drawn in question the validity of a treaty or statute of, or authority exercised under, the United States or wherein the Constitution of the United States, or a treaty thereof, or an act of Congress was brought in question and the right claimed thereunder was denied, and this without regard to the [258 U.S. 298, 301] amount involved. By the Act of January 28, 1915 (38 Stat. 803), section

1

244 of the Judicial Code was repealed, but section 246 (Comp. St. 1223) was amended and made to apply to the appellate jurisdiction of this court in respect to the decisions of the Supreme Court, not only of Hawaii, as before, but also Porto Rico, and it was provided that writs of error to those courts from this court could be prosecuted in the same class of cases as those in which this court was authorized under section 237 of the Judicial Code (Comp. St. 1214) to review decisions of state courts of last resort. Section 237 at that time allowed a writ of error to final decisions in state courts of last resort where was drawn in question the validity of a treaty, or a statute of, or an authority exercised under, the United States and the decision was against its validity, or where was drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States and the decision was in favor of its validity, or where any title, right, privilege, or immunity was claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under, the United States, and the decision was against the title, right, privilege or immunity especially set up or claimed by either party under such Constitution, treaty, statute, commission or authority. By Act of January 28, 1915 (38 Stat. 803, 804, amending section 246), this court was given power by certiorari to bring up for review all final judgments or decrees in civil or criminal cases in the supreme courts of Porto Rico and Hawaii, other than those reviewable here by writ of error because in the class similar to that described in section 237 of the Judicial Code. By Act of September 6, 1916 (39 Stat. 726), the jurisdiction of this court to review by writ of error, under section 237, final judgments and decrees of state courts of last resort was cut down by omitting cases (other than those involving the validity of [258 U.S. 298, 302] a treaty, statute or authority exercised under the United States or any state) wherein a title, right, privilege, or immunity, was claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under, the United States, and the decision was against such title, right, privilege or immunity, and such cases, it was provided, could only be examined on review in this court by certiorari.

The question now presented is whether the amendment to section 237 of the Judicial Code by the Act of 1916 applies to, and affects, the appellate jurisdiction of this court in reviewing decisions of the Supreme Court of Porto Rico. We think it does. We think that the manifest purpose of the Act of 1915, amending section 246 of the Code, in its reference to section 237 of the Judicial Code was to assimilate the appellate jurisdiction of this Court over the Supreme Courts of Porto Rico and Hawaii to that over state courts of last resort, and that the reference in amended section 246, to section 237 may be fairly construed to embrace subsequent changes in section 237 that are not obviously inapplicable.

This brings us to the question whether there was drawn in question in these cases the validity of a statute of Porto Rico under the Constitution of the United States. The Penal Code of Porto Rico divides crimes into felonies and misdemeanors. Rev. Stat. and Codes of Porto Rico 1911, Penal Code, 13. A felony is described as a crime punishable by death or imprisonment in the penitentiary. Every other crime is declared to be a misdemeanor. Penal Code, 14. Section 178 of the Porto Rican Code of Criminal Procedure provided that issues of fact in cases of felony should be tried by a jury when the defendant so elected,

2

but gave no such right in the case of misdemeanors. This was construed by the Supreme Court to deny such right. People v. Bird, 5 P. R. R. 387.

By section 244 (5676) of the Penal Code (as amended by Act of March 9, 1911, p. 71), the publication of a libel is made [258 U.S. 298, 303] punishable by a fine not exceeding $5,000, or imprisonment in jail for a term not exceeding two years, or both such fine and imprisonment, and also the costs of the action in the discretion of the court. It is, therefore, plain that libel under the Porto Rican law is a misdemeanor, and a jury trial was not required therein. By the Act of July 22, 1919 (Laws of Porto Rico 1919, No. 84, p. 684), a jury trial is now given in misdemeanors, but that did not come into force until after these libels were published and these trials had.

When the Penal Code, and the Code of Criminal Procedure were first passed in 1901, they both contained the provision that in all cases of libel the jury should determine the law and the fact. It was held, however, by the Supreme Court of Porto Rico in People v. Bird, 5 P. R. R. 387, 405, that this did not give a jury trial, but only made provision that if and when a right of jury trial was given in such cases, the jury should have the power to determine the law and the fact. Thereafter the Act of March 10, 1904 (Laws of Porto Rico 1904, p. 130), expressly repealed all reference to trials for libel in the Jury Act.

