

## VI. CITIZENSHIP – HISTORY AND ARGUMENTS

*A citizen of the United States - is NOT a legal Title,*

159. As Americans, we are socialized to believe that we are all Citizens of this great nation we call the United States of America. Quite frankly, most Americans are pretty emotional about the issue. The problem is that the people who write laws don't write them in the same manner that you and I speak. Laws are written to achieve certain goals and the words used within laws are selected to achieve those goals. Sometimes the goals are legitimate and the language that is used, while confusing at times, is necessary to achieve the goal. Other times confusing language is used for no other reason than to obscure the truth from the casual reader.

160. The issue of citizenship is no less clouded by such use of language than is any other area of law. The definitions of words or "legal terms" must be sought out diligently and the context in which they are used always carefully considered.

161. In the Constitution of the United States, the phrase "Citizen of the United States" appears. Because this phrase appears within a Constitution, not a statute, the meaning of the phrase is determined by the meaning intended by those who wrote and signed the Constitution. If the intended meaning is manifest, there is no power on earth, including that of a criminal in a black robe, which can alter the meaning of the phrase.

162. The meaning of the phrase "Citizen of the United States" is well understood. That phrase is shorthand for the sentence, "All the Citizens of the 13 independent nations [called "states"] that are a party to this Constitution". The important element that you should understand is that the "Citizen of the United States" spoken of in the Constitution of the United States is more properly and accurately a Citizen of the state in which he lives. The phrase "Citizen of the



United States" is actually a <u>euphemism</u> used for convenience and brevity, and not a legal title.

163. After the Constitution was signed by all the states, the federal government began acquiring "territories". At the time, these territories were limited to the lands west of the established boundaries of the states, and lands not claimed by the states. People born in those federally held territories, by parents who were not Citizens of a state, became de facto "citizens of the United States".

164. Although at that time there was no statutory authority for such a thing, international law had (and still has) a long established doctrine that, absent any extenuating circumstances, a person is a citizen of the national jurisdiction (or sovereignty) in which he's born. The federal territories were outside of the sovereignty of the individual state governments, and within the sovereignty of the United States government; hence the de facto status as a "citizen of the United States".

165. This principle also applies to persons in Washington DC, which is under the exclusive sovereignty of the United States. [For the sake of clarity, we use a lower case "c" for a citizen of the federal government and an upper case "C" to denote a Citizen of a state of the Union.] It should be noted that "citizens of the United States" are <u>not</u> *The People* who created the states, then by state action, created the federal government. These "federal citizens" are not "parties to the Constitution" and therefore did not have legal claim to the same rights, privileges, and immunities that state Citizens did.

166. One should take careful note that the <u>Citizens of the states of the Union are the *only* Citizens who possess all the rights, privileges, and immunities spoken of in the US Constitution, plus whatever additional rights are secured to them by their own state Constitutions</u>. Federal and state court cases that clearly show that the rights of one class of Citizen are thoroughly different from the "rights" (actually Congressionally granted privileges) of the other class of citizen.



40

This distinction in the "class of citizenship" continued without significant comment or concern until the end of the Civil War.

167. Although the Civil War was not fought over slavery (despite what you were taught in the public schools), the end of the Civil War nevertheless brought about the end of involuntary servitude and slavery in America. [See Article XIII of the Constitution of the United States.]

168. Prior to the Civil War, the southern states did not recognize blacks as persons who could become Citizens of their states. In fact it was well understood by the Citizens of these southern states that when their state Constitutions protected the right to own "property" or "chattel", that right included holding slaves. That was exactly what the framers of these southern Constitutions had intended and so that understanding was accurate and factual.

169. After the South lost the rebellion, the United States took the opportunity to free the slaves. This was easier said than done because the Constitutions of the Southern states hadn't changed a bit just because the South had lost the War. Their Constitutions still did not recognize blacks as persons who could attain citizenship.

170. "Prior to the adoption of the federal Constitution, states possessed unlimited and unrestricted sovereignty and retained the same even afterward...except as such was surrendered to the federal government or they were expressly prohibited from exercising by the United States Constitution." Blair v Ridgely, 97 D. 218, 249, S.P. People v. Coleman, 60 D. 581

171. Congress was faced with a difficult dilemma; it wanted the freed blacks to become Citizens, but there was nothing in the US Constitution that gave Congress the power to alter the Constitutions of the Southern states. The best Congress could do in an immediate sense was to consider the South under "military occupation" of the United States (which it was) and recognize that as

such, the Southern states came within the authority of Article I, Section 8, Clause 17 of the US Constitution.

