#3-A

§ 49                    TITLE 28—JUDICIARY AND JUDICIAL PROCEDURE                    Page 42

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–452 effective Oct. 1, 1981, see section 12 of Pub. L. 96–452, set out as a note under section 41 of this title.

SURVEY OF JUDICIAL BUSINESS IN ALASKA

Section 23(a) of Pub. L. 86–70, June 25, 1959, 73 Stat. 147, provided that: "The Judicial Conference of the United States, with the assistance of the Administrative Office of the United States Courts, shall conduct a study, including a field survey, of the Federal judicial business arising in the State of Alaska with a view toward directing the United States Court of Appeals for the Ninth Circuit to hold such terms of court in Anchorage or such other Alaskan cities as may be necessary for the prompt and efficient administration of justice."

CROSS REFERENCES

Courts always open, see section 452 of this title.

§ 49. Assignment of judges to division to appoint independent counsels

(a) Beginning with the two-year period commencing on the date of the enactment of this section, three judges or justices shall be assigned for each successive two-year period to a division of the United States Court of Appeals for the District of Columbia to be the division of the court for the purpose of appointing independent counsels. The Clerk of the United States Court of Appeals for the District of Columbia Circuit shall serve as the clerk of such division of the court and shall provide such services as are needed by such division of the court.

(b) Except as provided under subsection (f) of this section, assignment to such division of the court shall not be a bar to other judicial assignments during the term of such division.

(c) In assigning judges or justices to sit on such division of the court, priority shall be given to senior circuit judges and retired justices.

(d) The Chief Justice of the United States shall designate and assign three circuit court judges or justices, one of whom shall be a judge of the United States Court of Appeals for the District of Columbia, to such division of the court. Not more than one judge or justice or senior or retired judge or justice may be named to such division from a particular court.

(e) Any vacancy in such division of the court shall be filled only for the remainder of the two-year period in which such vacancy occurs and in the same manner as initial assignments to such division were made.

(f) Except as otherwise provided in chapter 40 of this title, no member of such division of the court who participated in a function conferred on the division under chapter 40 of this title involving an independent counsel shall be eligible to participate in any judicial proceeding concerning a matter which involves such independent counsel while such independent counsel is serving in that office or which involves the ex-

duties, regardless of whether such independent counsel is still serving in that office.

(Added Pub. L. 95–521, title I, § 602(a), Oct. 26, 1978, 92 Stat. 1873; amended Pub. L. 97–409, § 2(b)(1), Jan. 3, 1983, 96 Stat. 2039; Pub. L. 99–554, title I, § 144(g)(3), Oct. 27, 1986, 100 Stat. 3097; Pub. L. 100–191, §§ 4, 5(a), Dec. 15, 1987, 101 Stat. 1307.)

REFERENCES IN TEXT

The date of enactment of this section, referred to in subsec. (a), is Oct. 26, 1978.

AMENDMENTS

1987—Subsec. (a). Pub. L. 100–191, § 4, inserted at end: "The Clerk of the United States Court of Appeals for the District of Columbia Circuit shall serve as the clerk of such division of the court and shall provide such services as are needed by such division of the court."

Subsec. (f). Pub. L. 100–191, § 5(a), substituted "involving an independent counsel" for "involving a independent counsel".

1986—Subsec. (f). Pub. L. 99–554 substituted "chapter 40" for "chapter 39" in two places.

1983—Pub. L. 97–409, § 2(b)(1)(B), substituted "independent counsels" for "special prosecutors" in section catchline.

Subsec. (a). Pub. L. 97–409, § 2(b)(1)(B), substituted "independent counsels" for "special prosecutors".

Subsec. (f). Pub. L. 97–409, § 2(b)(1)(A), (C), substituted "independent counsel" for "special prosecutor" wherever appearing and "independent counsel's" for "special prosecutor's".

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554, set out as a note under section 581 of this title.

EFFECTIVE DATE

Section effective Oct. 26, 1978, see section 604 of Pub. L. 95–521, set out as a note under section 591 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 593, 596 of this title.

