

# U.S. Supreme Court

## MOOKINI v. UNITED STATES, 303 U.S. 201 (1938)

### 303 U.S. 201

**MOOKINI et al.**
**v.**
**UNITED STATES. ***

**No. 319.**
**Argued and Submitted Feb. 2, 1938.**
**Decided Feb. 28, 1938.**

[303 U.S. 201, 202]  Mr. O. P. Soares, of Honolulu, Hawaii, for petitioners.

Mr. Bates Booth, of Washington, D.C., for the United States.

Mr. Chief Justice HUGHES delivered the opinion of the Court.

Petitioners were convicted in the District Court of the Territory of Hawaii of violating section 35 of the Criminal Code, as amended, relating to fraudulent claims. 18 U.S.C. 80, 18 U.S.C.A. 80. The verdict was rendered on May 28, 1935; motions for a new trial were overruled on June 19, 1935; and petitioners were sentenced on June 29, 1935. Appeal was allowed by the District Court on September 27, 1935

The Circuit Court of Appeals, Ninth Circuit, finding that the appeal was not taken in the manner or within the time permitted by the Criminal Appeals Rules promulgated by this Court on May 7, 1934, Rule 3, 28 U.S.C.A. following section 723a, 292 U.S. 662, 663, dis- [303 U.S. 201, 203] missed the appeal. 92 F.2d 126. In view of the importance of the question as to the application of the Criminal Appeals Rules to the District Court of the Territory of Hawaii, we granted certiorari. 302 U.S. 674, 58 S.Ct. 53, 82 L.Ed. —.

It is not questioned that the appeal to the Circuit Court of Appeals was allowed within the three months' period specified in section 8(c) of the Act of February 13, 1925, c. 229, 43 Stat. 936, 940, 28 U.S.C. 225, 230, 28 U.S.C.A. 225, 230; 48 U.S.C. 645, 48 U.S.C.A. 645. The Criminal Appeals Rules were promulgated pursuant to the Act of March 8, 1934, 48 Stat. 399, amending the Act of February 24, 1933. 28 U.S. C. 723a, 28 U.S.C.A. 723a. The act authorized this Court "to prescribe, from time to time, rules of practice and procedure with respect to any or all proceedings after verdict, or finding of guilt by the court if a jury has been waived, or plea of guilty, in criminal cases in district courts of the United States, including the District Courts of Alaska, Hawaii, Puerto Rico, Canal Zone, and Virgin Islands, in the Supreme Courts of the District of Columbia, Hawaii, and Puerto Rico, in the United States Court for

4A —40

1

244 of the Judicial Code was repealed, but section 246 (Comp. St. 1223) was amended and made to apply to the appellate jurisdiction of this court in respect to the decisions of the Supreme Court, not only of Hawaii, as before, but also Porto Rico, and it was provided that writs of error to those courts from this court could be prosecuted in the same class of cases as those in which this court was authorized under section 237 of the Judicial Code (Comp. St. 1214) to review decisions of state courts of last resort. Section 237 at that time allowed a writ of error to final decisions in state courts of last resort where was drawn in question the validity of a treaty, or a statute of, or an authority exercised under, the United States and the decision was against its validity, or where was drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States and the decision was in favor of its validity, or where any title, right, privilege, or immunity was claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under, the United States, and the decision was against the title, right, privilege or immunity especially set up or claimed by either party under such Constitution, treaty, statute, commission or authority. By Act of January 28, 1915 (38 Stat. 803, 804, amending section 246), this court was given power by certiorari to bring up for review all final judgments or decrees in civil or criminal cases in the supreme courts of Porto Rico and Hawaii, other than those reviewable here by writ of error because in the class similar to that described in section 237 of the Judicial Code. By Act of September 6, 1916 (39 Stat. 726), the jurisdiction of this court to review by writ of error, under section 237, final judgments and decrees of state courts of last resort was cut down by omitting cases (other than those involving the validity of [258 U.S. 298, 302] a treaty, statute or authority exercised under the United States or any state) wherein a title, right, privilege, or immunity, was claimed under the Constitution, or any treaty or statute of, or commission held, or authority exercised under, the United States, and the decision was against such title, right, privilege or immunity, and such cases, it was provided, could only be examined on review in this court by certiorari.

The question now presented is whether the amendment to section 237 of the Judicial Code by the Act of 1916 applies to, and affects, the appellate jurisdiction of this court in reviewing decisions of the Supreme Court of Porto Rico. We think it does. We think that the manifest purpose of the Act of 1915, amending section 246 of the Code, in its reference to section 237 of the Judicial Code was to assimilate the appellate jurisdiction of this Court over the Supreme Courts of Porto Rico and Hawaii to that over state courts of last resort, and that the reference in amended section 246, to section 237 may be fairly construed to embrace subsequent changes in section 237 that are not obviously inapplicable.

This brings us to the question whether there was drawn in question in these cases the validity of a statute of Porto Rico under the Constitution of the United States. The Penal Code of Porto Rico divides crimes into felonies and misdemeanors. Rev. Stat. and Codes of Porto Rico 1911, Penal Code, 13. A felony is described as a crime punishable by death or imprisonment in the penitentiary. Every other crime is declared to be a misdemeanor. Penal Code, 14. Section 178 of the Porto Rican Code of Criminal Procedure provided that issues of fact in cases of felony should be tried by a jury when the defendant so elected,

2

but gave no such right in the case of misdemeanors. This was construed by the Supreme Court to deny such right. People v. Bird, 5 P. R. R. 387.

By section 244 (5676) of the Penal Code (as amended by Act of March 9, 1911, p. 71), the publication of a libel is made [258 U.S. 298, 303] punishable by a fine not exceeding $5,000, or imprisonment in jail for a term not exceeding two years, or both such fine and imprisonment, and also the costs of the action in the discretion of the court. It is, therefore, plain that libel under the Porto Rican law is a misdemeanor, and a jury trial was not required therein. By the Act of July 22, 1919 (Laws of Porto Rico 1919, No. 84, p. 684), a jury trial is now given in misdemeanors, but that did not come into force until after these libels were published and these trials had.

When the Penal Code, and the Code of Criminal Procedure were first passed in 1901, they both contained the provision that in all cases of libel the jury should determine the law and the fact. It was held, however, by the Supreme Court of Porto Rico in People v. Bird, 5 P. R. R. 387, 405, that this did not give a jury trial, but only made provision that if and when a right of jury trial was given in such cases, the jury should have the power to determine the law and the fact. Thereafter the Act of March 10, 1904 (Laws of Porto Rico 1904, p. 130), expressly repealed all reference to trials for libel in the Jury Act.

The effect of the Penal Code of Procedure, as construed by the Supreme Court of Porto Rico, and of the Act of March 10, 1904, repealing the jury act as to libel cases, was a statutory denial of the right of jury trial in such cases. A demand for a jury trial in this case, therefore, drew in question the validity of the statutes upon which the court relied in denying the demand. This necessarily leads to the conclusion that these cases are in the same class as those which come to this court by writ of error under section 237, as amended by the Act of 1916, and that jurisdiction by writ of error exists.

Was the issue properly saved in the record by the defendant? We think it was. The demand for a jury trial, the statute to the contrary notwithstanding, was made at the trial. It was renewed in the assignments of error in [258 U.S. 298, 304] the Porto Rican Supreme Court and here. Those assignments did not mention the statutes whose validity was involved, but merely averred that the defendant had been denied his right as an American citizen under the Sixth Amendment to the Constitution. While this is informal, we think that it is sufficient when the record discloses the real nature of the controversy and the specification of the assignment leaves no doubt that it is directed to that controversy.

We have now to inquire whether that part of the Sixth Amendment to the Constitution, which requires that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, applies to Porto Rico. Another provision on the subject is in article 3 of the Constitution providing that the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed. The Seventh Amendment of the Constitution

3

provides that in suits at common law, when the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. It is well settled that these provisions for jury trial in criminal and civil cases apply to the Territories of the United States. Webster v. Reid, 11 How. 437, 460; Reynolds v. United States, 98 U.S. 145, 167; Callan v. Wilson, 127 U.S. 540, 556, 8 S. Sup. Ct. 1301; American Publishing Co. v. Fisher, 166 U.S. 464, 17 Sup. Ct. 618; Thompson v. Utah, 170 U.S. 343, 347, 18 S. Sup. Ct. 620; Capital Traction Co. v. Hof, 174 U.S. 1, 19 Sup. Ct. 580; Black v. Jackson, 177 U.S. 349, 20 Sup. Ct. 648; Rasmussen v. United States, 197 U.S. 516, 528, 25 S. Sup. Ct. 514; Gurvich v. United States, 198 U.S. 581, 25 Sup. Ct. 803. But it is just as clearly settled that they do not apply to territory belonging to the [258 U.S. 298, 305] United States which has not been incorporated into the Union. Hawaii v. Mankichi, 190 U.S. 197, 23 Sup. Ct. 787; Dorr v. United States, 195 U.S. 138, 145, 24 S. Sup. Ct. 808, 1 Ann. Cas. 697. It was further settled in Downes v. Bidwell, 182 U.S. 244, 21 Sup. Ct. 770, and confirmed by Dorr v. United States, 195 U.S. 138, 24 Sup. Ct. 808, 1 Ann. Cas. 697, that neither the Philippines nor Porto Rico was territory which had been incorporated in the Union or become a part of the United States, as distinguished from merely belonging to it; and that the acts giving temporary governments to the Philippines, 32 Stat. 691 (Comp. St. 3804 et seq.), and to Porto Rico, 31 Stat. 77 (Comp. St. 3748 et seq.), had no such effect. The Insular Cases revealed much diversity of opinion in this Court as to the constitutional status of the territory acquired by the Treaty of Paris ending the Spanish War, but the Dorr Case shows that the opinion of Mr. Justice White of the majority, in Downes v. Bidwell, has become the settled law of the court. The conclusion of this court in the Dorr Case, 195 U.S. 149, 24 Sup. Ct. 813, 1 Ann. Cas. 697, was as follows:

> 'We conclude that the power to govern territory, implied in the right to acquire it, and given to Congress in the Constitution in article 4, 3, to whatever other limitations it may be subject, the extent of which must be decided as questions arise, does not require that body to enact for ceded territory, not made part of the United States by congressional action, a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation and of its own force, carry such right to territory so situated.'