The effect of the Penal Code of Procedure, as construed by the Supreme Court of Porto Rico, and of the Act of March 10, 1904, repealing the jury act as to libel cases, was a statutory denial of the right of jury trial in such cases. A demand for a jury trial in this case, therefore, drew in question the validity of the statutes upon which the court relied in denying the demand. This necessarily leads to the conclusion that these cases are in the same class as those which come to this court by writ of error under section 237, as amended by the Act of 1916, and that jurisdiction by writ of error exists.

Was the issue properly saved in the record by the defendant? We think it was. The demand for a jury trial, the statute to the contrary notwithstanding, was made at the trial. It was renewed in the assignments of error in [258 U.S. 298, 304] the Porto Rican Supreme Court and here. Those assignments did not mention the statutes whose validity was involved, but merely averred that the defendant had been denied his right as an American citizen under the Sixth Amendment to the Constitution. While this is informal, we think that it is sufficient when the record discloses the real nature of the controversy and the specification of the assignment leaves no doubt that it is directed to that controversy.

We have now to inquire whether that part of the Sixth Amendment to the Constitution, which requires that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, applies to Porto Rico. Another provision on the subject is in article 3 of the Constitution providing that the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed. The Seventh Amendment of the Constitution

provides that in suits at common law, when the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. It is well settled that these provisions for jury trial in criminal and civil cases apply to the Territories of the United States. Webster v. Reid, 11 How. 437, 460; Reynolds v. United States, 98 U.S. 145, 167; Callan v. Wilson, 127 U.S. 540, 556, 8 S. Sup. Ct. 1301; American Publishing Co. v. Fisher, 166 U.S. 464, 17 Sup. Ct. 618; Thompson v. Utah, 170 U.S. 343, 347, 18 S. Sup. Ct. 620; Capital Traction Co. v. Hof, 174 U.S. 1, 19 Sup. Ct. 580; Black v. Jackson, 177 U.S. 349, 20 Sup. Ct. 648; Rasmussen v. United States, 197 U.S. 516, 528, 25 S. Sup. Ct. 514; Gurvich v. United States, 198 U.S. 581, 25 Sup. Ct. 803. But it is just as clearly settled that they do not apply to territory belonging to the [258 U.S. 298, 305] United States which has not been incorporated into the Union. Hawaii v. Mankichi, 190 U.S. 197, 23 Sup. Ct. 787; Dorr v. United States, 195 U.S. 138, 145, 24 S. Sup. Ct. 808, 1 Ann. Cas. 697. It was further settled in Downes v. Bidwell, 182 U.S. 244, 21 Sup. Ct. 770, and confirmed by Dorr v. United States, 195 U.S. 138, 24 Sup. Ct. 808, 1 Ann. Cas. 697, that neither the Philippines nor Porto Rico was territory which had been incorporated in the Union or become a part of the United States, as distinguished from merely belonging to it; and that the acts giving temporary governments to the Philippines, 32 Stat. 691 (Comp. St. 3804 et seq.), and to Porto Rico, 31 Stat. 77 (Comp. St. 3748 et seq.), had no such effect. The Insular Cases revealed much diversity of opinion in this Court as to the constitutional status of the territory acquired by the Treaty of Paris ending the Spanish War, but the Dorr Case shows that the opinion of Mr. Justice White of the majority, in Downes v. Bidwell, has become the settled law of the court. The conclusion of this court in the Dorr Case, 195 U.S. 149, 24 Sup. Ct. 813, 1 Ann. Cas. 697, was as follows:

> 'We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in article 4, 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory, not made part of the United States by congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation and of its own force, carry such right to territory so situated.'