172. What this meant was that as long as the Southern states were held as a "defeated foe" Congress could pass legislation that would operate within the area known as "the Southern states". However, in the future, when Congress would restore the Southern states to their former status as regular states of the Union, all such federal legislation would cease to operate in the Southern states. This meant that Congress needed a two-phase solution.

173. The first phase being the enactment of federal laws to operate within the "occupied territories" and the second phase being a Constitutional amendment to secure the principles of those laws even after the laws themselves lost authority in the Southern states.

174. It should be noted at this point that although the slaves were now free, and had been born in a state of the Union, they still were not Citizens of that state. In short, they had no citizenship at all. Under long established doctrines of law, a person who is not a citizen of a place in which he resides is an alien. The legal position of the freed slaves was tenuous - yes, they were free, but they were aliens in the land of their birth and were thus not entitled to the same rights, privileges, and immunities as Citizens.



175. Although defeated in battle, the people of the South were not yet ready to capitulate on the slavery issue and they moved quickly to use the "alien" status of the blacks against them. Almost immediately after the surrender of the Confederacy, many Southern states started enacting "Black Codes". These laws were intended to operate only upon "persons not citizens" (a phrase right out of Dred Scott v. Sanford, 19 How. 393), and thus effectively limit the new found freedom enjoyed by the former slaves by requiring them to apply for licenses to do anything from holding a job, to hunting for food.

176. Because the Southern states were under the "exclusive legislative jurisdiction" of Congress at this time, any state or local laws that conflicted with federal law would immediately become void and unenforceable. Congress moved quickly to quash the Black Codes. In rapid succession Congress passed the Enforcement Act, the Freedman's Bureau Act, and the Civil Rights Act of 1866. Collectively, these acts prevented the enforcement of the Black Codes and simultaneously imbued the freed black slaves with federally granted privileges that are euphemistically called "rights". It is in the Enforcement Act that we first see the phrase "citizen of the United States" used as a "legal term" embracing *only* the recently freed black slaves.

177. This term is then used again in both the Freedman's Bureau Act, and the Civil Rights Act of 1866 in the same limited manner. It should be noted at this point that the phrase "citizen of the United States" had been used for nearly 8 decades before the Civil War, but always to speak of persons within federal territories. This was the first time that Congress had used the phrase to denote a person who had been born within a state of the Union. Congress could only apply the term in this way, within federal law, at that specific point in history because the South (where the freed blacks lived) was "federal territory" as long as it was being held by the United States military as a "defeated foe".

178. Phase two of Congress' plan was put into action with the drafting of the 14th Amendment. Here are its pertinent parts to this discussion:

179. **Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

laws and proceedings for the security of persons and property as is enjoyed by white citizens."

184. Please note that when the drafters of this bill meant to indicate a Citizen, they clearly used the word "citizen", however when defining "who" the Act applies to, the drafters used the word "person". As they used both words within the same paragraph, it is obvious that the drafters were keenly aware of the distinction.

185. Clearly Congressional intent was to provide non-citizens with the same fundamental rights as de jure state Citizens (who in that day, were exclusively white). This intent was further clarified in President Johnson's speech when he vetoed that bill. President Johnson made this statement as part of his speech:

186. "It [the Civil Rights Bill of 1866] comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, persons of color, Negroes, mulattoes and persons of African blood. Every individual of those races born in the United States is made a citizen thereof."

187. Once again, it can clearly be seen that the intent of the this Act was to embrace "persons" (as defined in Dred Scott case), but in no way was intended to address or alter the relationship of the de jure white Citizen to his state of birth or domicile.

188. In the case of *United States v. Otherson*, the US Supreme Court found it necessary to review the historical foundations of the Enforcement Act. The Court found that Senator Stewart, who had sponsored the Enforcement Act legislation, had made the following remarks regarding the Act's intent. Stewart noted that the bill,

189. "...simply extends to foreigners, not citizens, the protections of our laws". He also added that,

180.  **Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

181.  In drafting the Amendment, Congress was looking to make its federal laws (the Enforcement Act, the Freedman's Bureau Act, and the Civil Rights Act of 1866) a part of the US Constitution. In doing so they intended to ensure that the freed blacks would have certain privileges and protections remain in place after the United States pulled its army out of the South and restored the Southern states to their previous status as states of the Union. The Amendment would also insure that Congress had the national authority to enforce the provisions of the Amendment upon any state that attempted to violate them.