## CHAPTER 5—DISTRICT COURTS

| Sec. | |
|---|---|
| 81. | Alabama. |
| 81A. | Alaska. |
| 82. | Arizona. |
| 83. | Arkansas. |
| 84. | California. |
| 85. | Colorado. |
| 86. | Connecticut. |
| 87. | Delaware. |
| 88. | District of Columbia. |
| 89. | Florida. |
| 90. | Georgia. |
| 91. | Hawaii. |
| 92. | Idaho. |
| 93. | Illinois. |
| 94. | Indiana. |
| 95. | Iowa. |
| 96. | Kansas. |
| 97. | Kentucky. |
| 98. | Louisiana. |
| 99. | Maine. |
| 100. | Maryland. |
| 101. | Massachusetts. |
| 102. | Michigan. |

Ex 3 A

#3-A

Sec.
104.    Mississippi.
105.    Missouri.
106.    Montana.
107.    Nebraska.
108.    Nevada.
109.    New Hampshire.
110.    New Jersey.
111.    New Mexico.
112.    New York.
113.    North Carolina.
114.    North Dakota.
115.    Ohio.
116.    Oklahoma.
117.    Oregon.
118.    Pennsylvania.
119.    Puerto Rico.
120.    Rhode Island.
121.    South Carolina.
122.    South Dakota.
123.    Tennessee.
124.    Texas.
125.    Utah.
126.    Vermont.
127.    Virginia.
128.    Washington.
129.    West Virginia.
130.    Wisconsin.
131.    Wyoming.
132.    Creation and composition of district courts.
133.    Appointment and number of district judges.
134.    Tenure and residence of district judges.
135.    Salaries of district judges.
136.    Chief judges; precedence of district judges.
137.    Division of business among district judges.
138.    Terms abolished.
139.    Times for holding regular sessions.
140.    Adjournment.
141.    Special sessions; places; notice.
[142.    Repealed.]
143.    Vacant judgeship as affecting proceedings.
144.    Bias or prejudice of judge.

### HISTORICAL AND REVISION NOTES

Sections 81–131 of this chapter show the territorial composition of districts and divisions by counties as of January 1, 1945. All references to dates were omitted as unnecessary.

All references to fixed terms of holding court were also omitted in order to vest in each district court a wider discretion and greater flexibility in the disposition of its business. Such times will now be determined by rule of court rather than by statute. See sections 138 and 141 of this title.

### AMENDMENTS

1982—Pub. L. 97–164, title I, § 115(c)(3), Apr. 2, 1982, 96 Stat. 32, struck out item 142 "Accommodations at places for holding court".

1963—Pub. L. 88–139, § 3(a), Oct. 16, 1963, 77 Stat. 248, substituted "Terms abolished" for "Times for holding regular terms" in item 138, "Times for holding regular sessions" for "Term continued until terminated" in item 139, and "sessions" for "terms" in item 141.

1958—Pub. L. 85–508, § 12(a), July 7, 1958, 72 Stat. 348, added item 81A.

### SHORT TITLE OF 1978 AMENDMENT

For short title of Pub. L. 95–486, Oct. 2, 1978, 92 Stat. 2383, as "Federal District Court Organization Act of 1978", see note set out under section 1 of this title.

### FEDERAL RULES OF CIVIL PROCEDURE

See Appendix to this title.

### CROSS REFERENCES

Guam and Virgin Islands district courts, see sections 1424, 1424b, and 1611 et seq. of Title 48, Territories and Insular Possessions.

Jurisdiction and venue of district courts, see sections 1331 et seq. and 1391 et seq. of this title.

Northern Mariana Islands district court, see sections 1821 to 1838 of Title 48, Territories and Insular Possessions.

Three-judge courts, composition, see section 2284 of this title.

### CHAPTER REFERRED TO IN OTHER SECTIONS

This chapter is referred to in sections 451, 1257, 1869 of this title; title 18 section 3006A; title 22 section 1623.

## § 81. Alabama

Alabama is divided into three judicial districts to be known as the Northern, Middle, and Southern Districts of Alabama.

### Northern District

(a) The Northern District comprises seven divisions.

    (1) The Northwestern Division comprises the counties of Colbert, Franklin, and Lauderdale.