The question before us, therefore, is: Has Congress, since the Foraker Act of April 12, 1900 (31 Stat. 77), enacted legislation incorporating Porto Rico into the Union? Counsel for the plaintiff in error give, in their brief, an extended list of acts, to which we shall refer later, which they urge as indicating a purpose to make the island a part of the United States, but they chiefly rely on the Organic Act of Porto Rico of March 2, 1917 (38 Stat. 951 [Comp. St. 3803a-3803z]), known as the Jones Act. [258 U.S. 298, 306]  The act is entitled 'An act to provide a civil government for Porto Rico and for other purposes.' It does not indicate by its title that it has a purpose to incorporate the island into the Union. It does not contain any clause which declares such purpose or effect. While this is not conclusive, it strongly tends to show that Congress did not have such an intention. Few questions have been the subject of such discussion and dispute in our country as the status of our territory acquired from Spain in 1899. The division between the political parties in respect to it, the diversity of the views of the members of this court in regard to its constitutional aspects, and the constant recurrence of the subject in the Houses of

4

Congress, fixed the attention of all on the future relation of this acquired territory to the United States. Had Congress intended to take the important step of changing the treaty status of Porto Rico by incorporating it into the Union, it is reasonable to suppose that it would have done so by the plain declaration, and would not have left it to mere inference. Before the question became acute at the close of the Spanish War, the distinction between acquisition and incorporation was not regarded as important, or at least it was not fully understood and had not aroused great controversy. Before that, the purpose of Congress might well be a matter of mere inference from various legislative acts; but in these latter days, incorporation is not to be assumed without express declaration, or an implication so strong as to exclude any other view.

Again, the second section of the act is called a 'Bill of Rights,' and included therein is substantially every one of the guaranties of the federal Constitution, except those relating to indictment by a grand jury in the case of infamous crimes and the right of trial by jury in civil and criminal cases. If it was intended to incorporate Porto Rico into the Union by this act, which would ex proprio vigore make applicable the whole Bill of Rights [258 U.S. 298, 307] of the Constitution to the island, why was it thought necessary to create for it a Bill of Rights and carefully exclude trial by jury? In the very forefront of the act is this substitute for incorporation and application of the Bill of Rights of the Constitution. This seems to us a conclusive argument against the contention of counsel for the plaintiff in error.

The section of the Jones Act which counsel press on us is section 5. This in effect declares that all persons who under the Foraker Act were made citizens of Porto Rico and certain other residents shall become citizens of the United States, unless they prefer not to become such, in which case they are to declare such preference within six months, and thereafter they lose certain political rights under the new government. In the same section the United States District Court is given power separately to naturalize individuals of some other classes of residents. We set out the section in full in the margin. 1 Unaffected by the considerations [258 U.S. 298, 308] already suggested, perhaps the declaration of section 5 would furnish ground for an inference such as counsel for plaintiff in error contend, but under the circumstances we find it entirely consistent with nonincorporation. When Porto Ricans passed from under the government of Spain, they lost the protection of that government as subjects of the king of Spain, a title by which they had been known for centuries. They had a right to expect, in passing under the dominion of the United States, a status entitling them to the protection of their new sovereign. In theory and in law, they had it as citizens of Porto Rico, but it was an anomalous status, or seemed to be so in view of the fact that those who owed and rendered allegiance to the other great world powers were given the same designation and status as those living in their respective home countries so far as protection against foreign injustice went. It became a yearning of the Porto Ricans to be American citizens, therefore, and this act gave them the boon. What additional rights did it give them? It enabled them to move into the continental United States and becoming residents of any State there to enjoy every right of any other citizen of the United States, civil, social and political. A citizen of the Philippines must be naturalized before he can settle and vote in this country. Act of June 29, 1906, 30, 34 Stat. 606 (Comp. St. 4366). Not so the Porto Rican under the Organic

5

Act of 1917. [258 U.S. 298, 309]  In Porto Rico, however, the Porto Rican can not insist upon the right of trial by jury, except as his own representatives in his legislature shall confer it on him. The citizen of the United states living in Porto Rico cannot there enjoy a right of trial by jury under the federal Constitution, any more than the Porto Rican. It is locality that is determinative of the application of the Constitution, in such matters as judicial procedure, and not the status of the people who live in it.

It is true that in the absence of other and countervailing evidence, a law of Congress or a provision in a treaty acquiring territory, declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds upon which this court placed its conclusion that Alaska had been incorporated in the Union, in Rasmussen v. United States, 197 U.S. 516 , 25 Sup. Ct. 514. But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled, and offering opportunity for immigration and settlement by American citizens. It was on the American continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents, and one of them is in the very matter of trial by jury. This court refers to the difficulties in Dorr v. United States, 195 U.S. 138, 148 , 24 S. Sup. Ct. 808, 812 (49 L. Ed. 128, 1 Ann. Cas. 697):

> 'If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory, ... was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice [258 U.S. 298, 310]  and provoke disturbance rather than to aid the orderly administration of justice. ... Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored, and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition.'

The jury system needs citizens trained to the exercise of the responsibilities of jurors. In common-law countries centuries of tradition have prepared a conception of the impartial attitude jurors must assume. The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire. One of its greatest benefits is in the security it gives the people that they, as jurors, actual or possible, being part of the judicial system of the country, can prevent its arbitrary use or abuse. Congress has thought that a people like the Filipinos, or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and

6

political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when. Hence the care with which, from the time when Mr. McKinley wrote his historic letter to Mr. Root in April of 1900 (Public Laws Philippine Commission, 6-9-Act of July 2, 1902, 691, 692), concerning the character of government to be set up for the Philippines by the Philippine Commission, until the Act [258 U.S. 298, 311]  of 1917, giving a new Organic Act to Porto Rico, the United States has been liberal in granting to the islands acquired by the Treaty of Paris most of the American constitutional guaranties, but has been sedulous to avoid forcing a jury system on a Spanish and civil law country until it desired it. We cannot find any intention to depart from this policy in making Porto Ricans American citizens, explained as this is by the desire to put them as individuals on an exact equality with citizens from the American homeland, to secure them more certain protection against the world, and to give them an opportunity, should they desire, to move into the United States proper, and there without naturalization to enjoy all political and other rights.

We need not dwell on another consideration which requires us not lightly to infer, from acts thus easily explained on other grounds, an intention to incorporate in the Union these distant ocean communities of a different origin and language from those of our continental people. Incorporation has always been a step, and an important one, leading to statehood. Without, in the slightest degree, intimating an opinion as to the wisdom of such a policy, for that is not our province, it is reasonable to assume that, when such a step is taken, it will be begun and taken by Congress deliberately, and with a clear declaration of purpose, and not left a matter of mere inference or construction.

Counsel for the plaintiff in error also rely on the organization of a United States District Court in Porto Rico, on the allowance of review of the Porto Rican Supreme Court in cases when the Constitution of the United States is involved, on the statutory permission that Porto Rican youth can attend West Point and Annapolis Academies, on the authorized sale of United States stamps in the island, on the extension of revenue, navigation, immigration, [258 U.S. 298, 312]  national banking, bankruptcy, federal employers' liability, safety appliance, extradition, and census laws in one way or another to Porto Rico. With the background of the considerations already stated, none of these, nor all of them put together, furnish ground for the conclusion pressed on us.

The United States District Court is not a true United States court established under article 3 of the Constitution to administer the judicial power of the United States therein conveyed. It is created by virtue of the sovereign congressional faculty, granted under article 4, 3, of that instrument, of making all needful rules and regulations respecting the territory belonging to the United States. The resemblance of its jurisdiction to that of true United States courts, in offering an opportunity to nonresidents of resorting to a tribunal not subject to local influence, does not change its character as a mere territorial court. Nor does the legislative recognition that federal constitutional questions may arise in litigation in Porto Rico have any weight in this discussion. The Constitution of the United States is in force in Porto Rico as it is wherever and whenever the sovereign power of that government is exerted. This has not only been admitted, but emphasized, by this court in all its authoritative expressions upon the issues arising in the Insular Cases,

7

especially in the Downes v. Bidwell and the Door Cases. The Constitution, however, contains grants of power, and limitations which in the nature of things are not always and everywhere applicable and the real issue in the Insular Cases was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which ones of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements. The guaranties of certain fundamental personal rights declared in the Constitution, as, for instance, [258 U.S. 298, 313] that no person could be deprived of life, liberty, or property without due process of law, had from the beginning full application in the Philippines and Porto Rico, and, as this guaranty is one of the most fruitful in causing litigation in our own country, provision was naturally made for similar controversy in Porto Rico. Indeed, provision is made for the consideration of constitutional questions coming on appeal and writs of error from the Supreme Court of the Philippines, which are certainly not incorporated in the Union. Judicial Code, 248 (Comp. St. 1225a).

On the whole, therefore, we find no features in the Organic Act of Porto Rico of 1917 from which we can infer the purpose of Congress to incorporate Porto Rico into the United States with the consequences which would follow.

This court has passed on substantially the same questions presented here in two cases, People of Porto Rico v. Tapia, 245 U.S. 639, 38 Sup. Ct. 192, and People v. Muratti, 245 U.S. 639, 38 Sup. Ct. 192. In the former, the question was whether one who was charged with committing a felonious homicide some 12 days after the passage of the Organic Act in 1917, could be brought to trial without an indictment of a grand jury as required by the Fifth Amendment to the Constitution. The United States District Court of Porto Rico, on a writ of habeas corpus, held that he could not be held to answer and discharged him. In the other case, the felony charged was alleged to have been committed before the passage of the Organic Act, but prosecution was begun afterwards. In that, the Supreme Court of Porto Rico held that an indictment was not rendered necessary by the Organic Act. This court reversed the District Court in the Tapia Case and affirmed the Supreme Court in the Muratti Case, necessarily holding the Organic Act had not incorporated Porto Rico into the United States. These cases were disposed of by a per curiam. Counsel have urged us in the cases [258 U.S. 298, 314] at the bar to deal with the questions raised more at length in exposition of the effect of the Organic Act of 1917 upon the issue, and we have done so.