The question before us, therefore, is: Has Congress, since the Foraker Act of April 12, 1900 (31 Stat. 77), enacted legislation incorporating Porto Rico into the Union? Counsel for the plaintiff in error give, in their brief, an extended list of acts, to which we shall refer later, which they urge as indicating a purpose to make the island a part of the United States, but they chiefly rely on the Organic Act of Porto Rico of March 2, 1917 (38 Stat. 951 [Comp. St. 3803a-3803z]), known as the Jones Act. [258 U.S. 298, 306] The act is entitled 'An act to provide a civil government for Porto Rico and for other purposes.' It does not indicate by its title that it has a purpose to incorporate the island into the Union. It does not contain any clause which declares such purpose or effect. While this is not conclusive, it strongly tends to show that Congress did not have such an intention. Few questions have been the subject of such discussion and dispute in our country as the status of our territory acquired from Spain in 1899. The division between the political parties in respect to it, the diversity of the views of the members of this court in regard to its constitutional aspects, and the constant recurrence of the subject in the Houses of

4

Congress, fixed the attention of all on the future relation of this acquired territory to the United States. Had Congress intended to take the important step of changing the treaty status of Porto Rico by incorporating it into the Union, it is reasonable to suppose that it would have done so by the plain declaration, and would not have left it to mere inference. Before the question became acute at the close of the Spanish War, the distinction between acquisition and incorporation was not regarded as important, or at least it was not fully understood and had not aroused great controversy. Before that, the purpose of Congress might well be a matter of mere inference from various legislative acts; but in these latter days, incorporation is not to be assumed without express declaration, or an implication so strong as to exclude any other view.

Again, the second section of the act is called a 'Bill of Rights,' and included therein is substantially every one of the guaranties of the federal Constitution, except those relating to indictment by a grand jury in the case of infamous crimes and the right of trial by jury in civil and criminal cases. If it was intended to incorporate Porto Rico into the Union by this act, which would ex proprio vigore make applicable the whole Bill of Rights [258 U.S. 298, 307] of the Constitution to the island, why was it thought necessary to create for it a Bill of Rights and carefully exclude trial by jury? In the very forefront of the act is this substitute for incorporation and application of the Bill of Rights of the Constitution. This seems to us a conclusive argument against the contention of counsel for the plaintiff in error.

The section of the Jones Act which counsel press on us is section 5. This in effect declares that all persons who under the Foraker Act were made citizens of Porto Rico and certain other residents shall become citizens of the United States, unless they prefer not to become such, in which case they are to declare such preference within six months, and thereafter they lose certain political rights under the new government. In the same section the United States District Court is given power separately to naturalize individuals of some other classes of residents. We set out the section in full in the margin. 1 Unaffected by the considerations [258 U.S. 298, 308] already suggested, perhaps the declaration of section 5 would furnish ground for an inference such as counsel for plaintiff in error contend, but under the circumstances we find it entirely consistent with nonincorporation. When Porto Ricans passed from under the government of Spain, they lost the protection of that government as subjects of the king of Spain, a title by which they had been known for centuries. They had a right to expect, in passing under the dominion of the United States, a status entitling them to the protection of their new sovereign. In theory and in law, they had it as citizens of Porto Rico, but it was an anomalous status, or seemed to be so in view of the fact that those who owed and rendered allegiance to the other great world powers were given the same designation and status as those living in their respective home countries so far as protection against foreign injustice went. It became a yearning of the Porto Ricans to be American citizens, therefore, and this act gave them the boon. What additional rights did it give them? It enabled them to move into the continental United States and becoming residents of any State there to enjoy every right of any other citizen of the United States, civil, social and political. A citizen of the Philippines must be naturalized before he can settle and vote in this country. Act of June 29, 1906, 30, 34 Stat. 606 (Comp. St. 4366). Not so the Porto Rican under the Organic

5

Act of 1917. [258 U.S. 298, 309] In Porto Rico, however, the Porto Rican can not insist upon the right of trial by jury, except as his own representatives in his legislature shall confer it on him. The citizen of the United states living in Porto Rico cannot there enjoy a right of trial by jury under the federal Constitution, any more than the Porto Rican. It is locality that is determinative of the application of the Constitution, in such matters as judicial procedure, and not the status of the people who live in it.

It is true that in the absence of other and countervailing evidence, a law of Congress or a provision in a treaty acquiring territory, declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds upon which this court placed its conclusion that Alaska had been incorporated in the Union, in Rasmussen v. United States, 197 U.S. 516, 25 Sup. Ct. 514. But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled, and offering opportunity for immigration and settlement by American citizens. It was on the American continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents, and one of them is in the very matter of trial by jury. This court refers to the difficulties in Dorr v. United States, 195 U.S. 138, 148, 24 S. Sup. Ct. 808, 812 (49 L. Ed. 128, 1 Ann. Cas. 697):

> 'If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory, ... was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice [258 U.S. 298, 310] and provoke disturbance rather than to aid the orderly administration of justice. ... Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored, and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition.'