182.  Because the Congressional Acts were merely intended to "hold the line" until the 14th Amendment was ratified, their intent is significant in determining the intent of the 14th Amendment.

**The Civil Rights Act of 1866:**

183.  "All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States, and such citizen of every race and color shall have the same right in every state and territory of the United States to the full and equal benefit of all

190. "This bill extends [the equal protection of laws] to aliens, so that all persons who are in the United States shall have the equal protection of our laws."

191. These realities were not lost upon the various courts that were later called upon to make determinations as to the intent of the various civil rights acts or the 14th Amendment. In <u>Van Valkenburg v. Brown</u>, 43 Cal Sup Ct. 43, the Court made the following statement:

192. "No white person born within the limits of the United States and subject to their jurisdiction...owes his status of Citizenship to the recent amendments to the Federal Constitution."

193. As we are now repeatedly drawing a distinction between blacks and whites, this is probably a good point to stop and address the topic of racism as it relates to this point. This is a historical examination of the law as it existed in the various states and the United States prior to, and after, the Civil War, and how the foundations laid down in those laws and court decisions that are important to this court.

194. These arguments are not intended to critique or pass judgment upon the moral correctness (or lack thereof) of the laws which existed at that time, or upon the decisions of the US Supreme Court in reference to slavery, the Civil War, the various Civil Rights Acts, or the 14th Amendment. It is merely a historical observation with certain inevitable conclusions drawn at the end.

195. As examined, courts in the latter part of the 19th century were quite clear on the intended purpose of the Freedman's Bureau Act, the Enforcement Act, the Civil Rights Act of 1866, and the 14th Amendment.

196. In *Hurd v. Hodge* (1948), the court explained that in order to understand the Civil Rights Act of 1866, "...reference must be made to the scope and purpose of the 14th Amendment; for that statute and the Amendment were

closely related both in inception and in objectives which Congress sought to achieve".

197. The Court further stated that the purpose of the 14th Amendment, "was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land".

198. The "original intent" link can also be found in several other cases as well. Justice Harlan noted that privileges and immunities protected by the 14 Amendment included [used in its restrictive sense] those set forth in the first section of the Civil Rights Act. Justice Thurgood Marshall noted that;

199. "the Congress that passed the 14th Amendment is the same Congress that passed the 1866 Freedman's Bureau Act", and he concluded that the rights set forth in the Freedman's Bureau Act were dispositive of Congress' intent in the 14th Amendment.

200. In 1987, Justice William Brennan traced the "rights" [actually congressionally granted "privileges"] that are secured by the 14th Amendment to the Freedman's Bureau bill. He then went on to state that, "The main target of the Civil Rights Act of 1866 were the 'black codes' enacted in the Southern States..."

201. As can be readily seen, even relatively recent Courts have acknowledged the fact that the 14th Amendment was simply intended to integrate elements of the Civil Rights Act of 1866 and the Freedman's Bureau Act into the Constitutional structure of the nation. Accordingly, the 14th Amendment only applies to non-citizens (aliens) who were the exclusive focus of the Civil Rights Act of 1866 and the Freedman's Bureau Act.



202. Now that the intent, meaning, and proper application of the 14th Amendment have been illustrated, it is clear that the Amendment made "federal citizens" out of specific aliens who otherwise would have had no form of

citizenship at all. By converting these "aliens" into "federal citizens", they fell under the protection of the federal government with regard to those "rights" that had been conferred upon them by the 14th Amendment.

203.   In consideration of these facts, Black's Law Dictionary (6th Ed.) defines the 14th Amendment this way:

204.   The Fourteenth Amendment of the Constitution of the United States, ratified in 1868, creates or at least recognizes for the first time a citizenship of the United States, as distinct from that of the states;...

205.   Note the vagueness in the definition - "...creates or at least recognizes for the first time...". This vagueness is because Congressional intent purported to embrace only the recently freed slaves, but at the same time, the bare language of the Amendment, (without consideration of Congressional intent) seems to merely recognize the long standing principle that the federal government has its own citizens, who are not state Citizens; a legal reality that existed long before the 14th Amendment.