Court for the Northwestern Division shall be held at Florence.

    (2) The Northeastern Division comprises the counties of Cullman, Jackson, Lawrence, Limestone, Madison, and Morgan.

Court for the Northeastern Division shall be held at Huntsville and Decatur.

    (3) The Southern Division comprises the counties of Blount, Jefferson, and Shelby.

Court for the Southern Division shall be held at Birmingham.

    (4) The Eastern Division comprises the counties of Calhoun, Clay, Cleburne, and Talladega.

Court for the Eastern Division shall be held at Anniston.

    (5) The Western Division comprises the counties of Bibb, Greene, Pickens, Sumter, and Tuscaloosa.

Court for the Western Division shall be held at Tuscaloosa.

    (6) The Middle Division comprises the counties of Cherokee, De Kalb, Etowah, Marshall, and Saint Clair.

Court for the Middle Division shall be held at Gadsden.

    (7) The Jasper Division comprises the counties of Fayette, Lamar, Marion, Walker, and Winston.

Court for the Jasper Division shall be held at Jasper.

### Middle District

(b) The Middle District comprises three divisions.

    (1) The Northern Division comprises the counties of Autauga, Barbour, Bullock, Butler, Chilton, Coosa, Covington, Crenshaw, Elmore, Lowndes, Montgomery, and Pike.

Court for the Northern Division shall be held at Montgomery.

    (2) The Southern Division comprises the counties of Coffee, Dale, Geneva, Henry, and Houston.

# 3 - B

5.    Carlos Jorge of the Hinojosa Family does business as CARLOS JORGE HINOJOSA.

6.    Defendant has cancelled, forfeited, waived, and declined all benefits and privileges from the United States and its instrumentalities.

7.    Defendant has objected to the 14th amendment and is not a citizen of the United States.

8.    Defendant has reserved his rights under the Uniform Commercial Code at Article I, § 207 and has exercised the remedy provided to Defendant whereby Defendant might reserve Defendant's Common Law Right not to be compelled to perform under any contracts, commercial agreements or bankruptcy in which Defendant did not enter knowingly, intentionally, and voluntarily, with full disclosure of all relevant facts, meeting of the minds, specified obligations, and mutual exchange of **fair consideration.**

9.    Further, by such "Reservation of Right at U.C.C. 1-207, Defendant has notified all administrative agencies and agents of Local, State, and Federal governments and their instrumentalities, that, Defendant **does not and will not accept any and all liability** associated with any and all **compelled benefits** of any and all such unrevealed contracts, commercial agreements or bankruptcy, be they Admiralty or otherwise. **Such benefits include but are not limited to the Use of Federal Reserve Notes to discharge debts in equity with limited liability, and any such Use is by compelled Necessity as a matter of survival only**.

10.    Carlos Jorge of the Hinojosa Family is an *Idem Sonans* of the Defendant.

11.    This Court is not an Article III Court established under the Constitution of the United States and has no jurisdiction in this matter.

Ex 3B

authority to decide that question in the first instance." *Rescue Army* v. *Municipal Court of Los Angeles*, 171 P2d 8; 331 US 549, 91 L. ed. 1666, 67 S.Ct. 1409.

21.     This Court is <u>NOT</u> an Article III Court, this Honorable Court lacks Subject Matter Jurisdiction over Plaintiff's suit and therefore, the suit must be dismissed.

## II.  HISTORICAL  SUMMARY OF FACTS AND ARGUMENTS

22.     In the United States, there are two separate and distinct jurisdictions, such being the jurisdiction of the States within their own territorial boundaries and the other being federal jurisdiction. Broadly speaking, state jurisdiction encompasses the legislative power to regulate, control and govern real and personal property, individuals and enterprises within the territorial boundaries of any given State. In contrast, federal jurisdiction is extremely limited, with the same being exercised only in areas external to state legislative power and territory.

23.     Notwithstanding the clarity of this simple principle, the line of demarcation between these two jurisdictions and the extent and reach of each has become somewhat blurred, due to popular misconceptions and the efforts expended by the federal government to conceal one of its major weaknesses. Only by resorting to history and case law can this obfuscation be clarified and the two distinct jurisdictions be readily seen.