A second assignment of error is based on the claim that the alleged libels here did not pass the bounds of legitimate comment on the conduct of the Governor of the island, against whom they were directed, and that its prosecution is a violation of the First Amendment to the Constitution, securing free speech and a free press. A reading of the two articles removes the slightest doubt that they go far beyond the 'exuberant expressions of meridional speech,' to use the expression of this court in a similar case in Gandia v. Pittingill, 222 U.S. 452, 458, 32 S. Sup. Ct. 127. Indeed, they are so excessive and outrageous in their character that they suggest the query whether their superlative vilification has not overleaped itself and become unconsciously humorous. But this is not a defense.

8

The judgments of the Supreme Court of Porto Rico are

AFFIRMED.

Mr, Justice HOLMES concurs in the result.

### Footnotes

[ Footnote 1 ] Sec. 5. That all citizens of Porto Rico as defined by section seven of the act of April twelfth, nineteen hundred, 'temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, are hereby declared, and shall be deemed and held to be, citizens of the United States: Provided, that any person hereinbefore described may retain his present political status by making a declaration, under oath, of his decision to do so within six months of the taking effect of this act before the district court in the district in which he resides, the declaration to be in form as follows:

> '_____, _____, being duly sworn, hereby declare my intention not to become a citizen of the United States as provided in the act of Congress conferring United States citizenship upon citizens of Porto Rico and certain natives permanently residing in said island.'

In the case of any such person who may be absent from the island during said six months the term of this proviso may be availed of by transmitting a declaration, under oath, in the form herein in provided within six months of the taking effect of the act to the executive secretary of Porto Rico: And provided further, that any person who is born in Porto Rico of an alien parent and is permanently residing in that island may, if of full age, within six months of the taking his majority or within or if a minor, upon reaching his majority or within one year thereafter, make a sworn declaration of allegiance to the United States before the United States District Court for Porto Rico, setting forth therein all the facts connected with his or her birth and residence in Porto Rico and accompanying due proof thereof, and from and after the making of such declaration shall be considered to be a citizen of the United States.



# U.S. Supreme Court

## BALZAC v. PEOPLE OF PORTO RICO, 258 U.S. 298 (1922)

### 258 U.S. 298

**BALZAC**

**v.**

**PEOPLE OF PORTO RICO (two cases).**

**Nos. 178, 179.**
**Argued March 28, 1922.**
**Decided April 10, 1922.**

[258 U.S. 298, 299]  Mr. Jackson H. Ralston, of Washington, D. C. for plaintiff in error.

Mr. Grant T. Trent, of Washington, D. C., for the People of Porto Rico.

[258 U.S. 298, 300]

Mr. Chief Justice TAFT delivered the opinion of the Court.

These are two prosecutions for criminal libel, brought against the same defendant, Jesus M. Balzac, on informations filed in the district court for Arecibo, Porto Rico, by the district attorney for that district. Balzac was the editor of a daily paper published in Arecibo, known as 'El Baluarte,' and the articles upon which the charges of libel were based were published on April 16 and April 23, 1918, respectively. In each case the defendant demanded a jury. The Code of Criminal Procedure of Porto Rico grants a jury trial in cases of felony, but not in misdemeanors. The defendant, nevertheless, contended that he was entitled to a jury in such a case, under the Sixth Amendment to the Constitution, and that the language of the alleged libels was only fair comment, and their publication was protected by the First Amendment. His contentions were overruled; he was tried by the court, and was convicted in both cases and sentenced to five months' imprisonment in the district jail in the first, and to four months in the second, and to the payment of the costs in each. The defendant appealed to the Supreme Court of Porto Rico. That court affirmed both judgments. People v. Balzac, 28 P. R. R. 139; second case, 28 P. R. R. 141.

The first question in these cases is one of jurisdiction of this court. By section 244 of the Judicial Code, approved March 3, 1911 (36 Stat. 1157), it was provided that writs of error and appeals from the final judgments and decrees of the Supreme Court of Porto Rico might be prosecuted to this court in any case in which was drawn in question the validity of a treaty or statute of, or authority exercised under, the United States or wherein the Constitution of the United States, or a treaty thereof, or an act of Congress was brought in question and the right claimed thereunder was denied, and this without regard to the [258 U.S. 298, 301]  amount involved. By the Act of January 28, 1915 (38 Stat. 803), section

1

FEDERAL JURISDICTION

#4 - 8 c

(Last update: September 1, 1999)

# FEDERAL JURISDICTION

In the United States, there are two separate and distinct jurisdictions, one being that of the States within their own territorial boundaries and the other being federal jurisdiction. Broadly speaking, state jurisdiction encompasses the legislative power to regulate, control and govern real and personal property, individuals and enterprises within the territorial limits of any given State. In contrast, federal jurisdiction is extremely limited, with the same being exercised only in areas external to state legislative power and territory. Notwithstanding the clarity of this simple principle, the line of demarcation between these two jurisdictions and the extent and reach of each has become somewhat blurred due to popular misconceptions and the efforts expended by the federal government to conceal one of its major weaknesses. Only by resorting to history and case law can this obfuscation be clarified and the two distinct jurisdictions be readily seen.

The original thirteen colonies of America were each separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and each was governed separately and independently by the English Parliament.

The political connections of the separate colonies to the English Crown and Parliament descended to an rebellious state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, the First Continental Congress was convened by representatives of the several colonies in October, 1774, and its purpose was to submit a petition of grievances to the British Parliament and Crown. By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights;" but further, they asserted that these acts manifested designs, schemes and plans "which demonstrate a system formed to enslave America."

Matters grew worse and between October, 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July, 1776, the exercise of British authority in all of the colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal

FEDERAL JURISDICTION

Declaration of Independence.

The legal effect of the Declaration of Independence was to make each new State a separate and independent sovereign over which there was no other government of superior power or jurisdiction. This was clearly shown in *M'Ilvaine v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

> "This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign states, and that they did not derive them from concessions made by the British king. The treaty of peace contains a recognition of their independence, not a grant of it. From hence it results, that the laws of the several state governments were the laws of sovereign states, and as such were obligatory upon the people of such state, from the time they were enacted."

The consequences of independence was again explained in *Harcourt v. Gaillard*, 25 U.S. (12 Wheat.) 523, 526, 527 (1827), where the Supreme Court stated:

> "There was no territory within the United States that was claimed in any other right than that of some one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the states.
>
> "Each declared itself sovereign and independent, according to the limits of its territory.
>
> "[T]he soil and sovereignty within their acknowledged limits were as much theirs at the declaration of independence as at this hour."

Thus, unequivocally, in July, 1776, the new States possessed all sovereignty, power, and jurisdiction over all the soil and persons in their respective territorial limits.

This condition of supreme sovereignty of each State over all property and persons within the borders thereof continued notwithstanding the adoption of the Articles of Confederation. Article II of that document declared:

> "Article II. Each state retains its sovereignty, freedom, and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United

States, in Congress assembled."

As the history of the confederation government demonstrated, each State was indeed sovereign and independent to such a degree that it made the central government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States and the remedy became the calling of a constitutional convention.

The representatives which assembled in Philadelphia in May, 1787, to attend the Constitutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention was more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by them at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, § 8, cl. 17 of the U.S. Constitution, which defined federal jurisdiction as follows:

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The reason for the inclusion of this clause in the Constitution is obvious. Under the Articles of Confederation, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the Articles of Confederation was merely a body which represented and acted as agents of the separate States for external affairs, and it had no jurisdiction within the States. This defect in the Articles made the Confederation Congress totally dependent upon any given State for protection, and this dependency did in fact cause embarrassment for that Congress. During the Revolutionary War while the Congress met in Philadelphia, a body of mutineers from the Continental Army surrounded the Congress and chastised and insulted its members. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy this situation, so Congress was forced to flee first to Princeton, New Jersey, and finally to Annapolis, Maryland.[1] Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places which Congress might purchase for forts, magazines, arsenals and other needful buildings wherein the

State ceded jurisdiction of such lands to the federal government. Other than in these areas, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, and jurisdiction over those areas which had not been so ceded remained within the States.

While there had been no real provisions in the Articles which permitted the Confederation Congress to acquire property and possess exclusive jurisdiction over that property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States. These lands were deemed essential to enable the United States to perform the powers delegated by the Constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of them to Congress. Perhaps the best explanations for this clause in the Constitution were set forth in Essay No. 43 of *The Federalist*:

"The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

"The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment."

Since the ratification of the present U.S. Constitution, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply this clause of the Constitution. The essence of all these decisions manifests a legal principle that the States of this nation have exclusive jurisdiction of property and persons located within their borders, excluding such lands and persons residing thereon which have been ceded to the United States.

Perhaps one of the earliest decisions on this point was _United States v. Bevans_, 16 U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts. The defense complained that only the state had jurisdiction to prosecute this crime and argued that the federal circuit courts had no jurisdiction of this crime supposedly committed within the federal government's admiralty jurisdiction. In argument before the Supreme Court, counsel for the United States admitted as much:

"The exclusive jurisdiction which the United States have in forts and dock-yards ceded to them, is derived from the express assent of the states by whom the cessions are made. It could be derived in no other manner; because without it, the authority of the state would be supreme and exclusive therein," Id., at 350-51.

In holding that the State of Massachusetts had jurisdiction over this crime, the Court held:

"What, then, is the extent of jurisdiction which a state possesses?

"We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power," Id., at 386-87.

"The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction... Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall

be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

"It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction." Id., at 388.

The Court in *Bevans* thus established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

The decision in *Bevans* was closely followed by decisions made in two state courts and one federal court within the next two years. In *Commonwealth v. Young*, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

"The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts. The legislative power and exclusive jurisdiction remained in the several states, of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states."