The jury system needs citizens trained to the exercise of the responsibilities of jurors. In common-law countries centuries of tradition have prepared a conception of the impartial attitude jurors must assume. The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire. One of its greatest benefits is in the security it gives the people that they, as jurors, actual or possible, being part of the judicial system of the country, can prevent its arbitrary use or abuse. Congress has thought that a people like the Filipinos, or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and

political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when. Hence the care with which, from the time when Mr. McKinley wrote his historic letter to Mr. Root in April of 1900 (Public Laws Philippine Commission, 6-9-Act of July 2, 1902, 691, 692), concerning the character of government to be set up for the Philippines by the Philippine Commission, until the Act [258 U.S. 298, 311] of 1917, giving a new Organic Act to Porto Rico, the United States has been liberal in granting to the islands acquired by the Treaty of Paris most of the American constitutional guaranties, but has been sedulous to avoid forcing a jury system on a Spanish and civil law country until it desired it. We cannot find any intention to depart from this policy in making Porto Ricans American citizens, explained as this is by the desire to put them as individuals on an exact equality with citizens from the American homeland, to secure them more certain protection against the world, and to give them an opportunity, should they desire, to move into the United States proper, and there without naturalization to enjoy all political and other rights.

We need not dwell on another consideration which requires us not lightly to infer, from acts thus easily explained on other grounds, an intention to incorporate in the Union these distant ocean communities of a different origin and language from those of our continental people. Incorporation has always been a step, and an important one, leading to statehood. Without, in the slightest degree, intimating an opinion as to the wisdom of such a policy, for that is not our province, it is reasonable to assume that, when such a step is taken, it will be begun and taken by Congress deliberately, and with a clear declaration of purpose, and not left a matter of mere inference or construction.

Counsel for the plaintiff in error also rely on the organization of a United States District Court in Porto Rico, on the allowance of review of the Porto Rican Supreme Court in cases when the Constitution of the United States is involved, on the statutory permission that Porto Rican youth can attend West Point and Annapolis Academies, on the authorized sale of United States stamps in the island, on the extension of revenue, navigation, immigration, [258 U.S. 298, 312] national banking, bankruptcy, federal employers' liability, safety appliance, extradition, and census laws in one way or another to Porto Rico. With the background of the considerations already stated, none of these, nor all of them put together, furnish ground for the conclusion pressed on us.

The United States District Court is not a true United States court established under article 3 of the Constitution to administer the judicial power of the United States therein conveyed. It is created by virtue of the sovereign congressional faculty, granted under article 4, 3, of that instrument, of making all needful rules and regulations respecting the territory belonging to the United States. The resemblance of its jurisdiction to that of true United States courts, in offering an opportunity to nonresidents of resorting to a tribunal not subject to local influence, does not change its character as a mere territorial court. Nor does the legislative recognition that federal constitutional questions may arise in litigation in Porto Rico have any weight in this discussion. The Constitution of the United States is in force in Porto Rico as it is wherever and whenever the sovereign power of that government is exerted. This has not only been admitted, but emphasized, by this court in all its authoritative expressions upon the issues arising in the Insular Cases,

especially in the Downes v. Bidwell and the Door Cases. The Constitution, however, contains grants of power, and limitations which in the nature of things are not always and everywhere applicable and the real issue in the Insular Cases was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which ones of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements. The guaranties of certain fundamental personal rights declared in the Constitution, as, for instance, [258 U.S. 298, 313]  that no person could be deprived of life, liberty, or property without due process of law, had from the beginning full application in the Philippines and Porto Rico, and, as this guaranty is one of the must fruitful in causing litigation in our own country, provision was naturally made for similar controversy in Porto Rico. Indeed, provision is made for the consideration of constitutional questions coming on appeal and writs of error from the Supreme Court of the Philippines, which are certainly not incorporated in the Union. Judicial Code, 248 (Comp. St. 1225a).

On the whole, therefore, we find no features in the Organic Act of Porto Rico of 1917 from which we can infer the purpose of Congress to incorporate Porto Rico into the United States with the consequences which would follow.