206.   It is important to note that with all of the evidence that is available, it has never once been asserted by any member of Congress, or by the courts, that the 14th Amendment, or the phrase "citizen of the United States" as used before the ratification of the 14th Amendment, applies to native born Citizens of a state of the Union. It should also be noted that the original use and application of the phrase "citizen of the United States" still continues today, unaffected by the 14th Amendment, which embraced only a very narrow and specific group of persons.

207.   To summarize the points that touched upon thus far:

1. There is an original Citizen of a state of the Union.
2. There is a "citizen of the United States" as that phrase has always been used.

3. There is a "citizen of the United States" as that term is used in the 14th Amendment.

208. At this juncture one might rightly ask what the practical distinctions are in the three forms of citizenship. Before we move forward with that, we should observe that the 14th Amendment merely constitutionalized the concepts by which the United States had been operating for decades under the doctrine of international law, defining the derivation of citizenship. What made the 14th Amendment necessary was that for the first time the federal government intended to grant federal citizenship to persons born within a state of a Union.

**Rights of Citizens of the states of the Union**

209. The Declaration of Independence states that, "all men are created equal, that they are endowed by their Creator with certain unalienable Rights..." This clearly lays out the foundation of our rights - we are all equal before God, and the law; we possess rights which are "unalienable"; those rights are given to us by God (our Creator).

300. Although the men who wrote the Declaration of Independence said that "all men" are created equal, when it came time to create the legal framework of a government, they understood that they could not include "all men" in a Constitution, but could only speak of those people who had formed the states, which then resulted in the states creating a national government of limited power. It is the state Citizens to whom the phrase "all men" would have to be limited for governmental purposes.

301. Accordingly, as the form of our governments began to take shape, the people who would be able to claim these, "unalienable rights", which the "Creator" granted, would only be the Citizens of the states. While this may seem like a narrow restriction, one must remember that a government can only make laws (including its Constitution) for its own "body politic", and no one else.

302. So what are these mysterious "unalienable rights"? The Declaration of Independence says that, "among these [rights] are Life, Liberty and the pursuit of Happiness". While "Life, Liberty and the pursuit of Happiness" is pretty all encompassing, the words of the Framers tell us that there are more rights involved, and that "among them" are found the rights of "Life, Liberty and the pursuit of Happiness". In other words, the language of the Framers tells us that "Life, Liberty and the pursuit of Happiness" is a designated group of rights within a larger body of rights referred to as our "unalienable rights".

303. This larger body of "unalienable rights" is vast. In fact, it is so vast that no one, not even the judicial branch, has ever attempted to list the rights contained therein. This is best illustrated by the old adage that, "My right to swing my fist ends somewhere before it hits your nose". In short, a Citizen can do virtually anything he or she wants, so long as it does not infringe on the rights of another Citizen, or endanger the community. Also inclusive in these rights are your protections against mistreatment by government; the primary protections being expressly stated in the Bill of Rights in the US Constitution.

304. "You have rights antecedent to all earthly governments; rights that cannot be repealed or restrained by human laws; rights derived from the Great Legislator of the Universe." -- John Adams, Second President of the United States. (1792-1801)

305. The US Supreme Court has stated that because these rights existed antecedent [prior to] the formation of either the states or the national government they are outside the government's power to alter, modify, or abolish. How's that for some strong protection!

306. With these powerful rights in our hands, one might wonder what sort of "rights" are possessed by "citizens of the United States".

**The Stepchild "citizen"**

307. If the Citizens of the states of the Union have their "unalienable rights", what then do "citizens of the United States" have? Frankly, not much of value. For the balance of this section, we will use the term "federal citizen" to denote a "citizen of the United States".

308. A federal citizen has only those rights that have been granted to him by Congress by way of the numerous and various civil rights acts, and such rights as may have been invested in him by an activist US Supreme Court that felt it could legislate from the bench.

309. To be clear - the "rights" of federal citizens are not given to them by God, as are our unalienable rights. Their rights are given to them by Congress alone, and the most significant point to understand and keep in mind is that, "What Congress giveth, Congress may taketh away". Most Americans have no idea that there are two "classes of citizenship", nor do they understand the vast distinction between the two, and what it means in their lives.

310. The Courts have addressed such issues about federal citizenship:

214. "A 'civil right' is considered a right given and protected by law, and a person's enjoyment thereof is regulated entirely by the law that creates it." 82 CA 369. 373, 255, P 760.