24.     The original thirteen colonies of America were each separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and the English Parliament governed each separately and independently.

4

25.     The political connections of the separate colonies to the English Crown and Parliament descended to an unhappy state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, representatives of the several colonies convened the First Continental Congress in October, 1774, the purpose of which was to submit a petition of grievances to the British Parliament and Crown.

26.     By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights," and the purpose of which were designs, schemes and plans "which demonstrate a system formed to enslave America." Revolution was assuredly in the formative stages absent conciliation between the mother country and colonies.

27.     Between October, 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July, 1776, the exercise of British authority in any and all colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal Declaration of Independence.

28.     The legal effect of the Declaration of Independence was to make each new State a separate and independent sovereign over which there was no other government of superior power or jurisdiction. This was clearly shown in M'Ilvaine v. Coxe's Lessee, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

29.     "This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign

5

states, and that they did not derive them from concessions made by the British king. The treaty of peace contains a recognition of their independence, not a grant of it. From hence it results, that the laws of the several state governments were the laws of sovereign states, and as such were obligatory upon the people of such state, from the time they were enacted."

30.     And a further expression of similar import is found in Harcourt v. Gaillard, 25 U.S. (12 Wheat.) 523, 526, 527 (1827), where the Court stated:

31.     "There was no territory within the United States that was claimed in any other right than that of some one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the states.

32.     "Each declared itself sovereign and independent, according to the limits of its territory.

33.     "[T]he soil and sovereignty within their acknowledged limits were as much theirs at the declaration of independence as at this hour."

34.     Thus, unequivocally, in July, 1776, the new States possessed all sovereignty, power, and jurisdiction over all the soil and persons in their respective territorial limits.

35.     This condition of supreme sovereignty of each State over all property and persons within the borders thereof continued notwithstanding the adoption of the Articles of Confederation. In Article II of that document, it was expressly stated:

36.     "Article II. Each state retains its sovereignty, freedom, and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled."

37.     As the history of the confederation government demonstrated, each State was indeed sovereign and independent to the degree that it made the central

6

government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States and the remedy became the calling of a constitutional convention.

38.    The representatives who assembled in Philadelphia in May, 1787, to attend the Constitutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention produced more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by the States at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, Sec. 8, Cl. 17 of the U.S. Constitution, which read as follows:

39.    "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

40.    The reason for the inclusion of this clause in the Constitution was and is obvious. Under the Articles of Confederation, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the Articles was merely a body which represented and acted as agents of the separate States for external affairs, and had no jurisdiction within the States.

41.    This defect in the Articles made the Confederation Congress totally dependent upon any given State for protection, and this dependency did in fact cause embarrassment for that Congress. During the Revolutionary War, while the Congress met in Philadelphia, a body of mutineers from the Continental Army

surrounded the Congress and chastised and insulted the members thereof. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy the situation, and the Congress was forced to flee first to Princeton, New Jersey, and finally to Annapolis, Maryland.

42.     Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places as Congress might purchase for forts, magazines, arsenals, and other needful buildings wherein the State ceded jurisdiction of such lands to the federal government. Other than in these areas, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, and jurisdiction over unceded areas remained within the States.

43.     While there had been no real provisions in the Articles which permitted the Confederation Congress to acquire property and possess exclusive jurisdiction over such property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States.

44.     Such possessions were deemed essential to enable the United States to perform the powers conveyed by the Constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of such lands to Congress. Perhaps the most cogent reasons and explanations for this clause in the Constitution were set forth in Essay No. 43 of The Federalist:

45.     "The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an

8

imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy.

46.    This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

47.    "The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment."

48.    Since the time of the ratification and implementation of the present U.S. Constitution, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply the above provision of the Constitution. And

the essence of all these decisions is that the States of this nation have exclusive
jurisdiction of property and persons located within their borders, excluding such
lands and persons residing thereon which have been ceded to the United States.