A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In *People v. Godfrey*, 17 Johns. 225, 233 (N.Y. 1819), that court held that the fort was subject to the jurisdiction of the State since the lands therefore had not been ceded to the United States:

"To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United

States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offence committed, but the place in which it is committed, which must be out of the jurisdiction of the state."

The decisional authority upon which this court relied was *United States v. Bevans*, supra.

At about the same time that the New York Supreme Court rendered its opinion in *Godfrey*, a similar fact situation was before a federal court, the only difference being that the murder was committed on land which had been ceded to the United States. In *United States v. Cornell*, 25 Fed.Cas. 646, 648, No. 14,867 (C.C.D.R.I. 1819), the court held that the case fell within federal jurisdiction:

"But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

"When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted."

Almost 18 years later, the U.S. Supreme Court was again presented with a case involving the distinction between state and federal jurisdiction. In *New Orleans v. United States*, 35 U.S. (10 Pet.) 662, 737 (1836), the United States claimed title to property in New Orleans likewise claimed by the city. After holding that title to the subject lands was owned by the city, the Court addressed the question of federal jurisdiction:

"Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the federal government shall establish forts or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction."

In *New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837), the question before the Court involved an attempt by the City of New York to assess penalties against the master of a ship for his failure to make a report regarding

the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the Court held:

> "If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction," Id., at 133.

> "They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive," Id., at 139.

Some eight years later in _Pollard v. Hagan_, 44 U.S. (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a real property title dispute with one of the parties claiming a right to the contested property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay. In discussing the subject of federal jurisdiction, the Court held:

> "We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," Id., at 221.

> "[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," Id., at 223.

> "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," Id., at 228-29.

The single most important case regarding the subject of federal

jurisdiction appears to be *Fort Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 531, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. Here, the railroad company property which passed through the Fort Leavenworth federal enclave was being subjected to taxation by Kansas, and the company claimed an exemption from state taxation because its property was within federal jurisdiction and outside that of the state. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

> "The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals."

Thus the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to that jurisdiction; this jurisdiction is superior. Federal jurisdiction results from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. There is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and insular possessions of the United States.

The above principles of jurisdiction established in the last century continue their vitality today with only one minor exception. In the last century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing in the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which had been totally surrendered by the States. With the advent in this century of large federal works projects and national parks, the problems regarding management of these areas by the federal government were magnified. During the last century, it was thought that if a State ceded jurisdiction to the federal government, the cession granted full and

complete jurisdiction. But with the ever increasing number of separate tracts of land falling within the jurisdiction of the federal government in this century, it was obviously determined by both federal and state public officials that the States should retain greater control over these ceded lands, and the courts have acknowledged the constitutionality of varying degrees of state jurisdiction and control over lands so ceded.

One of the first cases to acknowledge the proposition that a State could retain some jurisdiction over property ceded to the federal government was *Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455 (1930). Here, a state attempt to assess an ad valorem tax on Army blankets located within a federal army camp was found invalid and beyond the state's jurisdiction. But in regards to the proposition that a State could make a qualified cession of jurisdiction to the federal government, the Court held:

> "[T]he state undoubtedly may cede her jurisdiction to the United States and may make the cession either absolute or qualified as to her may appear desirable, provided the qualification is consistent with the purposes for which the reservation is maintained and is accepted by the United States. And, where such a cession is made and accepted, it will be determinative of the jurisdiction of both the United States and the state within the reservation," Id., at 651-52.

Two cases decided in 1937 by the U.S. Supreme Court further clarify the constitutionality of a reservation of partial state jurisdiction over lands ceded to the jurisdiction of the United States. In *James v. Dravo Contracting Company*, 302 U.S. 134, 58 S.Ct. 208 (1937), the State of West Virginia sought to impose a tax upon the gross receipts of the company arising from a contract which it had made with the United States to build some dams. One of the issues involved in this case was the validity of the state tax imposed on the receipts derived by the company from work performed on lands to which the State had ceded "concurrent" jurisdiction to the United States. The Court held that a State could reserve and qualify any cession of jurisdiction for lands owned by the United States; since the State had done so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of jurisdiction to the U.S. A similar result occurred in *Silas Mason Co. v. Tax Commission of State of Washington*, 302 U.S. 186, 58 S.Ct. 233 (1937). Here, the United States was undertaking the construction of several dams on the Columbia River in Washington, and had purchased the lands necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee Dam, but filed suit challenging the Washington income tax when that State sought to impose that tax on the contract proceeds. Mason's argument that the federal government had exclusive jurisdiction over both the lands and

its contract was not upheld by either the Supreme Court of Washington or the U.S. Supreme Court. The latter Court held that none of the lands owned by the U.S. were within its jurisdiction and thus Washington clearly had jurisdiction to impose the challenged tax; see also *Wilson v. Cook*, 327 U.S. 474, 66 S.Ct. 663 (1946).

Some few years later in 1943, the Supreme Court was again presented with similar taxation and jurisdiction issues; the facts in these two cases were identical with the exception that one clearly involved lands ceded to the jurisdiction of the United States. This single difference caused directly opposite results in both cases. In *Pacific Coast Dairy v. Department of Agriculture of California*, 318 U.S. 285, 63 S.Ct. 628 (1943), the question involved the applicability of state law to a contract entered into and performed on a federal enclave to which jurisdiction had been ceded to the United States. During World War II, California passed a law setting a minimum price for the sale of milk, and this law imposed penalties for sales made below the regulated price. Here, Pacific Coast Dairy consummated a contract on Moffett Field, a federal enclave within the exclusive jurisdiction of the United States, to sell milk to such federal facility at below the regulated price. When this occurred, California sought to impose a penalty for what it perceived as a violation of state law. But, the U.S. Supreme Court refused to permit the enforcement of the California law, holding that the contract was made and performed in a territory outside the jurisdiction of California and within the jurisdiction of the United States, a place where this law didn't apply. Thus in this case, the existence of federal jurisdiction was the foundation for the decision. However, in *Penn Dairies v. Milk Control Commission of Pennsylvania*, 318 U.S. 261, 63 S.Ct. 617 (1943), an opposite result was reached on almost identical facts. Here, Pennsylvania likewise had a law which regulated the price of milk and penalized milk sales below the regulated price. During World War II, the United States leased some land from Pennsylvania for the construction of a military camp; since the land was leased, Pennsylvania did not cede jurisdiction to the United States. When Penn Dairies sold milk to the military facility for a price below the regulated price, the Commission sought to impose the penalty. In this case, since there was no federal jurisdiction, the Supreme Court found that the state law applied and permitted the imposition of the penalty. These two cases clearly show the different results which can occur with the presence or absence of federal jurisdiction.

A final point regarding federal jurisdiction concerns the question of when such jurisdiction ends or ceases. This issue was considered in *S.R.A. v. Minnesota*, 327 U.S. 558, 563-64, 66 S.Ct. 749 (1946), which involved the power of a State to tax the real property interest of a purchaser of land sold by the United States. Here, a federal post office building was sold to S.R.A. pursuant to a real estates sale contract which provided that title would pass only after the purchase price had

been paid. In refuting the argument of S.R.A. that the ad valorem tax on its equitable interest in the property was really an unlawful tax on U.S. property, the Court held:

> "In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article I, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states. As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power."

Thus when any property within the exclusive jurisdiction of the United States is no longer utilized by that government for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts to the State.

The above principles regarding the distinction between State and federal jurisdiction continue today; see *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426 (1963), and *United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 93 S.Ct. 2183 (1973). What was definitely decided in the beginning days of this Republic regarding the extent, scope, and reach of each of these two distinct jurisdictions remains unchanged and forms the foundation and basis for the smooth workings of state governmental systems in conjunction with the federal government. Without such jurisdictional principles which form a clear boundary between the jurisdiction of the States and the United States, our federal governmental system would have surely met its demise long before now.

In summary, the jurisdiction of the States is essentially the same as they possessed when they were leagued together under the Articles of Confederation. The confederated States possessed absolute, complete and full jurisdiction over property and persons located within their borders. It is hypocritical to assume or argue that these States, which had banished the centralized power and jurisdiction of the English Parliament and Crown over them by the Declaration of Independence, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress. They did not and they closely and jealously guarded their own rights, powers and jurisdiction. When the Articles were replaced by the Constitution, the intent and purpose of

the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States of lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

By the adoption of the Constitution, the States jointly surrendered some 17 specific and well defined powers to the federal Congress, which related almost entirely to external affairs of the States. Any single delegated power, or even several powers combined, do not operate in a fashion so as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent.

The only provision in the Constitution which permits territorial jurisdiction to be vested in the United States is found in Art. I, § 8, cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, and it possessed jurisdiction only in the lands encompassed in the Northwest Territories. Shortly after formation of the Union, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. Over time, the States have ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions which may now be owned by the United States.

The above conclusion is buttressed by the opinion of the federal government itself. In June 1957, the United States government published a work entitled *Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States*, Part II, and this report is the definitive study on this issue. Therein, the Committee stated:

> "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction — by State consent under Article I, section 8, clause 17... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place." Id., at 41.

> "It scarcely needs to be said that unless there has been a transfer

the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States of lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

By the adoption of the Constitution, the States jointly surrendered some 17 specific and well defined powers to the federal Congress, which related almost entirely to external affairs of the States. Any single delegated power, or even several powers combined, do not operate in a fashion so as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent.

The only provision in the Constitution which permits territorial jurisdiction to be vested in the United States is found in Art. I, § 8, cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, and it possessed jurisdiction only in the lands encompassed in the Northwest Territories. Shortly after formation of the Union, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. Over time, the States have ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions which may now be owned by the United States.

The above conclusion is buttressed by the opinion of the federal government itself. In June 1957, the United States government published a work entitled *Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States*, Part II, and this report is the definitive study on this issue. Therein, the Committee stated:

> "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction — by State consent under Article I, section 8, clause 17... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place," Id., at 41.