This court has passed on substantially the same questions presented here in two cases, People of Porto Rico v. Tapia, 245 U.S. 639 , 38 Sup. Ct. 192, and People v. Muratti, 245 U.S. 639 , 38 Sup. Ct. 192. In the former, the question was whether one who was charged with committing a felonious homicide some 12 days after the passage of the Organic Act in 1917, could be brought to trial without an indictment of a grand jury as required by the Fifth Amendment to the Constitution. The United States District Court of Porto Rico, on a writ of habeas corpus, held that he could not be held to answer and discharged him. In the other case, the felony charged was alleged to have been committed before the passage of the Organic Act, but prosecution was begun afterwards. In that, the Supreme Court of Porto Rico held that an indictment was not rendered necessary by the Organic Act. This court reversed the District Court in the Tapia Case and affirmed the Supreme Court in the Muratti Case, necessarily holding the Organic Act had not incorporated Porto Rico into the United States. These cases were disposed of by a per curiam. Counsel have urged us in the cases [258 U.S. 298, 314]  at the bar to deal with the questions raised more at length in exposition of the effect of the Organic Act of 1917 upon the issue, and we have done so.

A second assignment of error is based on the claim that the alleged libels here did not pass the bounds of legitimate comment on the conduct of the Governor of the island, against whom they were directed, and that its prosecution is a violation of the First Amendment to the Constitution, securing free speech and a free press. A reading of the two articles removes the slightest doubt that they go far beyond the 'exuberant expressions of meridional speech,' to use the expression of this court in a similar case in Gandia v. Pittingill, 222 U.S. 452, 458 , 32 S. Sup. Ct. 127. Indeed, they are so excessive and outrageous in their character that they suggest the query whether their superlative vilification has not overleaped itself and become unconsciously humorous. But this is not a defense.

The judgments of the Supreme Court of Porto Rico are

AFFIRMED.

Mr, Justice HOLMES concurs in the result.

**Footnotes**

[ Footnote 1 ] Sec. 5. That all citizens of Porto Rico as defined by section seven of the act of April twelfth, nineteen hundred, 'temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, are hereby declared, and shall be deemed and held to be, citizens of the United States: Provided, that any person hereinbefore described may retain his present political status by making a declaration, under oath, of his decision to do so within six months of the taking effect of this act before the district court in the district in which he resides, the declaration to be in form as follows:

> '\_\_\_\_, \_\_\_\_, being duly sworn, hereby declare my intention not to become a citizen of the United States as provided in the act of Congress conferring United States citizenship upon citizens of Porto Rico and certain natives permanently residing in said island.'

In the case of any such person who may be absent from the island during said six months the term of this proviso may be availed of by transmitting a declaration, under oath, in the form herein in provided within six months of the taking effect of the act to the executive secretary of Porto Rico: And provided further, that any person who is born in Porto Rico of an alien parent and is permanently residing in that island may, if of full age, within six months of the taking his majority or within or if a minor, upon reaching his majority or within one year thereafter, make a sworn declaration of allegiance to the United States before the United States District Court for Porto Rico, setting forth therein all the facts connected with his or her birth and residence in Porto Rico and accompanying due proof thereof, and from and after the making of such declaration shall be considered to be a citizen of the United States.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97-164 effective Oct. 1, 1982, see section 402 of Pub. L. 97-164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96-452 effective Oct. 1, 1981, see section 12 of Pub. L. 96-452, set out as a note under section 41 of this title.

SURVEY OF JUDICIAL BUSINESS IN ALASKA

Section 23(a) of Pub. L. 86-70, June 25, 1959, 73 Stat. 147, provided that: "The Judicial Conference of the United States, with the assistance of the Administrative Office of the United States Courts, shall conduct a study, including a field survey, of the Federal judicial business arising in the State of Alaska with a view toward directing the United States Court of Appeals for the Ninth Circuit to hold such terms of court in Anchorage or such other Alaskan cities as may be necessary for the prompt and efficient administration of justice."

CROSS REFERENCES

Courts always open, see section 452 of this title.

§ 49. Assignment of judges to division to appoint independent counsels

(a) Beginning with the two-year period commencing on the date of the enactment of this section, three judges or justices shall be assigned for each successive two-year period to a division of the United States Court of Appeals for the District of Columbia to be the division of the court for the purpose of appointing independent counsels. The Clerk of the United States Court of Appeals for the District of Columbia Circuit shall serve as the clerk of such division of the court and shall provide such services as are needed by such division of the court.