311. "The persons declared to be citizens are, "All persons born or naturalized in the United States and subject to the jurisdiction thereof." The evident meaning of these last words is not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject..." *Elk v. Wilkins*, 112 US 94, 101, 102 (1884)

312. While *Elk v. Wilkins* is a 14th Amendment case, the concept is still true concerning all federal citizens. In other words, all federal citizens must be, by

their very definition, a person who is "completely subject" to the jurisdiction of the federal government (such as a citizen of Washington DC). Virtually any legal concept stated by the courts concerning a 14th Amendment citizen is operative upon all federal citizens.

313. "The privileges and immunities clause of the 14th Amendment protects very few rights because it neither incorporates the Bill of Rights nor protects all rights of individual citizens. (See Slaughter House cases, 83 US (16 Wall.) 36, 21 L. Ed. 394 (1873)).

314. Instead this provision protects only those rights peculiar to being a citizen of the federal government; it does not protect those rights which relate to state citizenship." *Jones v. Temmer*, 839 F. Supp. 1226

315. "...the first eight amendments have uniformly been held not to be protected from state action by the privilege and immunities clause [of the 14th Amendment]."
*Hague v. CIO*, 307 US 496, 520

316. "The right to trial by jury in civil cases, guaranteed by the 7th Amendment...and the right to bear arms guaranteed by the 2nd Amendment...have been distinctly held not to be privileges and immunities of citizens of the United States guaranteed by the 14th Amendment...and in effect the same decision was made in respect of the guarantee against prosecution, except by indictment of a grand jury, contained in the 5th Amendment...and in respect of the right to be confronted with witnesses, contained in the 6th Amendment...it was held that the indictment, made indispensable by the 5th Amendment, and trial by jury guaranteed by the 6th Amendment, were not privileges and immunities of citizens of the United States, as those words were used in the 14th Amendment. We conclude, therefore, that the exemption from compulsory self-incrimination is not a privilege or immunity of National citizenship

guaranteed by this clause of the 14th Amendment." *Twining v. New Jersey*, 211 US 78, 98-99



317.   "There are, then, under our republican form of government, two classes of citizens, one of the United States and one of the state". *Gardina v. Board of Registrars of Jefferson County*, 160 Ala. 155; 48 So. 788 (1909)

318.   "The governments of the United States and of each state of the several states are distinct from one another. The rights of a citizen under one may be quite different from those which he has under the other". *Colgate v. Harvey*, 296 U.S. 404; 56 S.Ct. 252 (1935)

319.   "...rights of national citizenship as distinct from the fundamental or natural rights inherent in state citizenship". *Madden v. Kentucky*, 309 U.S. 83: 84 L.Ed. 590 (1940)

320.   "There is a difference between privileges and immunities belonging to the citizens of the United States as such, and those belonging to the citizens of each state as such". *Ruhstrat v. People*, 57 N.E. 41 (1900)

321.   "We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others, and each has citizens of it's own..." *United States v. Cruikshank*, 92 U.S. 542 (1875)

322.   "It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a state, which are distinct from each other and which depend upon different characteristics or circumstances in the individual". *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36; 21 L.Ed. 394 (1873)

323.   It should be noted that many of the rights not attributed to federal citizens in the cases above have since been granted to them either by Congress or by

the courts. These early decisions simply clarify and solidify the reality that federal citizens are not the same "class of citizen" as state Citizens.

## VII. CITIZENSHIP OF THE DEFENDANT

324.   Defendant is a "Sovereign Man" as proved by the Common Law Court, signed by (12) twelve Justices. It has been verified, accepted, signed, and filed as an Apostille by the Secretary of The State of Nevada. (attached)

325.   Defendant has not accepted jurisdiction in this court.

326.   Defendant has not accepted any contract with this court. (United States District Court, Brownsville, Texas)

326.   Defendant does not voluntarily accept privileges from the United States.

327.   Defendant objects to the 14th amendment and its citizenship, (citizen of the United States.

328.   Defendant reserved his Right under the Uniform Commercial Code at Article I § 207.

329.   Defendant objects to the use of Federal Reserve Notes to discharge debts in equity with limited liability.

## VIII. DEMAND FOR RELEASE

330.   Based on the aforementioned, Defendant hereby demands his release immediately, as no jurisdiction to hold him exists.