49.     Perhaps one of the earliest decisions on this point was United States v.
Bevans, 16 U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for
a murder committed on board the Warship, Independence, anchored in the
harbor of Boston, Massachusetts. The defense complained that only the state
had jurisdiction to prosecute and argued that the federal Circuit Courts had no
jurisdiction of this crime supposedly committed within the federal government's
admiralty jurisdiction. In argument before the Supreme Court, counsel for the
United States admitted as follows:

50.     "The exclusive jurisdiction which the United States have in forts and dock-
yards ceded to them, is derived from the express assent of the states by whom
the cessions are made. It could be derived in no other manner; because without
it, the authority of the state would be supreme and exclusive therein," 3 Wheat.,
at 350, 351.

51.     In holding that the State of Massachusetts had jurisdiction over the crime,
the Court held:

52.     "What, then, is the extent of jurisdiction which a state possesses? "We
answer, without hesitation, the jurisdiction of a state is co-extensive with its
territory; co-extensive with its legislative power," 3 Wheat., at 386, 387.

53.     "The article which describes the judicial power of the United States is not
intended for the cession of territory or of general jurisdiction. ... Congress has
power to exercise exclusive jurisdiction over this district, and over all places
purchased by the consent of the legislature of the state in which the same shall
be, for the erection of forts, magazines, arsenals, dockyards, and other needful
buildings.

54.    "It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction," 3 Wheat., at 388.

55.    Thus in Bevans, the Court established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

56.    The decision in Bevans was closely followed by decisions made in two state courts and one federal court within the next two years. In Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the state law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

57.    "The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts. The legislative power and exclusive jurisdiction remained in the several states, of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states."

58.    A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at

Fort Niagara, a federal fort. In People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819), that court held that the fort was subject to the jurisdiction of the State since the lands therefore had not been ceded to the United States. The rationale of its opinion stated:

59.     "To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offence committed, but the place in which it is committed, which must be out of the jurisdiction of the state."

60.     The case relied upon by this court was U.S. v. Bevans, supra.

61.     At about the same time that the New York Supreme Court rendered its opinion in Godfrey, a similar fact situation was before a federal court, the only difference being that the murder committed in the case occurred on land, which had been ceded to the United States. In United States v. Cornell, 25 Fed.Cas. 646, 648 No. 14,867 (C.C.D.R.I. 1819), the court held that the case fell within federal jurisdiction, describing such jurisdiction as follows:

62.     "But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

63.     "When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto

falls within the exclusive legislation of Congress, and the State jurisdiction is
completely ousted."

64.    Almost 18 years later, the U.S. Supreme Court was again presented with
a case involving the distinction between State and federal jurisdiction. In New
Orleans v. United States, 35 U.S. (10 Pet.) 662, 737 (1836), the United States
claimed title to property in New Orleans likewise claimed by the city. After holding
that title to the subject lands was owned by the city, the Court addressed the
question of federal jurisdiction and stated:

65.    "Special provision is made in the Constitution for the cession of jurisdiction
from the States over places where the federal government shall establish forts or
other military works. And it is only in these places, or in the territories of the
United States, where it can exercise a general jurisdiction."

66.    In New York v. Miln, 36 U.S. (11 Pet.) 102 (1837), the question before the
Court involved the attempt by the City of New York to assess penalties against
the master of a ship for his failure to make a report as to the persons his ship
brought to New York. As against the master's contention that the act was
unconstitutional and that New York had no jurisdiction in the matter, the Court
held:

67.    "If we look at the place of its operation, we find it to be within the territory,
and, therefore, within the jurisdiction of New York. If we look at the person on
whom it operates, he is found within the same territory and jurisdiction," 36 U.S.,
at 133.

68.    "They are these: that a State has the same undeniable and unlimited
jurisdiction over all persons and things within its territorial limits, as any foreign
nation, where that jurisdiction is not surrendered or restrained by the Constitution
of the United States. That, by virtue of this, it is not only the right, but the
bounden and solemn duty of a State, to advance the safety, happiness and
prosperity of its people, and to provide for its general welfare, by any and every

act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive," 36 U.S., at 139.

69.    Some eight years later, in Pollard v. Hagan, 44 U.S. (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a contest of the title to real property, with one of the parties claiming a right to the disputed property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay. In discussing the subject of federal jurisdiction, the Court held:

70.    "We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," 44 U.S., at 221.