> "It scarcely needs to be said that unless there has been a transfer

federal age discrimination laws as territorial); *Thomas v. Brown & Root, Inc.*, 745 F.2d 279, 281 (4th Cir. 1984) (holding same as *Cleary, supra*); *United States v. Mitchell*, 553 F.2d 996, 1002 (5th Cir. 1977) (holding marine mammals protection act as territorial); *Pfeiffer v. William Wrigley, Jr., Co.*, 755 F.2d 554, 557 (7th Cir. 1985) (holding age discrimination laws as territorial); *Airline Stewards & Stewardesses Assn. v. Northwest Airlines, Inc.*, 267 F.2d 170, 175 (8th Cir. 1959) (holding Railway Labor Act as territorial); *Zahourek v. Arthur Young and Co.*, 750 F.2d 827, 829 (10th Cir. 1984) (holding age discrimination laws as territorial); *Commodities Futures Trading Comm. v. Nahas*, 738 F.2d 487, 493 (D.C.Cir. 1984) (holding commission's subpoena power under federal law as territorial); *Reyes v. Secretary of H.E.W.*, 476 F.2d 910, 915 (D.C.Cir. 1973) (holding administration of Social Security Act as territorial); and *Schoenbaum v. Firstbrook*, 268 F.Supp. 385, 392 (S.D.N.Y. 1967) (holding securities act as territorial). This principle was perhaps best expressed in *Caha v. United States*, 152 U.S., at 215, where the Court declared:

> "The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government."

But, because of treaties as well as express statutory language, the federal drug laws operate extra-territorially; see *United States v. King*, 552 F.2d 833, 851 (9th Cir. 1976). The United States has territorial jurisdiction only in Washington, D.C., the federal enclaves within the States, and in the territories and insular possessions of the United States. However, it has no territorial jurisdiction over non-federally owned areas inside the territorial jurisdiction of the States within the American Union, and this proposition of law is supported by literally hundreds of cases.

As a general rule, the power of the United States to criminally prosecute is, for the most part, confined to offenses committed within "its jurisdiction" in the absence of treaties. This is born out simply by examination of 18 U.S.C. §5 which defines the term "United States" in clear jurisdictional terms. [2] Further, §7 of that federal criminal code contains the fullest statutory definition of the "jurisdiction of the United States." The U.S. district courts have jurisdiction of offenses occurring within the "United States" pursuant to 18 U.S.C. §3231.

Examples of this proposition are numerous. In *Pothier v. Rodman*, 291 F. 311 (1st Cir. 1923), the question involved whether a murder committed at Camp Lewis Military Reservation in the State of Washington was a federal crime. Here, the murder was committed more than a year before the U.S. acquired a deed for the property

which was the scene of the crime. Pothier was arrested and incarcerated in Rhode Island and filed a habeas corpus petition seeking his release on the grounds that the federal courts had no jurisdiction over this offense not committed in U.S. jurisdiction. The First Circuit agreed that there was no federal jurisdiction and ordered his release. But, on appeal to the U.S. Supreme Court, in *Rodman v. Pothier*, 264 U.S. 399, 44 S.Ct. 360 (1924), that Court reversed; although agreeing with the jurisdictional principles enunciated by the First Circuit, it held that only the federal court in Washington State could decide that issue. In *United States v. Unzeuta*, 35 F.2d 750 (8th Cir. 1929), the Eighth Circuit held that the U.S. had no jurisdiction over a murder committed in a railroad car at Fort Robinson, the state cession statute being construed as not including railroad rights-of-way. This decision was reversed in *United States v. Unzeuta*, 281 U.S. 138, 50 S.Ct. 284 (1930), the Court holding that the U.S. did have jurisdiction over the railroad rights-of-way in Fort Robinson. In *Bowen v. Johnson*, 97 F.2d 860 (9th Cir. 1938), the question presented was whether the lack of jurisdiction over an offense prosecuted in federal court could be raised in a habeas corpus petition. The denial of Bowen's petition was reversed in *Bowen v. Johnston*, 306 U.S. 19, 59 S.Ct. 442 (1939), the Court concluding that such a jurisdictional challenge could be raised via such a petition. But, the Court then addressed the issue, found that the U.S. both owned the property in question and had a state legislative grant ceding jurisdiction to the United States, thus there was jurisdiction in the United States to prosecute Bowen. But, if jurisdiction is not vested in the United States pursuant to statute, there is no jurisdiction; see *Adams v. United States*, 319 U.S. 312, 63 S.Ct. 1122 (1943).

The lower federal courts also require the presence of federal jurisdiction in criminal prosecutions. In *Kelly v. United States*, 27 F. 616 (D.Me. 1885), federal jurisdiction of a manslaughter committed at Fort Popham was upheld when it was shown that the U.S. owned the property where the offense occurred and the state had ceded jurisdiction. In *United States v. Andem*, 158 F. 996 (D.N.J. 1908), federal jurisdiction for a forgery offense was upheld on a showing that the United States owned the property where the offense was committed and the state had ceded jurisdiction of the property to the U.S. In *United States v. Penn*, 48 F. 669 (E.D.Va. 1880), since the U.S. did not have jurisdiction over Arlington National Cemetery, a federal larceny prosecution was dismissed. In *United States v. Lovely*, 319 F.2d 673 (4th Cir. 1963), federal jurisdiction was found to exist by U.S. ownership of the property and a state cession of jurisdiction. In *United States v. Watson*, 80 F.Supp. 649, 651 (E.D.Va. 1948), federal criminal charges were dismissed, the court stating:

> "Without proof of the requisite ownership or possession of the United States, the crime has not been made out."

In *Brown v. United States*, 257 F. 46 (5th Cir. 1919), federal jurisdiction was upheld on the basis that the U.S. owned the post office site where a murder was committed and the state had ceded jurisdiction; see also *England v. United States*, 174 F.2d 466 (5th Cir. 1949); *Hudspeth v. United States*, 223 F.2d 848 (5th Cir. 1955); *Krull v. United States*, 240 F.2d 122 (5th Cir. 1957); and *Gainey v. United States*, 324 F.2d 731 (5th Cir. 1963). In *United States v. Townsend*, 474 F.2d 209 (5th Cir. 1973), a conviction for receiving stolen property was reversed when the court reviewed the record and learned that there was absolutely no evidence disclosing that the defendant had committed this offense within the jurisdiction of the United States. In *United States v. Benson*, 495 F.2d 475, 481 (5th Cir. 1974), in finding federal jurisdiction for a robbery committed at Fort Rucker, the court held:

> "It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor."

In two Sixth Circuit cases, *United States v. Tucker*, 122 F. 518 (W.D.Ky. 1903), a case involving an assault committed at a federal dam, and *United States v. Blunt*, 558 F.2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, jurisdiction was sustained by finding that the U.S. owned the property in question and the state involved had ceded jurisdiction. In *In re Kelly*, 71 F. 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the United States. In *United States v. Johnson*, 426 F.2d 1112 (7th Cir. 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and a state cession. And cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see *United States v. Heard*, 270 F.Supp. 198 (W.D.Mo. 1967); *United States v. Redstone*, 488 F.2d 300 (8th Cir. 1973); *United States v. Goings*, 504 F.2d 809 (8th Cir. 1974) (demonstrating loss of jurisdiction); *Hayes v. United States*, 367 F.2d 216 (10th Cir. 1966); *Hall v. United States*, 404 F.2d 1367 (10th Cir. 1969); *United States v. Carter*, 430 F.2d 1278 (10th Cir. 1970); and *United States v. Cassidy*, 571 F.2d 534 (10th Cir. 1978).

Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more than any of the rest. In *United States v. Bateman*, 34 F. 86 (N.D.Cal. 1888), it was determined that the United States did not have jurisdiction to prosecute for a murder committed at the Presidio because California had never ceded jurisdiction; see also *United States v. Tully*, 140 F. 899 (D.Mon. 1905). But later, California ceded jurisdiction for the Presidio to the United States, and it was held in *United States v. Watkins*, 22 F.2d 437 (N.D.Cal. 1927), that this enabled

the U.S. to maintain a murder prosecution. See also *United States v. Holt*, 168 F. 141 (W.D.Wash. 1909), *United States v. Lewis*, 253 F. 469 (S.D.Cal. 1918), and *United States v. Wurtzbarger*, 276 F. 753 (D.Or. 1921). Because the U.S. owned and had a state cession of jurisdiction for Fort Douglas in Utah, it was held that the U.S. had jurisdiction for a rape prosecution in *Rogers v. Squier*, 157 F.2d 948 (9th Cir. 1946). But, without a cession, the U.S. has no jurisdiction; see *Arizona v. Manypenny*, 445 F.Supp. 1123 (D.Ariz. 1977).

The above cases from the U.S. Supreme Court and federal appellate courts set forth the rule that in criminal prosecutions, the government, as the party seeking to establish the existence of federal jurisdiction, must prove U.S. ownership of the property in question and a state cession of jurisdiction. This same rule manifests itself in state cases. State courts are courts of general jurisdiction and in a state criminal prosecution, the state must only prove that the offense was committed within the state and a county thereof. If a defendant contends that only the federal government has jurisdiction over the offense, he, as proponent for the existence of federal jurisdiction, must likewise prove U.S. ownership of the property where the crime was committed and state cession of jurisdiction.

Examples of the operation of this principle are numerous. In Arizona, the State has jurisdiction over federal lands in the public domain, the state not having ceded jurisdiction of that property to the U.S.; see *State v. Dykes*, 114 Ariz. 592, 562 P.2d 1090 (1977). In California, if it is not proved by a defendant in a state prosecution that the state has ceded jurisdiction, it is presumed the state does have jurisdiction over a criminal offense; see *People v. Brown*, 69 Cal. App.2d 602, 159 P.2d 686 (1945). If the cession exists, the state has no jurisdiction; see *People v. Mouse*, 203 Cal. 782, 265 P. 944 (1928). In Montana, the state has jurisdiction over property if it is not proved there is a state cession of jurisdiction to the U.S.; see *State ex rel Parker v. District Court*, 147 Mon. 151, 410 P.2d 459 (1966); the existence of a state cession of jurisdiction to the U.S. ousts the state of jurisdiction; see *State v. Tully*, 31 Mont. 365, 78 P. 760 (1904). The same applies in Nevada; see *State v. Mack*, 23 Nev. 359, 47 P. 763 (1897), and *Pendleton v. State*, 734 P.2d 693 (Nev. 1987); it applies in Oregon (see *State v. Chin Ping*, 91 Or. 593, 176 P. 188 (1918), and *State v. Aguilar*, 85 Or.App. 410, 736 P.2d 620 (1987)); and in Washington (see *State v. Williams*, 23 Wash.App. 694, 598 P.2d 731 (1979)).