(b) Except as provided under subsection (f) of this section, assignment to such division of the court shall not be a bar to other judicial assignments during the term of such division.

(c) In assigning judges or justices to sit on such division of the court, priority shall be given to senior circuit judges and retired justices.

(d) The Chief Justice of the United States shall designate and assign three circuit court judges or justices, one of whom shall be a judge of the United States Court of Appeals for the District of Columbia, to such division of the court. Not more than one judge or justice or senior or retired judge or justice may be named to such division from a particular court.

(e) Any vacancy in such division of the court shall be filled only for the remainder of the two-year period in which such vacancy occurs and in the same manner as initial assignments to such division were made.

(f) Except as otherwise provided in chapter 40 of this title, no member of such division of the court who participated in a function conferred on the division under chapter 40 of this title involving an independent counsel shall be eligible to participate in any judicial proceeding concerning a matter which involves such independent counsel while such independent counsel is serving in that office or which involves the exercise of such independent counsel's official duties, regardless of whether such independent counsel is still serving in that office.

(Added Pub. L. 95-521, title VI, § 602(a), Oct. 26, 1978, 92 Stat. 1873; amended Pub. L. 97-409, § 2(b)(1), Jan. 3, 1983, 96 Stat. 2039; Pub. L. 99-554, title I, § 144(g)(3), Oct. 27, 1986, 100 Stat. 3097; Pub. L. 100-191, §§ 4, 5(a), Dec. 15, 1987, 101 Stat. 1307.)

REFERENCES IN TEXT

The date of enactment of this section, referred to in subsec. (a), is Oct. 26, 1978.

AMENDMENTS

1987—Subsec. (a). Pub. L. 100-191, § 4, inserted at end: "The Clerk of the United States Court of Appeals for the District of Columbia Circuit shall serve as the clerk of such division of the court and shall provide such services as are needed by such division of the court."

Subsec. (f). Pub. L. 100-191, § 5(a), substituted "involving an independent counsel" for "involving a independent counsel".

1986—Subsec. (f). Pub. L. 99-554 substituted "chapter 40" for "chapter 39" in two places.

1983—Pub. L. 97-409, § 2(b)(1)(B), substituted "independent counsels" for "special prosecutors" in section catchline.

Subsec. (a). Pub. L. 97-409, § 2(b)(1)(B), substituted "independent counsels" for "special prosecutors".

Subsec. (f). Pub. L. 97-409, § 2(b)(1)(A), (C), substituted "independent counsel" for "special prosecutor" wherever appearing and "independent counsel's" for "special prosecutor's".

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99-554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99-554, set out as a note under section 581 of this title.

EFFECTIVE DATE

Section effective Oct. 26, 1978, see section 604 of Pub. L. 95-521, set out as a note under section 591 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 593, 595 of this title.

## CHAPTER 5—DISTRICT COURTS

| Sec. | |
|---|---|
| 81. | Alabama. |
| 81A. | Alaska. |
| 82. | Arizona. |
| 83. | Arkansas. |
| 84. | California. |
| 85. | Colorado. |
| 86. | Connecticut. |
| 87. | Delaware. |
| 88. | District of Columbia. |
| 89. | Florida. |
| 90. | Georgia. |
| 91. | Hawaii. |
| 92. | Idaho. |
| 93. | Illinois. |
| 94. | Indiana. |
| 95. | Iowa. |
| 96. | Kansas. |
| 97. | Kentucky. |
| 98. | Louisiana. |
| 99. | Maine. |
| 100. | Maryland. |
| 101. | Massachusetts. |
| 102. | Michigan. |
| 103. | Minnesota. |

Sec.
104. Mississippi.
105. Missouri.
106. Montana.
107. Nebraska.
108. Nevada.
109. New Hampshire.
110. New Jersey.
111. New Mexico.
112. New York.
113. North Carolina.
114. North Dakota.
115. Ohio.
116. Oklahoma.
117. Oregon.
118. Pennsylvania.
119. Puerto Rico.
120. Rhode Island.
121. South Carolina.
122. South Dakota.
123. Tennessee.
124. Texas.
125. Utah.
126. Vermont.
127. Virginia.
128. Washington.
129. West Virginia.
130. Wisconsin.
131. Wyoming.
132. Creation and composition of district courts.
133. Appointment and number of district judges.
134. Tenure and residence of district judges.
135. Salaries of district judges.
136. Chief judges; precedence of district judges.
137. Division of business among district judges.
138. Terms abolished.
139. Times for holding regular sessions.
140. Adjournment.
141. Special sessions; places; notice.
[142. Repealed.]
143. Vacant judgeship as affecting proceedings.
144. Bias or prejudice of judge.