71    "[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," 44 U.S., at 223.

72.    "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," 44 U.S., at 228, 229.

73.    The single most important case regarding the subject of federal jurisdiction appears to be Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. There, the railroad company property, which passed through the Fort Leavenworth federal enclave, was being subjected to taxation by Kansas, and the company claimed an exemption from

state taxation. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

74.     "The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals."

75.     Thus, the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to such jurisdiction; this jurisdiction is superior. Federal jurisdiction results only from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. And there is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and possessions of the United States.

76.     The above principles of jurisdiction established continue their vitality today with only one minor exception. In the last century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing into the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which had been totally surrendered by the States. With the advent in this century of large federal works projects and

15

national parks, the problems regarding management of these areas by the
federal government were magnified.

77.    During the last century or so, it was thought that if a State ceded
jurisdiction to the federal government, the cession granted full and complete
jurisdiction. But, with the ever increasing number of separate tracts of land falling
within the jurisdiction of the federal government, it was obviously determined by
both federal and state public officers that the States should retain greater control
over these ceded lands, and the courts have acknowledged the constitutionality
of varying degrees of state jurisdiction and control over lands so ceded.

78.    Perhaps one of the first cases to acknowledge the proposition that a State
could retain a degree of jurisdiction over property ceded to the federal
government was Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455
(1930). In this case, a state attempt to assess an ad valorem tax on Army
blankets located within a federal army camp was found invalid and beyond the
state's jurisdiction. But, in regards to the proposition that a State could make a
qualified cession of jurisdiction to the federal government, the Court held:

79.    "[T]he state undoubtedly may cede her jurisdiction to the United States
and may make the cession either absolute or qualified as to her may appear
desirable, provided the qualification is consistent with the purposes for which the
reservation is maintained and is accepted by the United States. And, where such
a cession is made and accepted, it will be determinative of the jurisdiction of both
the United States and the state within the reservation," 281 U.S., at 651, 652.

80.    Two cases decided in 1937 by the U.S. Supreme Court further clarify the
constitutionality of a reservation of any degree of state jurisdiction over lands
ceded to the jurisdiction of the United States. In James v. Dravo Contracting
Company, 302 U.S. 134, 58 S.Ct. 208 (1937), the State of West Virginia sought
to impose a tax upon the gross receipts of the company arising from a contract
which it had made with the United States to build some dams on rivers. One of

16

the issues involved in this case was the validity of the state tax imposed on the receipts derived by the company from work performed on lands to which the State had ceded "concurrent" jurisdiction to the United States. In the Court's opinion, it held that a State could reserve and qualify any cession of jurisdiction for lands owned by the United States; since the State had done so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of jurisdiction to the U.S.

81.     A similar result occurred in Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233 (1937). Here, the United States was undertaking the construction of several dams on the Columbia River in Washington, and had purchased the lands necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee Dam, but filed suit challenging the Washington income tax when that State sought to impose such tax on the contract proceeds. Either the Supreme Court of Washington or the U.S. Supreme Court did not uphold Mason's argument that the federal government had exclusive jurisdiction over both the lands and such contract. The latter Court held that none of the lands owned by the U.S. were within its jurisdiction and thus Washington clearly had jurisdiction to impose the challenged tax; see also Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663 (1946).

82.     Some few years later in 1943, the Supreme Court was again presented with similar taxation and jurisdiction issues; the facts in these two cases were identical with the exception that one clearly involved lands ceded to the jurisdiction of the United States. This single difference caused directly opposite results in both cases. In Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628 (1943), the question involved the applicability of state law to a contract entered into and performed on a federal enclave to which jurisdiction had been ceded to the United States.

83.     During World War II, California passed a law setting a minimum price for the sale of milk, which law imposed penalties for sales made below the regulated

price. Here, Pacific Coast Dairy consummated a contract on Moffett Field, a
federal enclave within the exclusive jurisdiction of the United States, to sell milk
to such federal facility at below the regulated price. When this occurred,
California sought to impose a penalty for what it perceived as a violation of state
law. But, the U.S. Supreme Court refused to permit the enforcement of the
California law, holding that the contract was made and performed in a territory
outside the jurisdiction of California and within the jurisdiction of the United
States, a place where this law didn't apply.