In *People v. Hammond*, 1 Ill.2d 65, 115 N.E.2d 331 (1953), a burglary of an IRS office was held to be within state jurisdiction, the court holding that the <u>defendant was required to prove existence of federal jurisdiction by U.S. ownership of the property and state cession of jurisdiction</u>. In two cases from Michigan, larcenies committed at U.S.

Case 1:04cr00129    Document 25-5    Filed in TXSD on 05/11/2005    Page 29 of 39

post offices which were rented were held to be within state jurisdiction; see *People v. Burke*, 161 Mich. 397, 126 N.W. 446 (1910), and *People v. Van Dyke*, 276 Mich. 32, 267 N.W. 778 (1936). See also *In re Kelly*, 311 Mich. 596, 19 N.W.2d 218 (1945). In *Kansas City v. Garner*, 430 S.W.2d 630 (Mo.App. 1968), state jurisdiction over a theft offense occurring in a federal building was upheld, and the court stated that a defendant had to show federal jurisdiction by proving U.S. ownership of the building and a cession of jurisdiction from the state to the United States. A similar holding was made for a theft at a U.S. missile site in *State v. Rindall*, 146 Mon. 64, 404 P.2d 327 (1965). In *Pendleton v. State*, 734 P.2d 693 (Nev. 1987), the state court was held to have jurisdiction over a D.U.I. committed on federal lands, the defendant having failed to show U.S. ownership and state cession of jurisdiction.

In *People v. Gerald*, 40 Misc.2d 819, 243 N.Y.S.2d 1001 (1963), the state was held to have jurisdiction of an assault at a U.S. post office since the defendant did not meet his burden of showing presence of federal jurisdiction; and because a defendant failed to prove title and jurisdiction in the United States for an offense committed at a customs station, state jurisdiction was upheld in *People v. Fisher*, 97 A.D.2d 651, 469 N.Y.S.2d 187 (A.D. 3 Dept. 1983). The proper method of showing federal jurisdiction in state court is demonstrated by the decision in *People v. Williams*, 136 Misc.2d 294, 518 N.Y.S.2d 751 (1987). This rule was likewise enunciated in *State v. Burger*, 33 Ohio App.3d 231, 515 N.E.2d 640 (1986), a case involving a D.U.I. offense committed on a road near a federal arsenal.

In *Kuerschner v. State*, 493 P.2d 1402 (Okl.Cr.App. 1972), the state was held to have jurisdiction of a drug sales offense occurring at an Air Force Base, the defendant not having attempted to prove federal jurisdiction by showing title and jurisdiction of the property in question in the United States; see also *Towry v. State*, 540 P.2d 597 (Okl.Cr.App. 1975). Similar holdings for murders committed at U.S. post offices were made in *State v. Chin Ping*, 91 Or. 593, 176 P. 188 (1918), and in *United States v. Pate*, 393 F.2d 44 (7th Cir. 1968). Another Oregon case, *State v. Aguilar*, 85 Or.App. 410, 736 P.2d 620 (1987), demonstrates this rule. Finally, in *Curry v. State*, 111 Tex. Cr. 264, 12 S.W.2d 796 (1928), it was held that, in the absence of proof that the state had ceded jurisdiction of a place to the United States, the state courts had jurisdiction over an offense.

Therefore, in federal criminal prosecutions involving jurisdictional type crimes, the government must prove the existence of federal jurisdiction by showing U.S. ownership of the place where the crime was committed and state cession of jurisdiction. If the government contends for the power to criminally prosecute for an offense committed outside "its jurisdiction," it must prove an extra-territorial

FEDERAL JURISDICTION

application of the statute in question as well as a constitutional foundation supporting the same. Absent this showing, no federal prosecution can be commenced for offenses committed outside "its jurisdiction."

END NOTES:

[1] See *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 529, 5 S.Ct. 995 (1885).

[2] The statutory definition of "United States" as expressed in this § 5 is identical to the constitutional definition of this term; see *Cunard S. S. Co. v. Mellon*, 262 U.S. 100, 43 S.Ct. 504 (1923), which deals with the definition of "United States" as used in the 18th Amendment.

███████████████████████████

    The first FULL and complete definition of the word "state" in a federal statute appears in an act to tax booze and tobacco, 15 Stat. 125, ch. 186 (July 20, 1868). Section 104 of this act, 15 Stat. at 166, contained definitions to certain words appearing in the act and here may be found the following:

✗    "... and the word 'State' to mean and include a Territory and District of Columbia..."

The word "State" appeared in sections at 15 Stat. 128, 151.

███████████████████████████

[Note for the reader: The above memo discusses only about 140 cases. If you wish to find more cases addressing the issue of federal territorial jurisdiction, please see the other 3 separate files noted on the main web site. The important U.S. Supreme Court cases are all cataloged in their own file; the same type of cases from each federal circuit and each state are found in the other two files. If you wish to learn more about how federal laws are applicable outside "its jurisdiction," please study the brief regarding treaties.] ✗ ✗ ✗

HOME



# CIRCUIT JURISDICTION CASES

### FIRST CIRCUIT

**1. *United States v. Travers*, 28 Fed. Cas. 204, No. 16,537 (C.C.D. Mass. 1814):**
Sailor in U.S. Navy yard had completed his Naval service and was discharged, but committed murder of an officer in a fight before leaving. This "opinion" is the jury instructions in the case, with the court holding that the yard was within U.S. jurisdiction.

**2. *United States v. Davis*, 25 Fed. Cas. 781, No. 14,930 (C.C.D. Mass. 1829):**
Federal indictment for larceny at a Marine Hospital in Massachusetts, and defendant challenged jurisdiction. Justice Story held that the U.S. had jurisdiction over the offense via state cession and that Assimilative Crimes Act applied.

**3. *United States v. Ames*, 24 Fed. Cas. 784, No. 14,441 (C.C.D. Mass. 1845):**
Ames built a dam on his land which caused flooding on U.S. lands; U.S. sued for trespass. The question in the case was whether state law and its damage remedy applied. Court held that property was within U.S. jurisdiction, thus state law did not apply.

**4. *Kelly v. United States*, 27 F. 616 (D.Me. 1885):**
Defendant charged with manslaughter committed at Fort Popham in U.S. jurisdiction; defense contended that state never ceded jurisdiction. In upholding federal court's jurisdiction, court cited Maine's cession statute and opinion in *State v. Kelly*, 76 Me. 331.

**5. *Pothier v. Rodman*, 291 F. 311 (1st Cir. 1923):**
Pothier indicted for murder in federal court in Washington for offense occurring at Camp Lewis; he was arrested in Rhode Island. Challenge via habe to jurisdiction on extradition was on grounds that Camp Lewis was still within state's jurisdiction, and appellate court agreed. Reversed, *Rodman v. Pothier*, 264 U.S. 299, 44 S.Ct. 360 (1924).

**6. *City of Springfield v. United States*, 99 F.2d 860 (1st Cir. 1938):**
US Post office ceased operation in 1933 and property was thereafter leased to private interest and then sold. City sought to impose real estate tax in 1937 because U.S. was not using the property. Court held that, even though the city and state had jurisdiction over the property, no tax which interfered with the sale could be imposed.

**7. *City of Franklin v. Coleman Bros. Corp.*, 152 F.2d 527 (1st Cir. 1945):**
The U.S. bought property for dam project and state ceded jurisdiction. The corporation contracted with U.S. to build dam and city imposed personal property tax. Held, city had no jurisdiction to impose the tax.

**8. *Berube v. White Plains Iron Works, Inc.*, 211 F.Supp. 457 (D.Me. 1962):**
Both parties involved in auto accident at Loring Air Force Base, defendant being

**7. *Vasina v. Grumman Corp.*, 644 F.2d 112 (2nd Cir. 1981):**
Navy pilot killed in plane crash occurring at Boardman Bombing Range in Oregon; widow sued aircraft manufacturer and recovered large award. On appeal, Grumman argued for application of Oregon law at time U.S. acquired jurisdiction, but appellate court applied present Oregon law via federal statute.

## THIRD CIRCUIT

**1. *United States v. Andem*, 158 F. 996 (D.N.J. 1908):**
Prosecution for forging corporate seal to a pleading filed in federal court, located in a building within U.S. jurisdiction. Prosecution used Assimilative Crimes Act and relied on state statute. Defendant challenged federal court's jurisdiction, but the court found U.S. ownership of lands and state cession; motion was denied.

**2. *United States v. Mayor and Council of City of Hoboken*, 29 F.2d 932 (D.N.J. 1928):**
City sought to tax piers owned by U.S.; U.S. sought and obtained, injunction regarding taxes. Court entered injunction for one year only, and taxes for subsequent years were to be adjudicated between parties pursuant to state law.

**3. *Capetola v. Barclay White Co.*, 139 F.2d 556 (3rd Cir. 1943):**
Plaintiff injured while working at Philadelphia Navy Yard, and he obtained workmen's comp. benefits under state law. He then sued to recover further on grounds that the state statute was inapplicable in the federal enclave. Court held that, by act of Congress, the state law applied in the enclave, thus plaintiff had recovered all allowed by law.

**4. *United States v. City of Chester*, 144 F.2d 415 (3rd Cir. 1944):**
The U.S. filed suit against city which was attempting to apply its building code to housing being built on U.S. property. Notwithstanding presence of U.S. jurisdiction, court held that city's building code did not apply because of language of federal statute.

**5. *Ackerly v. Commercial Credit Co.*, 111 F.Supp. 92 (D.N.J. 1953):**
Suit for damages for death caused by explosion at South Amboy. One defendant challenged process on grounds that it wasn't doing business in New Jersey; it argued that most of its business was within a U.S. enclave, and very little in the state. But, court disagreed and held it was doing business in state.