HISTORICAL AND REVISION NOTES

Sections 81–131 of this chapter show the territorial composition of districts and divisions by counties as of January 1, 1945. All references to dates were omitted as unnecessary.

All references to fixed terms of holding court were also omitted in order to vest in each district court a wider discretion and greater flexibility in the disposition of its business. Such times will now be determined by rule of court rather than by statute. See sections 138 and 141 of this title.

AMENDMENTS

1982—Pub. L. 97–164, title I, § 115(c)(3), Apr. 2, 1982, 96 Stat. 32, struck out item 142 "Accommodations at places for holding court".

1963—Pub. L. 88–139, § 3(a), Oct. 16, 1963, 77 Stat. 248, substituted "Terms abolished" for "Times for holding regular terms" in item 138, "Times for holding regular sessions" for "Term continued until terminated" in item 139, and "sessions" for "terms" in item 141.

1958—Pub. L. 85–508, § 12(a), July 7, 1958, 72 Stat. 348, added item 81A.

SHORT TITLE OF 1978 AMENDMENT

For short title of Pub. L. 95–408, Oct. 2, 1978, 92 Stat. 883, as "Federal District Court Organization Act of 1978", see note set out under section 1 of this title.

FEDERAL RULES OF CIVIL PROCEDURE

See Appendix to this title.

CROSS REFERENCES

Guam and Virgin Islands district courts, see sections 1424, 1424b, and 1611 et seq. of Title 48, Territories and Insular Possessions.

Jurisdiction and venue of district courts, see sections 1331 et seq. and 1391 et seq. of this title.

Northern Mariana Islands district court, see sections 1821 to 1826 of Title 48, Territories and Insular Possessions.

Three-judge courts, composition, see section 2284 of this title.

CHAPTER REFERRED TO IN OTHER SECTIONS

This chapter is referred to in sections 451, 1827, 1869 of this title; title 18 section 3006A; title 22 section 1623.

§ 81. Alabama

Alabama is divided into three judicial districts to be known as the Northern, Middle, and Southern Districts of Alabama.

Northern District

(a) The Northern District comprises seven divisions.
 (1) The Northwestern Division comprises the counties of Colbert, Franklin, and Lauderdale.
 Court for the Northwestern Division shall be held at Florence.
 (2) The Northeastern Division comprises the counties of Cullman, Jackson, Lawrence, Limestone, Madison, and Morgan.
 Court for the Northeastern Division shall be held at Huntsville and Decatur.
 (3) The Southern Division comprises the counties of Blount, Jefferson, and Shelby.
 Court for the Southern Division shall be held at Birmingham.
 (4) The Eastern Division comprises the counties of Calhoun, Clay, Cleburne, and Talladega.
 Court for the Eastern Division shall be held at Anniston.
 (5) The Western Division comprises the counties of Bibb, Greene, Pickens, Sumter, and Tuscaloosa.
 Court for the Western Division shall be held at Tuscaloosa.
 (6) The Middle Division comprises the counties of Cherokee, De Kalb, Etowah, Marshall, and Saint Clair.
 Court for the Middle Division shall be held at Gadsden.
 (7) The Jasper Division comprises the counties of Fayette, Lamar, Marion, Walker, and Winston.
 Court for the Jasper Division shall be held at Jasper.

Middle District

(b) The Middle District comprises three divisions.
 (1) The Northern Division comprises the counties of Autauga, Barbour, Bullock, Butler, Chilton, Coosa, Covington, Crenshaw, Elmore, Lowndes, Montgomery, and Pike.
 Court for the Northern Division shall be held at Montgomery.
 (2) The Southern Division comprises the counties of Coffee, Dale, Geneva, Henry, and Houston.