84.     Thus, in this case, the existence of federal jurisdiction was the foundation
for the ruling. However, in Penn Dairies v. Milk Control Commission of
Pennsylvania, 318 U.S. 261, 63 S.Ct. 617 (1943), an opposite result was
reached on almost identical facts. Here, Pennsylvania likewise had a law, which
regulated the price of milk and penalized sales of milk below the regulated price.
During World War II, the United States leased some land from Pennsylvania for
the construction of a military camp; since the land was leased, Pennsylvania did
not cede jurisdiction to the United States. When Penn Dairies sold milk to the
military facility for a price below the regulated price, the Commission sought to
impose the penalty. In this case, since there was no federal jurisdiction, the
Supreme Court found that the state law applied and permitted the imposition of
the penalty. Thus, these two cases clearly show the different results, which can
occur with the presence or absence of federal jurisdiction.

85.     A final point, which must be made regarding federal jurisdiction, involves
the point as to when such jurisdiction ends or ceases. This point was considered
in S.R.A. v. Minnesota, 327 U.S. 558, 66 S.Ct. 749 (1946), which involved the
power of a State to tax the real property interest of a purchaser of land sold by
the United States. Here, a federal post office building was sold to S.R.A.
pursuant to a real estates sale contract, which provided that title would pass only
after the purchase price had been paid. In refuting the argument of S.R.A. that
the ad valorem tax on its equitable interest in the property was really an unlawful
tax on U.S. property, the Court held:

18

86.    "In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article I, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states.

87.    As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power," 327 U.S., at 563, 564.

88.    Thus, it appears clearly that once that government no longer utilizes any property within the exclusive jurisdiction of the United States for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts to the State.

89.    The above principles regarding the distinction between State and federal jurisdiction continue through today; see Paul v. United States, 371 U.S. 245, 83 S.Ct. 426 (1963), and United States v. State Tax Commission of Mississippi, 412 U.S. 363, 93 S.Ct. 2183 (1973). And what was definitely decided in the beginning days of this Republic regarding the extent, scope, and reach of each of these two distinct jurisdictions remains unchanged and forms the foundation and basis for the smooth workings of state governmental systems in conjunction with the federal government. Without such jurisdictional principles, which form a clear boundary between the jurisdiction of the States and the United States, our federal governmental system would have surely met its demise long before now.

90.     In summary, jurisdiction of the States is essentially the same as that possessed by the States, which were leagued together under the Articles of Confederation. The confederated States possessed absolute, complete and full jurisdiction over property and persons located within their borders. It is hypocritical to assume or argue that these States, which had absolved and banished the centralized power and jurisdiction of the English Parliament and Crown over them by the Declaration of Independence, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress. They did not and they closely and jealously guarded their own rights, powers and jurisdiction. When the Articles were replaced by the Constitution, the intent and purpose of the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States for lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

91.     By the adoption of the Constitution, the States jointly surrendered some 17 specific and well-defined powers to the federal Congress, which related strictly to external affairs of the States. Any single power, or even several powers combined, do not operate in a fashion as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent.

92.     The only provision in the Constitution, which permits jurisdiction to be vested in the United States, is found in Art. I, Sec. 8, Cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, possessing jurisdiction only in the lands encompassed in the Northwest Territories.

93.    Shortly thereafter, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. As time progressed thereafter, the States at various times ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions, which may be now owned by the United States.

94.    The above conclusion is not the mere opinion of the author of this brief, but it is likewise that of the federal government itself. In June 1957, the government of the United States published a work entitled Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part II, which report is the definitive study on this issue. Therein, the Committee stated:

95.    "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction – by State consent under Article I, section 8, clause 17 .... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place," Id., at 41.

96.    "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the State, the Federal Government possesses no legislative jurisdiction over any area within a State, such jurisdiction being for exercise by the State, subject to non-interference by the State with Federal functions," Id., at 45.

97.    "The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State," Id., at 46.