**6. *Application of Thompson*, 157 F.Supp. 93 (E.D.Pa. 1957):**
Petitioner resided in New Jersey but worked at Philadelphia Navy Shipyard, a federal enclave. City imposed income tax pursuant to Buck Act, and defendant failed to pay and was arrested. Court upheld tax nonetheless. Affirmed, *United States ex rel. Thompson v. Lennox*, 258 F.2d 320 (3rd Cir. 1958).

**7. *United States v. Lewisburg Area School District*, 539 F.2d 301 (3rd Cir. 1976):**
School district and county sought to impose per capita tax and occupation tax on residents of federal penitentiary, within U.S. jurisdiction. The U.S. sued to enjoin such effort. Court held that the Buck Act permitted the occupation tax but not the per capita tax.

**8. *Water Isle Hotel and Beach Club, Ltd. v. Kon Tiki St. Thomas, Inc.*, 795 F.2d 325**

jurisdiction and radar guns. Jurisdictional challenge denied on grounds that the U.S. had concurrent jurisdiction over this parkway, and on basis of property clause.

9. *Stokes v. Adair*, 265 F.2d 662 (4th Cir. 1959):
Auto accident occurring at Fort Leavenworth, Kansas; Virginia citizen then sued Virginia citizen in federal court, but suit was dismissed for alleged lack of diversity. Court held, however, that *McGlinn* rule made state law federal and action was valid based on federal law.

10. *United States v. Gray Line Water Tours of Charleston*, 311 F.2d 779 (4th Cir. 1962):
Tour company was landing visitors at pier to Fort Sumter and U.S. brought action to enjoin. In upholding injunction, court upheld grant of concession to tour company's competitor on property clause grounds.

11. *United States v. Schuster*, 220 F.Supp. 61 (E.D.Va. 1963):
Prosecution for unauthorized use of auto under state law via Assimilative Crimes Act; car was taken from lot rented to U.S., adjoining a base. State law granted concurrent jurisdiction to U.S. for leased property so the court upheld federal jurisdiction.

12. *United States v. Lovely*, 319 F.2d 673 (4th Cir. 1963):
Lovely convicted of rape committed at New Fort Jackson in South Carolina; he thereafter sought release via a 2255 on jurisdictional grounds. On appeal of denial of motion, court stated that an old state cession statute requiring the U.S. to record evidence of title, if still effective, would prevent U.S. having jurisdiction here because the U.S. failed to record. But another state cession statute didn't require such recording, so the court concluded federal jurisdiction existed.

13. *Bartsch v. Washington Metro. Area Transit Comm.*, 357 F.2d 923 (4th Cir. 1966):
Taxicab owner sought review of agency order; court held that National Airport was in U.S. jurisdiction.

14. *Cornman v. Dawson*, 295 F.Supp. 654 (D.Md. 1969):
Residents of federal enclave sought right to vote in state elections. Because of federal legislation permitting the state to exercise jurisdiction in federal enclaves, and because state law granted many rights to enclave residents, court held they were entitled to vote. Affirmed, *Evans v. Cornman*, 398 U.S. 419, 90 S.Ct. 1753 (1970).

15. *Board of Supervisors of Fairfax County, Va. v. United States*, 408 F.Supp. 556 (E.D.Va. 1976):
County brought action to enjoin a public nuisance, which was a reformatory owned and operated by the U.S. County wanted the U.S. to curtail use of the place as a prison. This decision was simply on a motion to dismiss, and court discussed *McGlinn* rule that state nuisance laws at time of cession would be applicable.

16. *United States v. Holmes*, 414 F.Supp. 831 (D.Md. 1976):
Defendant entered Aberdeen Proving Grounds by wading into the water and was arrested by U.S. officers. She attacked jurisdiction by alleging that the waters

**8. *Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952):**
Personal injury action for events occurring at Fort McPherson; district court dismissed for lack of jurisdiction in absence of diversity. Court found that U.S. was owner of property and had jurisdiction; state torts law pursuant to *McGlinn* rule applied in enclave and were federal laws, hence the action was good.

**9. *City of Birmingham v. Thompson*, 200 F.2d 505 (5th Cir. 1952):**
City sought building permit from contractor of Veteran's Hospital. Finding ownership and cession of jurisdiction with no reservation in state concerning building permits, court found that city had no jurisdiction to impose permit requirement.

**10. *Hudspeth v. United States*, 223 F.2d 848 (5th Cir. 1955):**
Jurisdictional challenge was not upheld, as place was within U.S. jurisdiction.

**11. *Krull v. United States*, 240 F.2d 122 (5th Cir. 1957):**
In rape prosecution, jurisdiction upheld, court finding ownership and cession.

**12. *Stockwell v. Page Aircraft Maintenance*, 212 F.Supp. 102 (M.D.Ala. 1962):**
Service of process for corporation at Fort Rucker; held that the fort was within Alabama as state never ceded jurisdiction.

**13. *Gainey v. United States*, 324 F.2d 731 (5th Cir. 1963):**
Manslaughter conviction for event occurring at U.S. Penitentiary; held the pen was an area over which the U.S. had legislative jurisdiction.

**14. *Halpert v. Udall*, 231 F.Supp. 574 (S.D.Fla. 1964):**
U.S. acquired land for Everglades and state ceded jurisdiction. Private land owner in park challenged closing of road and regulation he contended affected value of his property; claims were dismissed.

**15. *Fountain v. New Orleans Public Service, Inc.*, 265 F.Supp. 630 (E.D.La. 1967):**
Wrongful death action for events occurring in Foreign Trade Zone at Port of New Orleans. Plaintiff claimed the zone to be "under the jurisdiction of the U.S."; however, court dismissed complaint because the U.S. did not own or lease the land and state had never ceded jurisdiction.

**16. *Dekalb County, Ga. v. Henry C. Beck Co.*, 382 F.2d 992 (5th Cir. 1967):**
Action by county to collect permit fee from contractor building a hospital on U.S. lands at Emory. Summary judgment against county was reversed on appeal, the court finding that the U.S. never accepted jurisdiction, and that record was devoid of facts necessary to make a supremacy clause finding regarding county's building code.

**17. *Mississippi River Fuel Corp. v. Cocreham*, 382 F.2d 929 (5th Cir. 1967):**
The U.S. owned and had state cession for Barksdale A.F.B., upon which the corporation was producing oil and gas for which state sought to impose severance tax. Court held that severance tax could not be imposed in this place outside the jurisdiction of the state.

**18. *Graham v. Brewer*, 295 F.Supp. 1140 (N.D.Ala. 1968):**

**2.** *United States v. Tucker,* **122 F. 518 (W.D.Ky. 1903):**
Defendant indicted for assault with intent to murder committed at a federal dam in U.S. jurisdiction. Court found U.S. ownership and state cession and upheld jurisdiction.

**3.** *Falls City Brewing Co. v. Reeves,* **40 F.Supp. 35 (W.D.Ky. 1941):**
Brewing company sold liquor to post exchange at Fort Knox; it filed suit against state officer who contended that permit was needed to sell at exchange on basis of Buck Act. Held, under facts, Buck Act did not apply and state had no taxing authority at Fort Knox.

**4.** *First Hardin National Bank v. Fort Knox National Bank,* **361 F.2d 276 (6th Cir. 1966):**
Fort Knox Bank sought to establish a branch in adjoining town and local banks challenged the attempt as unlawful. Court disagreed and permitted the branch.

**5.** *United States v. Blunt,* **558 F.2d 1245 (6th Cir. 1977):**
Inmate at F.C.I. in Lexington was convicted of assault with deadly weapon and challenged jurisdiction. Court took judicial notice that the prison was within U.S. territorial jurisdiction.

**6.** *United States v. McGee,* **432 F.Supp. 557 (S.D. Ohio 1977):**
Dayton sought to annex Wright-Patterson A.F.B. to city and U.S. sued for injunction, which was granted. Court held that, when U.S. opposed annexation on grounds of interference, court would prevent annexation. Affirmed, 611 F.2d 375 (6th Cir. 1979).

**7.** *United States v. McGee,* **714 F.2d 607 (6th Cir. 1983):**
Second attempt by Dayton to annex Wright-Patterson enjoined.

## SEVENTH CIRCUIT

**1.** *United States v. Railroad Bridge Co.,* **27 Fed. Cas. 686, No. 16,114 (C.C.N.D. Ill. 1855):**
Rock Island, in the Mississippi River, had at one time been a federal fort, but fort was abandoned and island was in the public domain. Illinois legislature chartered railroad and gave it eminent domain powers and railroad took land on island for bridge. Since the U.S. has no jurisdiction over property, it was subject to state jurisdiction and federal property could be taken via eminent domain. This case had good discussion of proprietorial lands of U.S.

**2.** *World's Columbian Exposition v. United States,* **56 F. 654 (7th Cir. 1893):**
The U.S. sought to enjoin opening of exposition on Sunday, contrary to its desires and statute. But, since U.S. had no property interest in the exposition, injunction denied; the U.S. did not own property or have a cession.

**3.** *In re Kelly,* **71 F. 545 (E.D.Wis. 1895):**
Kelly was charged with assault with deadly weapon at National Soldier's Home, property being owned by corporation. Court held there was no federal jurisdiction, on grounds that cession act of state could not be construed as conveying exclusive jurisdiction.

Defendant was transporting for hire within National Park without permission from director, and the U.S. sought and obtained injunction. Court held that regulations requiring permit were valid under property clause.

6. *Williams v. Arlington Hotel Co.*, 22 F.2d 669 (8th Cir. 1927):
Hotel, in U.S. jurisdiction, destroyed by fire and action brought for property damage. Court held that *McGlinn* rules applied to the property.

7. *St. Louis-San Francisco Ry. Co. v. Satterfield*, 27 F.2d 586 (8th Cir. 1928):
Railroad challenged state's authority to tax its property located at Fort Sill. Court held that state cession statute reserved right to tax so the tax was valid.

8. *United States v. Unzeuta*, 35 F.2d 750 (8th Cir. 1929):
Court held that U.S. had no jurisdiction over murder committed in freight car inside Fort Robinson; reversed, 281 U.S. 138, 50 S.Ct. 284 (1930).

9. *Hill v. Ring Const. Co.*, 19 F.Supp. 434 (W.D.Mo. 1937):
This case is an anomaly regarding the *McGlinn* rule; it deals with cubic yards.

10. *Coffman v. Cleveland Wrecking Co. of Cincinnati*, 24 F.Supp. 581 (W.D.Mo. 1938):
Held, that *McGlinn* rule made state law so incorporated federal.

11. *Jewell v. Cleveland Wrecking Co.*, 28 F.Supp. 364 (W.D.Mo. 1938):
State case involving personal injuries on federal property removed to federal court; held, state court had jurisdiction.

12. *Olsen v. McPartlin*, 105 F.Supp. 561 (D.Minn. 1952):
Suit based on accident occurring at Fort Snelling held sustainable in federal court on grounds of federal question, the court following the *McGlinn* rule.

13. *United States v. Heard*, 270 F.Supp. 198 (W.D.Mo. 1967):
Defendant charged with carrying concealed weapon at Jobs Corps Center, within U.S. jurisdiction. Finding both U.S. ownership and state cession, defendant's challenge to jurisdiction was denied.

14. *United States v. City of Bellevue, Neb.*, 474 F.2d 473 (8th Cir. 1973):
City's effort to annex SAC base denied and subjected to injunction; such would interfere with base.

15. *United States v. Redstone*, 488 F.2d 300 (8th Cir. 1973):
Defendant convicted of assault with dangerous weapon, event occurring at Fort Lincoln Military Reservation. Court found U.S. ownership and state cession and upheld jurisdiction.

16. *United States v. Goings*, 504 F.2d 809 (8th Cir. 1974):
Assault prosecution for event occurring on land owned by corporation. On appeal from dismissal of case, court held that U.S. had at one time owned and had jurisdiction over the property; but when it conveyed lands to corporation, the United Tribes, it lost jurisdiction.

sovereign rights, that condition remains to this day, unless the state has in some way, either directly or by implication, receded to the United States its sovereign jurisdiction. This could be done by direct cession, or by consenting through its legislature to the purchase of land for such governmental purposes, and a purchase for such purposes in pursuance of such consent. Neither has been done in this instance."

4. *United States v. San Francisco Bridge Co.*, 88 F. 891, 894 (N.D. Cal. 1898):
Defendant company was engaged in building a federal post office in San Francisco; contrary to law of U.S., it required or permitted laborers to work more than 8 hours a day. Conviction of company upheld, notwithstanding challenge to jurisdiction, the U.S. here not having any. Conviction was upheld impliedly on property clause and the control of Congress over public works of the U.S., matters outside state jurisdiction. But, court did state:

"Upon this state of facts, it must be held that the state of California retains complete and exclusive political jurisdiction over such land, and, this being so, there can be no question that person there committing murder, or any other offense denounced by its laws, would be subject to trial and punishment by the courts of the state."

5. *United States v. Tully*, 140 F. 899 (D.Mon. 1905):
Defendant charged with murder committed at Fort Missoula, a place within U.S. jurisdiction. However, crime was committed in area of fort subject to state jurisdiction, and defendant's challenge to jurisdiction of the U.S. was upheld, the court holding that the lands where the crime was committed was within state jurisdiction.

6. *United States v. Holt*, 168 F. 141 (W.D.Wash. 1909):
Defendant convicted of a murder committed at Fort Worden, in U.S. jurisdiction. Defendant challenged the court's jurisdiction post-trial, but the same was upheld, the court finding that the U.S. owned the land and the state had ceded jurisdiction. Affirmed, *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2 (1910).

7. *United States v. Pierce County*, 193 F. 529, 531 (W.D.Wash. 1912):
The U.S. acquired several lots for erection of post office and courthouse; after acquisition and state cession, a tax was imposed on such property. Court invalidated the tax, stating:

"In the case of lands acquired by the United States for needful public buildings, with the consent of the state legislature, as is the situation here, the national Constitution withdraws such 'places' entirely from the jurisdiction of the state immediately upon their purchase by the general government."

8. *Steele v. Halligan*, 229 F. 1011 (W.D.Wash. 1916):
Action for personal injuries to inmate in federal prison which was removed to federal court. Here, U.S. owned prison lands and had state cession of jurisdiction. In challenge to removal petition, court held that laws of state regarding private rights in existence at time of cession become the law of federal enclave, until conflicting legislation is passed by Congress.

Indians, did not create federal jurisdiction. Reversed, *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286 (1938).

18. *United States ex rel. Bowen v. Johnston*, 58 F.Supp. 208 (N.D. Cal. 1944):
The continuing saga of Bowen's challenge to his imprisonment on jurisdictional grounds. His contention that the U.S. never accepted jurisdiction over Chickamauga National Park was not upheld.

19. *United States v. Aho*, 68 F.Supp. 358 (D.Or. 1944):
Drainage district, costs of which were born by land owners in the district, opposed acquisition of land in district by U.S. via eminent domain, the district contending it likewise was entitled to compensation. Court held that U.S. could not acquire the land without compensating the district.

20. *Rogers v. Squier*, 157 F.2d 948 (9th Cir. 1946):
Defendant convicted of rape committed at Fort Douglas in Utah sought habeas corpus on jurisdictional grounds. He argued that state reserved criminal jurisdiction over the fort in two separate cession statutes. Court found that the acts did confer jurisdiction to the U.S. and denied relief.

21. *Petersen v. United States*, 191 F.2d 154 (9th Cir. 1951):
The U.S. acquired lands for Kings Canyon National Park, but within park were some privately owned lands. California ceded jurisdiction for all lands inside the park and the question at issue was whether the private lands were likewise in U.S. jurisdiction. Private landowners obtained state permit to sell liquors and U.S. sought injunction. Court held that the state could cede jurisdiction to privately owned lands inside the park.

22. *United States v. Fallbrook Public Utility District*, 108 F.Supp. 72 (S.D.Cal. 1952):
Question involving water rights to Santa Margarita River.

23. *State of California v. United States*, 235 F.2d 647 (9th Cir. 1956):
Long case dealing with water rights of all parties; involves jurisdictional principles.

24. *United States v. Warne*, 190 F.Supp. 645 (N.D.Cal. 1960):
California's milk control law was challenged by U.S. insofar as it applied to military bases. The law regulated milk prices and imposed penalties. The court analyzed the title to each military base and the state cession statute applicable to each, as well as U.S. acceptance of jurisdiction. Court held California law inapplicable on jurisdiction and supremacy clause grounds.

25. *United States v. Packard*, 236 F.Supp. 585 (N.D.Cal. 1964):
Defendant was duly convicted of refusing to leave naval reservation.

26. *Swanson Painting Co. v. Painters Local Union No. 260*, 391 F.2d 523 (9th Cir. 1968):
Company working at Malmstrom A.F.B., in U.S. jurisdiction, held to be doing business in state for "long arm" service process.

27. *Macomber v. Bose*, 401 F.2d 545 (9th Cir. 1968):

# TENTH CIRCUIT

**1. *United States v. Stahl*, 27 Fed. Cas. 1288, No. 16,373 (C.C.D. Kan. 1868):**
Held, that murder committed at Fort Harker was subject to state jurisdiction and not that of U.S. because state had not ceded jurisdiction.

**2. *Ex parte Hebard*, 11 Fed. Cas. 1010, No. 6313 (C.C.D. Kan. 1877):**
In 1875, Kansas ceded jurisdiction of Fort Leavenworth to the U.S. Here, Hebard was federally prosecuted for larceny committed at the fort. On challenge to jurisdiction, court held that the mere state cession of jurisdiction for property owned by U.S. was sufficient to confer jurisdiction; habe denied.

**3. *Danielson v. Donmopray*, 57 F.2d 565 (D.Wy. 1932):**
Deceased killed in car accident at Fort Francis E. Warren in Wyoming. State wrongful death action filed and then removed. Court followed *McGlinn* rule.

**4. *Dyhre v. Hudspeth*, 106 F.2d 286 (10th Cir. 1939):**
Mail fraud case; on habe, defendant discharged because use of the U.S. Mails, the jurisdictional basis for the case, was not a part of the fraud scheme.

**5. *Johnson v. Yellow Cab Transit Co.*, 137 F.2d 274 (10th Cir. 1943):**
Officers Club at Fort Sill ordered liquor, which was seized by the state. Transit company sued and obtained injunction. Court held state liquor laws inapplicable to fort. Affirmed, 321 U.S. 383, 64 S.Ct. 622 (1974).

**6. *United States v. Chicago, R. I. & P. Ry. Co.*, 171 F.2d 377 (10th Cir. 1948):**
Workmen's foot injured while train passed through Fort Sill. Company paid claim and instituted tort claim against U.S. Recovery based on state law permitted.

**7. *Murphy v. Love*, 249 F.2d 783 (10th Cir. 1957):**
Love was transporting liquors to Fort Leavenworth and obtained injunction prohibiting interference. Affirmed since state had no jurisdiction and tax on liquor was inapplicable via Buck Act.

**8. *Hayes v. United States*, 367 F.2d 216 (10th Cir. 1966):**
Prisoner convicted of murder committed at Leavenworth Prison challenged jurisdiction. Same was denied.

**9. *Hall v. United States*, 404 F.2d 1367 (10th Cir. 1969):**
Defendant's challenge that Fort Sill, place where he stole an automobile, was not within U.S. jurisdiction was denied.

**10. *United States v. Carter*, 430 F.2d 1278 (10th Cir. 1970):**
Defendant was convicted of assault with deadly weapon which occurred at Lowry A.F.B. Held, court could take judicial notice that property was within U.S. jurisdiction.

**11. *McQueary v. Laird*, 449 F.2d 608 (10th Cir. 1971):**
The U.S. stored chemical agents at Rocky Mountain Arsenal and residents of area complained. Court dismissed suit, but discussed jurisdictional principles.